

March 20, 2019

Terrie LaRue
MCGRIFF INSURANCE SERVICES INC
P.O. BOX 13941
RESEARCH TRIANGLE P, NC 27709-3941

RE:  THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

Insuring Company: Federal Insurance Company

Dear Terrie:

Enclosed is our ForeFront Portfolio 3.0 Policy for the above referenced Insured.

I want to thank you for the opportunity to underwrite this account.

Please let me know if I can be of further assistance.

Sincerely,

Robert N Chipman

CHUBB

j k

Chubb Specialty Insurance        One Financial Center        617.439.4440
                                 22nd Floor                  Fax 617.439.0351
                                 Boston, MA 02111

PREMIUM BILL

Insured:   THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY    Date:    03/20/2019

Producer:   MCGRIFF INSURANCE SERVICES INC
            P.O. BOX 13941
            RESEARCH TRIANGLE P, NC 27709-3941

Company:   Federal Insurance Company

THIS BILLING IS TO BE ATTACHED TO AND FORM A PART OF THE POLICY REFERENCED BELOW.

Policy Number:  8234-7252

Policy Period:     March 10, 2019 to March 10, 2020

NOTE: PLEASE RETURN THIS BILL WITH REMITTANCE AND NOTE HEREON ANY CHANGES. BILL WILL BE
RECEIPTED AND RETURNED TO YOU PROMPTLY UPON REQUEST.

PLEASE REMIT TO PRODUCER INDICATED ABOVE. PLEASE REFER TO 8234-7252

| Product | Effective Date | Premium |
|---------|----------------|---------|
| FFP30 | 03/10/19 | $72,246.00 |
| | | |
| | | |

* For Kentucky policies, amount displayed includes tax and collection fees.

| TOTAL POLICY PREMIUM | $72,246.00 |
|----------------------|------------|
| TOTAL INSTALLMENT PREMIUM DUE | $72,246.00 |

Form 26-10-0426 (Ed. 2/98)

PREMIUM BILL

Date:   03/20/2019

Insured:   THE NORTH CAROLINA MUTUAL WHOLESALE DRUG
           COMPANY

Producer:   MCGRIFF INSURANCE SERVICES INC
            P.O. BOX 13941
            RESEARCH TRIANGLE P, NC 27709-3941

Company:   Federal Insurance Company

THIS BILLING IS TO BE ATTACHED TO AND FORM A PART OF THE POLICY REFERENCED BELOW.

Policy Number:   8234-7252

Policy Period:     March 10, 2019 to March 10, 2020

NOTE: PLEASE RETURN THIS BILL WITH REMITTANCE AND NOTE HEREON ANY CHANGES. BILL WILL BE
RECEIPTED AND RETURNED TO YOU PROMPTLY UPON REQUEST.

| Product | Effective Date | Commission Rate | Premium |
|---------|----------------|-----------------|---------|
| FFP30 | 03/10/19 | 16.00 % | $72,246.00 |
| | | | |
| | | | |

* For Kentucky policies, amount displayed includes tax and collection fees.

| | |
|---|---|
| **TOTAL POLICY PREMIUM** | $72,246.00 |
| **TOTAL INSTALLMENT PREMIUM DUE** | $72,246.00 |

WHEN REMITTING PLEASE INDICATE POLICY OR CERTIFICATE NUMBER

Form 26-10-0426 (Ed. 2/98)

# POLICYHOLDER
# DISCLOSURE NOTICE OF
# TERRORISM INSURANCE COVERAGE
### (for policies with no terrorism exclusion or sublimit)
### Insuring Company: Federal Insurance Company

You are hereby notified that, under the Terrorism Risk Insurance Act (the "Act"), this policy makes available to you insurance for losses arising out of certain acts of terrorism. Terrorism is defined as any act certified by the Secretary of the Treasury of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that the insurance provided by your policy for losses caused by acts of terrorism is partially reimbursed by the United States under the formula set forth in the Act. Under this formula, the United States pays 85% of covered terrorism losses that exceed the statutorily established deductible to be paid by the insurance company providing the coverage. Beginning in 2016, the Federal share will be reduced by 1% per year until it reaches 80%, where it will remain.

However, if aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

10-02-1281 (Ed. 03/2015)

If aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

The portion of your policy's annual premium that is attributable to insurance for such acts of terrorism is: $ -0-.

If you have any questions about this notice, please contact your agent or broker.

10-02-1281 (Ed. 03/2015)

# IMPORTANT NOTICE TO POLICYHOLDERS

Insuring Company: Federal Insurance Company

All of the members of the Chubb Group of Insurance companies doing business in the United States (hereinafter "Chubb") distribute their products through licensed insurance brokers and agents ("producers"). Detailed information regarding the types of compensation paid by Chubb to producers on US insurance transactions is available under the Producer Compensation link located at the bottom of the page at www.chubb.com, or by calling 1-866-588-9478. Additional information may be available from your producer.

Thank you for choosing Chubb.

.

10-02-1295 (ed. 6/2007)

March 20, 2019


THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY
816 ELLIS ROAD
DURHAM, NC 27703

## Important Information: Please read!

Thank you for purchasing your Kidnap, Ransom and Extortion coverage from Chubb. As a leading provider of this important coverage, Chubb has the safety of your employees and corporate assets as our top priority. To accomplish this goal, we are pleased to provide you with the following tools:

## IN THE EVENT OF A KIDNAPPING, EXTORTION OR SIMILAR THREAT

As a Chubb policy holder, you are provided freedom of choice regarding which consulting firm responds to a claim. However, Chubb has partnered with The Ackerman Group, LLC, an independent international security consulting firm to provide you a guaranteed and immediate response in a time of crisis. The Ackerman Group can handle all aspects of a hostage recovery, including negotiations, liaison with law enforcement, as well as protection of and when appropriate, delivery of ransom funds.

There is NO requirement to contact Chubb at the outset of an incident. If you wish to retain The Ackerman Group, please contact **305-865-0072** (day or night) and identify your organization as being insured by Chubb.

Please note that The Ackerman Group cannot address or respond to coverage questions, which should be directed to your agent or broker.

*For more information on how to respond to a kidnapping, see page three of this packet.*

**RISKNET®**
Your Chubb Kidnap, Ransom and Extortion coverage provides you with complimentary access to The Ackerman Group's widely followed RISKNET database. RISKNET is an Internet-based service that analyzes terrorism, criminal and political stability risks around the world.

To take advantage of this service, please register for RISKNET, by completing the on-line RISKNET registration form at:

https://www2.chubb.com/us-en/business-insurance/risknet-signup.aspx.

**TRAINING AND CONSULTING SERVICES REIMBURSEMENT**
Preparedness and training are critical to helping your organization through a crisis. The Ackerman Group offers a number of training seminars to help mitigate your risk. Where

14-02-2180 (09/2016)                    Page 1

permitted by law, a premium credit is available for costs incurred in receiving this training during the policy period, up to 10% of the Kidnap, Ransom and Extortion policy premium.

*For more information about these seminars and how to receive your reimbursement, see page four of this packet.*

## RISK MANAGEMENT GUIDES
If you would like more information about your kidnap/ransom & extortion insurance coverage from Chubb or you would like a free copy of *Managing Travel Risks*, a useful guide for international travelers, and *Managing Terrorism Risks*, a guide to controlling international travel risks, we encourage you to talk to your agent or broker. To order directly from Chubb, simply email formsordering@chubb.com and request form 14-01-0179 and 14-01-0178, and provide your mailing address.

## UNLIMITED NON-EMERGENCY PHONE CONSULTATION
While risk management guides and seminars are helpful, sometimes a phone call with an expert to quickly evaluate a non-emergency situation is necessary. As a Chubb customer, you are entitled to contact The Ackerman Group on an unlimited basis during standard business hours (9:00 AM – 5:30 PM Eastern Time) to discuss unique risks you may face and obtain up to date analysis by an Ackerman Group consultant. Calls are generally limited to one hour and should be made by contacting the group directly at **305-865-0072** and identifying yourself as a Chubb insured requesting non-emergency phone consulting.

## PRE-CRISIS PREPARATION
Perhaps the most important step your company can take to react effectively to a kidnapping is to plan ahead, appoint the right people to a crisis management team, and make certain field and home office staff know how to contact a team member.

### Plan ahead by making these preparations

1) Establish a corporate crisis management team made up of three core people:

   a) The ultimate decision maker, normally the CEO.

   b) The coordinator, often the corporate security director, risk manager, or chief of international operations.

   c) The general counsel.

   The team might also include a finance officer to raise the ransom, a personnel specialist to oversee the care of the hostage's family, and a public relations specialist to handle press inquiries. <u>Since the first hours following a kidnapping are critical to successful resolution, early decisions should be made by key corporate decision makers in consultation with a qualified security consultant versed in kidnap response, not by a field manager or staff.</u>

2) Identify ahead of time, and establish a dialogue with a qualified security consultant to work with this crisis management team. Understand each other's roles and responsibilities prior to a crisis to prevent confusion in the middle of an actual kidnapping, extortion or similar threat.

14-02-2180 (09/2016)          Page 2

3) Create a communications infrastructure so field managers know who is on the crisis management team and how to notify them the moment an emergency occurs. Stress that immediate notification of the crisis management team, even before notifying local law enforcement authorities, is necessary to ensure effective handling of the situation consistent with procedures established for these emergency situations.

## THE INITIAL RESPONSE TO A KIDNAPPING

**When a threat occurs...**

In general, neither the field manager nor the crisis management team should try to thwart the attempt alone, but should swiftly do the following.

**The field manager should:**

1) Contact a crisis management team member (usually the coordinator) immediately upon learning of, or suspecting, a kidnapping.
2) Give all the known details about the circumstances of the abduction, the medical condition of the hostage, and the content of any communications from the kidnappers.

**The crisis management team should:**

1) Ask the field manager (or other caller) for the specifics about the abduction circumstances, hostage's medical condition, content of kidnappers' communications, and other useful information.

2) Instruct the field manager (or other senior representative) not to talk to the press and not to report the incident to local law-enforcement authorities until the crisis management team gives the go-ahead. (This assumes local authorities have not already been notified.)

3) Direct the field manager to prepare appropriate staff members to expect written or telephone communications from the kidnappers and to record phone calls if possible. Call recipients should merely listen to the demands and ask the kidnappers to call back. They should not attempt to negotiate.

4) Tell the field manager to stand by for further instructions from the crisis management team. Emphasize that no one should attempt to handle this emergency alone.

5) Convene a meeting of the crisis management team and if the assistance of The Ackerman Group is required, immediately contact them at (**305-865-0072**, day or night). When calling, identify the corporation as a Chubb insured. The Ackerman representative will normally participate in the initial team meeting by speakerphone and then spearhead the recovery effort. However, all significant decisions will be referred to the crisis management team.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 9 of 143

**TRAINING AND CONSULTING SERVICES REIMBURSEMENT**

The Ackerman Group, LLC offers a number of training seminars at reduced fees for Chubb clients, including Crisis Management, International Travel Security and Personal Protection/Kidnap Prevention. Where permitted by law, a premium credit is available for costs incurred in receiving this training during the policy period, up to 10% of the Kidnap, Ransom and Extortion policy premium.

Each training seminar takes about three to four hours. The training seminars are presented by The Ackerman Group, LLC consultants, based on availability. Descriptions of the various training seminars that may be of interest are listed below:

1. **CRISIS MANAGEMENT TRAINING SEMINAR**
   This training is designed for members of a corporate Crisis Management Team (CMT). As part of this training, The Ackerman Group LLC (AG) will provide a draft Crisis Management Plan which can be adapted to your particular corporate culture and operating procedures. The plan details the composition of a corporate CMT and describes the duties of each member of the CMT. It also outlines AG's response and management tactics during a case. The seminar includes a tabletop exercise which allows the participants to work through a simulated kidnap case.

2. **INTERNATIONAL TRAVEL SECURITY TRAINING SEMINAR**
   This seminar is geared toward international travel risks. Topics include: navigating through higher risk foreign airports, ground transportation options, selecting hotels and securing your room, basic street crime avoidance/prevention tactics, basic kidnap prevention guidelines and protection of proprietary information while traveling abroad. The seminar can be tailored to focus on particular areas of the world.

3. **PERSONAL PROTECTION/KIDNAP PREVENTION TRAINING SEMINAR**
   Specifically designed for expatriates and local nationals employed overseas, this training details the primary risks for personnel working and living abroad and provides basic training, from defense and evasion tactics to basic kidnap survival tactics if these should fail. Emphasis is placed on behavior modification and surveillance detection methodologies to help reduce risk.

*This document is for information only. It is offered as a resource to be used together with your professional insurance advisers in maintaining a loss prevention program. No liability is assumed by reason of the information this document contains.*

*For promotional purposes, Chubb refers to member insurers of the Chubb Group of Insurance Companies underwriting coverage.*

*The precise coverage afforded is subject to the terms, conditions and exclusions of the policies as issued. Not all insurers do business in all jurisdictions.*

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 10 of 143

# Notice of Loss Control Services

Insuring Company: Federal Insurance Company

As a Chubb policyholder, you have loss prevention information and/or services available to you, as listed in this Notice. You may order any brochure by email to formsordering@chubb.com and to view our full suite of loss prevention brochures/services go to www.chubb.com/us/fl-lossprevention

## Directors and Officers (D&O) Liability Loss Prevention Services

*   ***Directors and Officers Liability Loss Prevention* Manuals:**
    Directors and Officers Liability Loss Preventions – #14-01-0035
    Directors and Officers Securities Litigation Loss Preventions – #14-01-0448
    Director Liability Loss Prevention in Mergers and Acquisitions – #14-01-1099
    Directors and Officers Liability Loss Prevention for Not-for-Profit- -#14-01-0036
    Cyber Loss Mitigation for Directors -#14-01-1199

## Employment Practices Liability (EPL) Loss Prevention Services

*   **Toll-free Hot Line**

    Have a question on how to handle an employment situation? Simply call **1.888.249.8425** to access the nationally known employment law firm of Jackson Lewis P.C. We offer customers an unlimited number of calls to the hot line at no additional charge.

*   **ChubbWorks.com**
    ChubbWorks.com is a web-based platform that offers multiple services including overviews of employment laws, sample employment policies and procedures, and on-line training. To gain immediate access to ChubbWorks go to **www.chubbworks.com** and register using your policy number.

*   ***Employment Practices Loss Prevention Guidelines* Manual**

    *Employment Practices Loss Prevention Guidelines - #14-01-0061*

*   **Loss Prevention Consultant Services**

    Chubb has developed a network of more than 120 law firms, human resources consulting firms, and labor economist/statistical firms that offer specialized services for employment issues.

*   **Public Company EPL Customers**

    Employment Practices Loss Prevention Guidelines – Written by Seyfarth Shaw exclusively for Chubb this manual provides an overview of key employment issues faced by for-profit companies and offers proactive idea for avoiding employment lawsuits.

*   **Private Company EPL Customers**
    Employment Practices Loss Prevention Guidelines – Written by Seyfarth Shaw exclusively for Chubb this manual provides an overview of key employment issues for –profit companies and offers proactive idea for avoiding employment lawsuits.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 11 of 143

## Fiduciary Liability Loss Prevention Services

- **Fiduciary Liability Loss Prevention Manual**
  Who May Sue You and Why: How to Reduce Your ERISA Risks and the Role of Fiduciary
  Liability Insurance #14-01-1019

## Crime Loss Prevention Services

- **Crime/Kidnap, Ransom & Extortion Loss Prevention Manual**

  Preventing Fraud: How Anonymous Hotlines Can Help #14-01-1090

## Cyber Security Loss Prevention Services

Visit: https://www2.chubb.com/us-en/business-insurance/cyber-security.aspx to learn more
about Chubb's Cyber Services for our policyholders.

## Health Care Directors and Officers (D&O) Liability Loss Prevention Services

- **Readings in Health Care Governance Manual**
  Readings in Health Care Governance -#14-01-0788

- **ChubbWorks.com**
  ChubbWorks.com for Health Care Organizations – The Health Care Zone is a free online
  resource containing health care specific loss prevention information for employment practices
  liability, directors and officers (D&O) liability, and fiduciary liability exposures. To gain
  immediate access to ChubbWorks go to **www.chubbworks.com** and register using your policy
  number.

- **Health Care D&O Loss Prevention Consultant Services**
  Health Care D& O Loss Prevention Consultant Services- #14-01-1164

--------------------

The services provided are advisory in nature. While this program is offered as a resource in
developing or maintaining a loss prevention program, you should consult competent legal counsel
to design and implement your own program. No liability is assumed by reason of the services,
access or information provided. All services are subject to change without notice.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 12 of 143

CHUBB' **Chubb Group of Insurance Companies**
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**<sup>SM</sup>
*General Terms and Conditions*

GTC DECLARATIONS

**FEDERAL INSURANCE COMPANY**
A stock insurance company, incorporated under the laws of
Indiana, herein called the Company

Capital Center, 251 North Illinois, Suite 1100
Indianapolis, IN 46204-1927

**Policy Number**: 8234-7252

**NOTICE: THE LIABILITY COVERAGE PARTS PROVIDE CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD", OR ANY APPLICABLE EXTENDED REPORTING PERIOD. THE LIMIT OF LIABILITY TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY "DEFENSE COSTS", AND "DEFENSE COSTS" WILL BE APPLIED AGAINST THE RETENTION. IN NO EVENT WILL THE COMPANY BE LIABLE FOR "DEFENSE COSTS" OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY. READ THE ENTIRE POLICY CAREFULLY.**

**Item 1.** **Parent Organization:** THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

**Principal Address:** 816 ELLIS ROAD

DURHAM, NC 27703

**Item 2.** **Policy Period:**

(A)  From: March 10, 2019

(B)  To: March 10, 2020

At 12:01 AM local time at the address shown in Item 1.

**Item 3.** **A Combined Maximum Aggregate Limit of Liability applies:**

[ ]  Yes          [X]  No

The Combined Maximum Aggregate Limit of Liability for all **Claims** under all **Liability Coverage Parts** shall be:

Not Applicable

**Item 4.** **Coverage applicable to this Policy:**

[X]  Directors & Officers and Entity Liability Coverage Part

[X]  Employment Practices Liability Coverage Part

[X]  Fiduciary Liability Coverage Part

[ ]  Miscellaneous Professional Liability Coverage Part

[ ]  Employed Lawyers Liability Coverage Part

[ ]  CyberSecurity Coverage Part

[ ]  Crime Coverage Part

14-02-17270D (11/2010)                          1 of 2

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 13 of 143


[X] Kidnap Ransom and Extortion Coverage Part

[X] Workplace Violence Expense Coverage Part

**Item 5.** **Extended Reporting Period:**

(A) Additional Period:   3 years

(B) Additional Premium:   200 % of Annual Premium

In witness whereof, the Company issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by a duly authorized representative of the Company.

**FEDERAL INSURANCE COMPANY**

_____
Secretary

03/20/2019
_____
Date

_____
President

_____
Authorized Representative

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 14 of 143

In consideration of payment of the premium and subject to the Declarations and the limitations, conditions, provisions and other terms of this Policy, the Company and the Insureds agree as follows:

## I. TERMS AND CONDITIONS

Except for these General Terms and Conditions or unless stated to the contrary in any Coverage Part, the terms and conditions of each Coverage Part apply only to that Coverage Part. If any provision in these General Terms and Conditions is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of such Coverage Part shall control for purposes of that Coverage Part. All references to "Section", "Subsection", "Paragraph" or "Subparagraph" in these General Terms and Conditions shall apply only to these General Terms and Conditions, unless otherwise stated. All references to "Section", "Subsection", "Paragraph" or "Subparagraph" in a Coverage Part, shall apply only to such Coverage Part, unless otherwise stated.

## II. DEFINITIONS

**Anniversary Date** means the date and time exactly one (1) year after the date and time set forth in Item 2(A), Policy Period, of the GTC Declarations and each succeeding date and time exactly one (1) year after the previous **Anniversary Date**.

**Claim** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Coverage Event** means the event or loss which must occur or be sustained or discovered, in order to invoke coverage under each **Non-Liability Coverage Part**.

**Defense Costs** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Expense** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Insured** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Insured Person** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Liability Coverage Part** means:

(A)    the Directors & Officers and Entity Liability, Employment Practices Liability, Fiduciary Liability, Employed Lawyers Liability and Miscellaneous Professional Liability Coverage Parts; and

(B)    Insuring Clause (A), Cyber Liability Coverage, of the CyberSecurity Coverage Part,

if purchased as set forth in Item 4, Coverage applicable to this Policy, of the GTC Declarations.

**Loss** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Non-Liability Coverage Part** means:

(A)    the Crime, Kidnap Ransom and Extortion and Workplace Violence Expense Coverage Parts; and

(B)    Insuring Clauses (B), Privacy Notification and Crisis Management Expenses Coverage; (C), Reward Expenses Coverage; (D), E-Business Interruption and Extra Expenses Coverage; (E), E-Threat Expenses Coverage and (F), E-Vandalism Expenses Coverage, of the CyberSecurity Coverage Part,

if purchased as set forth in Item 4, Coverage applicable to this Policy, of the GTC Declarations.

**Organization** means the **Parent Organization** and any **Subsidiary**. **Organization** shall also mean any such entity as a debtor in possession under United States bankruptcy law or the equivalent of a debtor in possession under the law of any other country.

**Parent Organization** means the entity named in Item 1 of the GTC Declarations.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 15 of 143


**Policy Period** means the period of time set forth in Item 2 of the GTC Declarations, subject to any prior termination in accordance with Section X, Termination of Policy.

**Policy Year** means the period, within the **Policy Period,** from the date and time set forth in Item 2(A), Policy Period, of the GTC Declarations to the first **Anniversary Date,** or the period from an **Anniversary Date** to its next succeeding **Anniversary Date,** subject to any prior termination in accordance with Section X, Termination of Policy.

**Potential Claim** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Related Claims** means all **Claims** for **Wrongful Acts** based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events.

**Securityholder Derivative Demand Evaluation Costs** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Subsidiary** means:

(A)     any entity while more than fifty percent (50%) of the outstanding securities representing the present right to vote for election of or to appoint directors, trustees, managers, members of the Board of Managers or equivalent positions of such entity are owned, or controlled, by the **Parent Organization,** directly or through one or more **Subsidiaries;**

(B)     any entity while:

(1)     exactly fifty percent (50%) of the voting rights representing the present right to vote for election of or to appoint directors, trustees, managers, members of the Board of Managers or equivalent positions of such entity are owned, or controlled, by the **Parent Organization,** directly or through one or more **Subsidiaries;** and

(2)     the **Parent Organization,** pursuant to a written contract with the owners of the remaining and outstanding voting stock of such entity, solely controls the management and operation of such entity; or

(C)     any foundation, charitable trust or political action committee while such entity is controlled by the **Parent Organization.**

**Voluntary Program Loss** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Voluntary Program Notice** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Wrongful Act** shall have the meaning ascribed to that term in each applicable Coverage Part.

---

III.    **LIMIT OF LIABILITY**

(A)     With respect to the **Liability Coverage Parts:**

(1)     If the Combined Maximum Aggregate Limit of Liability set forth in Item 3 of the GTC Declarations is elected, the amount stated in such Item 3 shall be the maximum aggregate limit of liability of the Company for all Loss, **Voluntary Program Loss** and **Securityholder Derivative Demand Evaluation Costs** during each **Policy Year** under all **Liability Coverage Parts** combined. However, any **Loss, Voluntary Program Loss** or **Securityholder Derivative Demand Evaluation Costs** paid under any **Liability Coverage Part** shall not exceed the Maximum Aggregate Limit of Liability set forth in Item 2 of the Declarations of such Coverage Part.

(2)     If the Combined Maximum Aggregate Limit of Liability set forth in Item 3 of the GTC Declarations is not elected, the maximum aggregate limit of liability of the Company for all **Loss, Voluntary Program Loss,** and **Securityholder Derivative Demand Evaluation Costs** during each **Policy Year** under each **Liability Coverage Part** shall be the Maximum Aggregate Limit of Liability set forth in Item 2 of the Declarations for each **Liability Coverage Part.**

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 16 of 143

(3) **Defense Costs** are part of, and not in addition to, the Maximum Aggregate Limit of Liability set forth in Item 2 of the Declarations of each **Liability Coverage Part** and payment by the Company of **Defense Costs** shall reduce and may exhaust such Limits of Liability.

(B) With respect to the **Non-Liability Coverage Parts**, the Company's maximum liability shall be the Limits of Liability set forth in the Declarations of each **Non-Liability Coverage Part**.

## IV. RELATED CLAIMS

With respect to the **Liability Coverage Parts**:

(A) All **Related Claims** shall be deemed a single **Claim** made in the **Policy Year** in which the earliest of such **Related Claims** was first made or first deemed to have been made in accordance with the Reporting section of the applicable **Liability Coverage Part** (the "Earliest Related Claim").

(B) All **Related Claims** shall be subject to the same Retention and Limits of Liability applicable to the Earliest Related Claim.

## V. EXTENDED REPORTING PERIOD

With respect to the **Liability Coverage Parts**:

(A) If this Policy does not renew or otherwise terminates for a reason other than for failure to pay premium (each a "Termination of Coverage"), then an **Insured** shall have the right to purchase an Extended Reporting Period for the Additional Period and Additional Premium set forth in Item 5 of the GTC Declarations.

(B) In the event of a Termination of Coverage and upon request from an **Insured**, the Company shall, in its sole discretion, provide a quote for Additional Periods other than as set forth in Item 5, Extended Reporting Period, of the GTC Declarations. Any such additional quote offered shall be subject to such Additional Premium as the Company may require.

(C) The offer of renewal terms and conditions or premiums different from those in effect prior to renewal shall not constitute refusal to renew.

(D) This right to purchase an Extended Reporting Period shall lapse unless written notice of election to purchase the Extended Reporting Period, together with payment of the applicable Additional Premium, is received by the Company within sixty (60) days after the effective date of the Termination of Coverage.

(E) If an Extended Reporting Period is purchased, then coverage otherwise afforded by this Policy shall be extended to apply to **Claims**: (1) first made during such Extended Reporting Period; and (2) reported to the Company pursuant to the Reporting section of the applicable Coverage Part, but only to the extent such **Claims** are for **Wrongful Acts** before the effective date of such Termination of Coverage or the date of any conversion of coverage described in Section VI, Changes in Exposure, whichever is earlier. Any **Claim** made during the Extended Reporting Period shall be deemed to have been made during the **Policy Year** immediately preceding the Extended Reporting Period.

(F) The entire premium for the Extended Reporting Period shall be deemed fully earned at the inception of such Extended Reporting Period.

(G) The limit of liability for the Extended Reporting Period is part of and not in addition to any maximum aggregate limit of liability for the **Policy Year** immediately preceding the Extended Reporting Period.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 17 of 143

VI.  **CHANGES IN EXPOSURE**

(A)  **Acquisition of Another Organization**

(1)  If before or during the **Policy Period** an **Organization** acquires voting rights in another entity such that the acquired entity becomes a **Subsidiary**,

(2)  then coverage shall be provided for such **Subsidiary** and its **Insureds** with respect to any:

(a)  **Liability Coverage Part**, solely for **Claims** for **Wrongful Acts** after such acquisition; or

(b)  **Non-Liability Coverage Part**, solely after the effective date of such acquisition subject to the Liability for Prior Losses section of such **Non-Liability Coverage Part**.

(B)  **Cessation of Subsidiaries**

(1)  If before or during the **Policy Period** an **Organization** ceases to be a **Subsidiary**,

(2)  then with respect to any:

(a)  **Liability Coverage Part**, coverage for such **Subsidiary** and its **Insureds** shall continue until termination of this Policy in accordance with Section VI(C), Conversion of Coverage Under Certain Circumstances, or Section X, Termination of Policy, whichever occurs first, but only for **Claims** for **Wrongful Acts** while such **Organization** was a **Subsidiary**; or

(b)  **Non-Liability Coverage Part**, such **Subsidiary** and its **Insureds** shall cease to be **Insureds** as of the effective date of such cessation and coverage under this Policy shall apply as provided in such **Non-Liability Coverage Part**.

(C)  **Conversion of Coverage Under Certain Circumstances**

(1)  If during the **Policy Period** any of the following events occur:

(a)  another entity, person or group of entities or persons acting in concert, acquires more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of directors, trustees, members of the Board of Managers or management committee members of the **Parent Organization**;

(b)  the acquisition of all or substantially all of the **Parent Organization's** assets, by another entity, person or group of entities or persons acting in concert, or the merger of the **Parent Organization** into or with another entity such that the **Parent Organization** is not the surviving entity; or

(c)  the **Parent Organization** emerges from bankruptcy as of the effective date stated in the plan of reorganization,

(2)  then:

(a)  any applicable coverage under this Policy with respect to:

(i)  any **Liability Coverage Part**, shall continue until the expiration of the current **Policy Period**, solely for **Claims** for **Wrongful Acts** prior to such event;

(ii)  the Crime Coverage Part, shall terminate subject to Exclusions III(C), Loss Sustained Option, or III(D), Loss Discovered Option, of such Coverage Part;

(iii)  the Kidnap Ransom and Extortion Coverage Part, shall terminate subject to Exclusion III(A)(9), Notice, of such Coverage Part;

(iv)  the Workplace Violence Coverage Part, shall terminate subject to Exclusion III(E) Notice, of such Coverage Part; or

(v)  Insuring Clauses (B), Privacy Notification and Crisis Management Expenses Coverage; (C), Reward Expenses Coverage; (D), E-Business Interruption and

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 18 of 143

Extra Expenses Coverage; (E), E-Threat Expenses Coverage and (F), E-Vandalism Expenses Coverage, of the CyberSecurity Coverage Part, shall continue until the expiration of the current **Policy Period** solely for **Expense** first incurred prior to such event;

(b)     the **Parent Organization** shall give written notice of such event to the Company as soon as practicable together with such information as the Company may require; and

(c)     the entire premium for this Policy shall be deemed fully earned as of the effective date of such event.

---

## VII.     SPOUSES, DOMESTIC PARTNERS, ESTATES AND LEGAL REPRESENTATIVES

With respect to the **Liability Coverage Parts**, coverage under this Policy shall extend to **Claims** for **Wrongful Acts** of an **Insured Person** made against:

(A)     the lawful spouse or domestic partner of such **Insured Person** solely by reason of such spouse or domestic partner's status as a spouse or domestic partner, or such spouse or domestic partner's ownership interest in property which the claimant seeks as recovery for an alleged **Wrongful Act** of such **Insured Person**; or

(B)     the estate, heirs, legal representatives or assigns of such **Insured Person** if such **Insured Person** is deceased, or the legal representatives or assigns of such **Insured Person** if such **Insured Person** is legally incompetent, insolvent or bankrupt,

provided that no coverage afforded by this Section VII shall apply with respect to any loss arising from an act, error or omission by an **Insured Person's** spouse, domestic partner, estate, heirs, legal representatives or assigns.

---

## VIII.     SUBROGATION

In the event of any payment under this Policy, the Company shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery. As a condition precedent to the Company's payment under this Policy, the **Insureds** agree to execute all papers required and shall take all reasonable actions to secure and preserve such rights, including the execution of such documents necessary to enable the Company to effectively bring suit or otherwise pursue subrogation rights in the name of the **Insureds**.

---

## IX.     NOTICE

(A)     Notice to the Company of any **Claim, Potential Claim, Voluntary Program Notice** or circumstances under any **Liability Coverage Part**, or any **Coverage Event** under any **Non-Liability Coverage Part**, shall be deemed notice under the Policy in its entirety.

(B)     All notices to the Company under this Policy of any **Claim, Potential Claim, Voluntary Program Notice** or circumstances under any **Liability Coverage Part**, or any **Coverage Event** under any **Non-Liability Coverage Part**, shall be given in writing to one of the following addresses:

(1)     specialtyclaims@chubb.com; or

(2)     Attn: Claims Department
Chubb Group of Insurance Companies
82 Hopmeadow St.
Simsbury, CT 06070-7683

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 19 of 143


(C)    All other notices to the Company under this Policy shall be given in writing addressed to:

> Attn: Chubb Underwriting Department
> Chubb Group of Insurance Companies
> 202B Hall's Mill Road
> Whitehouse Station, NJ 08889

(D)    Any notice described above shall be effective on the date of receipt by the Company.

## X.   TERMINATION OF POLICY

(A)    This Policy shall terminate at the earliest of the following times:

    (1)    upon receipt by the Company of written notice of termination from the **Parent Organization**, provided that this Policy may not be terminated by the **Parent Organization** after the effective date of any event described in Section VI(C), Conversion of Coverage Under Certain Circumstances;

    (2)    upon expiration of the **Policy Period** set forth in Item 2 of the GTC Declarations;

    (3)    twenty (20) days after receipt by the **Parent Organization** of a written notice of termination from the Company based upon nonpayment of premium, unless the premium is paid within such twenty (20) day period; or

    (4)    at such other time as may be agreed upon by the Company and the **Parent Organization**.

(B)    The Company shall refund the unearned premium computed at customary short rates if this Policy is terminated by the **Parent Organization**. Under any other circumstances the refund shall be computed pro rata. Payment or tender of any unearned premium by the Company shall not be a condition precedent to the effectiveness of such termination, but such payment shall be made as soon as practicable.

## XI.   BANKRUPTCY

Bankruptcy or insolvency of an **Insured** shall not relieve the Company of its obligations nor deprive the Company of its rights or defenses under this Policy.

## XII.   COORDINATION OF COVERAGE

Any **Loss** covered under more than one **Liability Coverage Part** shall be first covered under the CyberSecurity Coverage Part, if applicable, subject to its terms, conditions and limitations. Any remaining portion of such **Loss** which is not paid under the CyberSecurity Coverage Part shall then be covered under the Employment Practices Coverage Part, if applicable, subject to its terms, conditions and limitations. Any remaining portion of such **Loss** otherwise covered under any other applicable **Liability Coverage Part** which is not paid under the CyberSecurity or Employment Practices Liability Coverage Parts shall be covered under such other **Liability Coverage Part**, subject to the terms, conditions and limitations of such **Liability Coverage Part**.

Any loss covered under the CyberSecurity Coverage Part and the Kidnap Ransom and Extortion Coverage Part shall be first covered under the Kidnap Ransom and Extortion Coverage Part, subject to its terms, conditions and limitations. Any remaining portion of such loss otherwise covered under the CyberSecurity Coverage Part which is not paid under the Kidnap Ransom and Extortion Coverage Part shall be covered under the CyberSecurity Coverage Part, subject to its terms, conditions and limitations.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 20 of 143

XIII.  **VALUATION AND FOREIGN CURRENCY**

All premiums, limits, retentions, loss and other amounts under this Policy are expressed and payable in the currency of the United States of America. Except as otherwise provided in this Policy, if a judgment is rendered, a settlement is denominated or any element of loss under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States of America dollars at the rate of exchange published in *The Wall Street Journal* on the date the judgment becomes final, the amount of the settlement is agreed upon or any element of loss is due, respectively.

XIV.  **ACTION AGAINST THE COMPANY**

No action may be taken against the Company unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy. No person or entity shall have any right under this Policy to join the Company as a party to any action against any **Insured** to determine such **Insured's** liability nor shall the Company be impleaded by such **Insured** or legal representatives of such **Insured**.

XV.  **ROLE OF PARENT ORGANIZATION**

By acceptance of this Policy, the **Parent Organization** agrees that it shall be considered the sole agent of, and shall act on behalf of, each **Insured** with respect to: (A) the payment of premiums and the receiving of any return premiums that may become due under this policy; (B) the negotiation, agreement to and acceptance of endorsements; and (C) the giving or receiving of any notice provided for in this Policy (except the giving of notice to apply for an Extended Reporting Period as provided in Section V, Extended Reporting Period, the giving of notice as provided in Section VIII, Proof of Loss and Legal Proceedings, of the CyberSecurity Coverage Part and the giving of notice of **Claim, Potential Claim, Voluntary Program Notice** or circumstances as provided in the Reporting section of the applicable **Liability Coverage Part**). Each **Insured** agrees that the **Parent Organization** shall act on its behalf with respect to all such matters.

XVI.  **ALTERATION AND ASSIGNMENT**

No change in, modification of, or assignment of interest under this Policy shall be effective except when made by written endorsement to this Policy which is signed by an authorized representative of Chubb, a division of Federal Insurance Company.

XVII.  **TERRITORY**

This Policy shall apply anywhere in the world.

XVIII.  **HEADINGS**

The descriptions in the headings and subheadings of this Policy are solely for convenience and form no part of the terms and conditions of coverage.

XIX.  **COMPLIANCE WITH TRADE SANCTIONS**

This insurance does not apply to the extent that trade or economic sanctions or other similar laws or regulations prohibit the Company from providing insurance.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 21 of 143

# Schedule of Forms

To be attached to and form part of      Company:   Federal Insurance Company
Policy No.   8234-7252

Issued to:   THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

ForeFront Portfolio 3 0 General Terms and Conditions Policy

14-02-17367 (1/12 ed.)

14-02-17864 (12/10 ed.)

14-02-22814 (12/17 ed.)

ForeFront Portfolio 3 0 Directors & Officers and Entity Liability Coverage Part

14-02-17293 (1/11 ed.)

14-02-18059 (5/11 ed.)

14-02-18077 (2/12 ed.)

14-02-19167 (2/12 ed.)

14-02-19428 (6/12 ed.)

14-02-19646 (2/13 ed.)

14-02-21084 (3/14 ed.)

14-02-21382 (12/14 ed.)

14-02-22161 (9/16 ed.)

14-02-22215 (1/17 ed.)

ForeFront Portfolio 3 0 Employment Practices Liability Coverage Part

14-02-14596 F3 (8/11 ed.)

14-02-17292 (7/11 ed.)

14-02-18340 (8/11 ed.)

14-02-18717 (2/12 ed.)

14-02-21810 (5/15 ed.)

ForeFront Portfolio 3.0 Fiduciary Liability Coverage Part Federal

14-02-10684 F3 (5/11 ed.)

14-02-17297 (12/10 ed.)

14-02-17298 (12/10 ed.)

14-02-17299 (12/10 ed.)

14-02-17300 (12/10 ed.)

14-02-17301 (1/11 ed.)

14-02-17370 (6/12 ed.)

14-02-6193 F3 (5/11 ed.)
Form 14-02-0854 (Ed. 04-01)

# Schedule of Forms

To be attached to and form part of          Company:    Federal Insurance Company
Policy No.    8234-7252

Issued to:    THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY


ForeFront Portfolio 3.0 Kidnap Ransom and Extortion Coverage Part Federal

14-02-17304 (12/10 ed.)

14-02-17305X (6/11 ed.)

14-02-17306 (12/11 ed.)

14-02-17897 (12/10 ed.)

14-02-18107 (5/11 ed.)

14-02-23003 (10/17 ed.)

14-02-6760 F3 (9/11 ed.)

ForeFront Portfolio 3.0 Workplace Violence Expense Coverage Part Federal

14-02-18107 (5/11 ed.)

Coverage Section: ForeFront Portfolio 3 0 General Terms and Conditions Policy

Effective date of
this endorsement/rider: March 10, 2019

Federal Insurance Company

Endorsement/Rider No. 1

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

SHARED LIMIT AMONG CERTAIN LIABILITY COVERAGE PARTS ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)   Item 3 of the Declarations of the General Terms and Conditions Section is deleted and replaced with the following:

   **Item 3. A Combined Maximum Aggregate Limit of Liability option is only available if indicated by X:**

   [X] Yes   [ ] No   The Combined Maximum Aggregate Limit of Liability for all **Claims** under the Directors & Officers Liability and Employment Practices Liability coverage parts shall be: $10,000,000.00

(2)   Paragraph (A)(1) of Section III Limit of Liability of the General Terms and Conditions Section is deleted and replaced with the following:

   (1)   The Combined Maximum Aggregate Limit of Liability for the Directors & Officers Liability and Employment Practices Liability coverage parts as set forth in Item 3 of the Declarations of these General Terms and Conditions shall be the combined maximum aggregate liability of the Company for all **Loss** from all **Claims** first made during each **Policy Year** under the Directors & Officers Liability and Employment Practices Liability coverage parts combined, regardless of the number of **Claims**; provided that, the maximum aggregate liability of the Company for all **Loss** from all **Claims** first made during each **Policy Year** under each such Coverage Part shall not exceed the respective maximum aggregate Limit of Liability as set forth in Item 2 of the Declarations for each such Coverage Part, regardless of the number of **Claims**. If the maximum aggregate Limit of Liability of the Directors & Officers Liability and Employment Practices Liability coverage parts as set forth in Item 2 of the Declarations for each such Coverage Part is less than the combined maximum aggregate Limit of Liability for the Directors & Officers Liability and Employment Practices Liability coverage parts as set forth in Item 3 of the Declarations of these General Terms and Conditions, such lesser limit shall be a sublimit and such amount shall be part of, and not in addition to, the combined maximum aggregate Limit of Liability as set forth in Item 3 of the Declarations of these General Terms and Conditions.

(3)      Paragraph (A)(2) of Section III, Limit of Liability, of the General Terms and Conditions Section is deleted.

(4)      It is understood and agreed that the combined maximum aggregate Limit of Liability set forth in Item 3 of the Declarations of the General Terms and Conditions shall not apply to **Loss** from **Claims** made under the Fiduciary Liability coverage part.  Accordingly, the maximum aggregate liability of the Company for all **Loss** from all **Claims** first made during each **Policy Year** under the Fiduciary Liability coverage part shall be the maximum aggregate Limit of Liability set forth in Item 2 of the Declarations of such respective **Liability Coverage Part**, regardless of the number of **Claims**.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

14-02-17367 (01/2012)          **Page 2**

Coverage Section: ForeFront Portfolio 3 0 General Terms and Conditions Policy

Effective date of
this endorsement/rider: March 10, 2019          Federal Insurance Company

                                                Endorsement/Rider No. 2

                                                To be attached to and
                                                form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

---

NORTH CAROLINA AMENDATORY ENDORSEMENT
TO THE GENERAL TERMS AND CONDITIONS

In consideration of the premium charged, it is agreed that:

1.      The section of the **Application** that deems the **Application** attached to and part of the policy is
        inapplicable unless the **Application** is physically attached to the policy.

2.      The definition of **Application** as defined in the applicable Coverage Parts is amended by replacing the word
        "warranty" with "representations".

3.      Section V, Extended Reporting Period, is deleted and replaced with the following:

        With Respect to the **Liability Coverage Parts**, if the Company or the **Parent Organization**
        terminates or does not renew this Policy, other than termination by the Company for nonpayment
        of premium, then the **Parent Organization** shall have the right to purchase an Extended
        Reporting Period for the twelve (12) month period or such other period of time as agreed upon by
        the company and the **Parent Organization** beginning on the effective date of the termination or
        non-renewal of this Policy.  The premium for this Extended Reporting Period is the amount set
        forth in Item 5 of the Declarations unless the **Parent Organization** elects a reinstated limit, in
        which case the premium for the Extended Reporting Period shall be adjusted upward. The entire
        additional premium for the Extended Reporting Period shall be deemed fully earned at the
        inception of such Extended Reporting Period.

        This right to purchase an Extended Reporting Period shall lapse unless written notice of election
        to purchase the Extended Reporting Period, together with payment of the additional premium due
        is received by the Company within thirty (30) days following the effective date of the termination
        or non-renewal of this Policy. Such notice must state if a reinstated limit of liability is desired.  If
        such notice does not state that a reinstated limit of liability is desired, the limit of liability for the
        Extended Reporting Period shall be part of, and not in addition to, the Company's maximum
        aggregate limit of liability for all **Loss** on account of all **Claims** first made during the immediately
        preceding policy year.  If such notice does state that a reinstated limit is desired, the limit of
        liability for the Extended Reporting Period shall be equal to, and not in addition to the Company's
        maximum aggregate limit of all Claims first made during the immediately preceding **Policy Year**.

        If the Extended Reporting Period is purchased, then coverage otherwise afforded by this
        Endorsement will be extended to apply to **Loss** from **Claims** first made during such Extended
        Reporting Period and reported in accordance with this Endorsement, but only for **Wrongful Acts**
        occurring or allegedly occurring before the effective date of the **Policy Year** or the date of

14-02-17864 (12/2010)                      Page 1

conversion of coverage described in the General Terms and Conditions, whichever is earlier. No coverage will be available under this Policy for **Loss** from **Claims** made during an Extended Reporting Period based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event, **Claim** or **Wrongful Act**: (i) underlying or alleged in any prior and/or pending litigation as of the termination date of this Policy; or (ii) which has been the subject of any notice given before the termination date under any policy of insurance, including this Policy. Any **Claim** made during the Extended Reporting Period shall be deemed to have been made during the immediately preceding **Policy Year**.

4.      Within forty-five (45) days after receipt of a written request from the **Parent Organization**, the Company will mail to the **Parent Organization** loss information respecting its account for the past three (3) years, which information shall include, but not be limited to, aggregate information on total open and closed **Claims** (which shall include the date, description of occurrence, and amount of payments) and information on any notice of occurrence.

The Policy will be deemed to have been amended to the extent necessary to effect the purposes of this Amendatory Endorsement.

The regulatory requirements set forth in this Amendatory Endorsement shall supersede and take precedence over any provisions of the Policy or any endorsement to the Policy, whenever added, that are inconsistent with or contrary to the provisions of this Amendatory Endorsement, unless such Policy or endorsement provisions comply with the applicable insurance laws of the state of North Carolina.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 27 of 143

Coverage Section: ForeFront Portfolio 3 0 General Terms and Conditions Policy

Effective date of
this endorsement/rider: March 10, 2019      Federal Insurance Company

Endorsement/Rider No. 3

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

In consideration of the premium charged, it is agreed that:

A. If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

B. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any "loss" that is otherwise excluded under this Policy.

14-02-22814 (12/2017)      Page 1

Case 1:22-cv-00553-CCE-JEP  Document 1-2  Filed 07/15/22  Page 28 of 143

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 29 of 143

**CHUBB**  **Chubb Group of Insurance Companies**
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*[SM]
*Directors & Officers and Entity Liability*
*Coverage Part*

**D&O DECLARATIONS**

**FEDERAL INSURANCE COMPANY**
A stock insurance company, incorporated under the laws of
Indiana, herein called the Company

Capital Center, 251 North Illinois, Suite 1100
Indianapolis, IN 46204-1927

**NOTICE: THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD", OR ANY APPLICABLE EXTENDED REPORTING PERIOD. THE LIMIT OF LIABILITY TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY "DEFENSE COSTS", AND "DEFENSE COSTS" WILL BE APPLIED AGAINST THE RETENTION. IN NO EVENT WILL THE COMPANY BE LIABLE FOR "DEFENSE COSTS" OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY. READ THE ENTIRE POLICY CAREFULLY.**

| Item 1. | **Parent Organization:** | | THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY |
|---|---|---|---|

| Item 2. | **Maximum Aggregate Limit of Liability for this Coverage Part:** | | $10,000,000.00 |
|---|---|---|---|

**Item 3.**   **Optional Coverage Applicable to this Coverage Part:**

[X] Additional Limit of Liability Dedicated for Executives

**Item 4.**   **Retentions:**

| (A) | Insuring Clause (A) Individual Non-Indemnified Liability Coverage: | None |
|---|---|---|
| (B) | Insuring Clause (B) Individual Indemnified Liability Coverage: | $200,000.00 |
| (C) | Insuring Clause (C) Entity Liability Coverage: | $200,000.00 |

**Item 5.**   **Pending or Prior Proceedings Dates:**

| (A) | Insuring Clauses (A) and (B): | March 10, 1998 |
|---|---|---|
| (B) | Insuring Clause (C): | March 10, 2005 |

14-02-17271D (12/2010)                    1 of 1

 Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Directors & Officers and Entity Liability
Coverage Part*

In consideration of payment of the premium and subject to the Declarations, General Terms and Conditions, and the limitations, conditions, provisions and other terms of this Coverage Part, the Company and the Insureds agree as follows:

## I.  INSURING CLAUSES

**Insuring Clause (A):  Individual Non-Indemnified Liability Coverage**

(A)  The Company shall pay, on behalf of an **Insured Person**, **Loss** on account of a **Claim** first made against the **Insured Person** during the **Policy Period**, or the Extended Reporting Period if applicable, to the extent that such **Loss** is not indemnified by an **Organization**.

**Insuring Clause (B):  Individual Indemnified Liability Coverage**

(B)  The Company shall pay, on behalf of an **Organization**, **Loss** on account of a **Claim** first made against an **Insured Person** during the **Policy Period**, or the Extended Reporting Period if applicable, to the extent the **Organization** indemnifies the **Insured Person** for such **Loss** as permitted or required by law.

**Insuring Clause (C):  Entity Liability Coverage**

(C)  The Company shall pay, on behalf of an **Organization**, **Loss** on account of a **Claim** first made against the **Organization** during the **Policy Period**, or the Extended Reporting Period if applicable.

## II.  SECURITYHOLDER DERIVATIVE DEMAND EVALUATION COVERAGE

The Company shall pay, on behalf of an **Organization**, **Securityholder Derivative Demand Evaluation Costs** incurred with the Company's prior written consent which the **Organization** becomes legally obligated to pay on account of any securityholder derivative demand that is first made during the **Policy Period**, or, if exercised, during the Extended Reporting Period, for **Wrongful Acts** by an **Executive** before or during the **Policy Period** in an aggregate amount not to exceed $500,000 per **Policy Period** which amount is part of, and not in addition to, the Maximum Aggregate Limit of Liability set forth in Item 2 of the D&O Declarations and no Retention shall apply to such amount.

## III.  ADDITIONAL LIMIT OF LIABILITY DEDICATED FOR EXECUTIVES (Optional)

(A)  Notwithstanding anything in this Policy to the contrary, the Additional Limit of Liability Dedicated For Executives, if purchased as set forth in Item 3 of the D&O Declarations, shall be an additional Limit of Liability in an amount not to exceed $500,000, which amount is in addition to, and not part of, the Maximum Aggregate Limit of Liability set forth in Item 2 of the D&O Declarations.

(B)  The Additional Limit of Liability Dedicated For Executives is available solely for **Loss** resulting from any **Claim** against any **Executive** covered under Insuring Clause (A), Individual Non-Indemnified Liability Coverage.

(C)  The Additional Limit of Liability Dedicated For Executives shall be excess of any insurance available that is specifically excess to this Coverage Part and such excess insurance must be completely exhausted by payment of loss, damages or defense costs thereunder before the Company shall have any obligation to make any payment on account of the Additional Limit of Liability Dedicated For Executives.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 31 of 143

**CHUBB**  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0<sup>SM</sup>*
*Directors & Officers and Entity Liability*
*Coverage Part*

## IV.  DEFINITIONS

For purposes of this Coverage Part:

**Application** means:

(A)  any portion of an application given to the Company for this Policy, including any attachments, written information and materials provided to the Company by or on behalf of an **Insured** for the purposes of the Company's underwriting of this Coverage Part; and

(B)  any warranty provided to the Company within the past three years in connection with any coverage part or policy of which this Coverage Part is a renewal or replacement.

**Claim** means:

(A)  when used in reference to the coverage provided by Insuring Clauses (A), Individual Non-Indemnified Liability Coverage, or (B), Individual Indemnified Liability Coverage, any:

(1)  written demand first received by an **Insured** for monetary or non-monetary relief, including injunctive relief;

(2)  civil proceeding commenced by the service of a complaint or similar pleading;

(3)  criminal proceeding commenced by: (a) an arrest, or (b) a return of an indictment, information or similar document;

(4)  formal administrative or formal regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;

(5)  arbitration or mediation proceeding commenced by receipt of a demand for arbitration, demand for mediation or similar document; or

(6)  official request for **Extradition**,

against an **Insured Person** for a **Wrongful Act**, including any appeal therefrom;

(7)  civil, criminal, administrative or regulatory investigation or interview of an **Insured Person** for a **Wrongful Act** once such **Insured Person** is identified in writing by any investigating authority as a target of such investigation or interview, including when such **Insured Person** is served with a target letter or similar document; or

(8)  written request first received by an **Insured** to toll or waive a statute of limitations relating to a potential **Claim** described in Paragraphs (A)(1) through (A)(7) above;

(B)  solely when used in reference to the coverage provided by Insuring Clause (A), Individual Non-Indemnified Liability Coverage, any service of a subpoena or other similar written request upon an **Insured Person** compelling witness testimony or document production in connection with the matters described in Paragraphs (A)(1) through (A)(7) above or with any equivalent action against an **Organization** or **Outside Entity**; in which case, the Company shall pay the **Defense Costs** incurred solely by such **Insured Person** in responding to such subpoena or written request; or

(C)  when used in reference to the coverage provided by Insuring Clause (C), Entity Liability Coverage, any:

(1)  written demand first received by an **Insured** for monetary damages or non-monetary relief, including injunctive relief;

(2)  civil proceeding commenced by the service of a complaint or a similar pleading;

(3)  criminal proceeding commenced by a return of an indictment, information or similar document;

(4)  formal administrative or formal regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document; but only while such proceeding is also pending against an **Insured Person**; or

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 32 of 143

CHUBB®    Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**[SM]
**Directors & Officers and Entity Liability**
**Coverage Part**

(5)    arbitration or mediation proceeding commenced by receipt of a demand for arbitration, demand for mediation or similar document,

against an **Organization** for a **Wrongful Act**, including any appeal therefrom; or

(6)    written request first received by an **Insured** to toll or waive a statute of limitations relating to a potential **Claim** described in Paragraph (C)(1) through (C)(5) above.

**Defense Costs** means that part of **Loss** consisting of reasonable costs, charges, fees (including attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of **Insured Persons**) incurred in investigating, defending, opposing or appealing any **Claim** and the premium for appeal, attachment or similar bonds.

**Employee** means any natural person whose labor or service is, was or will be engaged and directed by an **Organization**, including a part-time, seasonal, leased and temporary employee, intern or volunteer.  **Employee** shall not include any independent contractor.

**ERISA** means the Employee Retirement Income Security Act of 1974 (including amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, and the Health Insurance Portability and Accountability Act of 1996), the English Pension Scheme Act 1993 or the English Pensions Act 1995; all as amended; any similar statutory or common law anywhere in the world; or any rule or regulation promulgated under any such Act or law.

**Executive** means any natural person who is, was or will be:

(A)    a duly elected or appointed director, officer, member of the Advisory Board or in-house general counsel of any **Organization** incorporated in the United States of America;

(B)    a duly elected or appointed: (1) manager or member of the Board of Managers or equivalent position; (2) member of the Advisory Board; or (3) in-house general counsel, of any **Organization** formed as a limited liability company in the United States of America; or

(C)    a holder of an equivalent position to those described in Subsections (A) or (B) above in any **Organization** incorporated, formed or organized anywhere in the world.

**Extradition** means any formal process by which an **Insured Person** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation, or the execution of a warrant for the arrest of an **Insured Person** where such execution is an element of **Extradition**.

**Financial Impairment** means the status of an **Organization** resulting from:

(A)    the appointment by any federal or state official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate such **Organization**; or

(B)    such **Organization** becoming a debtor in possession under the United States bankruptcy law or the equivalent of a debtor in possession under the law of any other country,

provided that the court or other judicial or administrative body overseeing the receivership, conservatorship, liquidation, rehabilitation, bankruptcy or equivalent proceeding has denied a request by the **Organization**, or other party determined to have standing, for authorization of the **Organization** to indemnify an **Insured Person** for **Loss**; provided further that, the Company may, in its sole discretion, waive the foregoing requirement.

**Insured** means any **Organization** and any **Insured Person**.

**Insured Person** means any **Executive** or **Employee** of an **Organization** acting either in his or her capacity as such or in an **Outside Capacity**.

Case 1:22-cv-00553-CCE-JEP    Document 1-2    Filed 07/15/22    Page 33 of 143

 Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Directors & Officers and Entity Liability*
*Coverage Part*

**Loss** means the amount which an **Insured** becomes legally obligated to pay as a result of any **Claim**, including:

(A)      compensatory damages;

(B)      punitive, exemplary or multiplied damages, if and to the extent such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages, provided such jurisdiction has a substantial relationship to the **Insured**, the Company, or to the **Claim** giving rise to such damages;

(C)      civil fines or civil penalties assessed against an **Insured Person**, including civil penalties assessed against an **Insured Person** pursuant to 15 U.S.C. §78dd-2(g)(2)(B) (the Foreign Corrupt Practices Act), if and to the extent such fines or penalties are insurable under the law of the jurisdiction in which such fines or penalties are assessed;

(D)      judgments, including pre-judgment and post-judgment interest;

(E)      settlements; and

(F)      **Defense Costs**,

provided that **Loss** does not include any portion of such amount that constitutes any:

(1)      cost of compliance with any order for, grant of or agreement to provide non-monetary relief, including injunctive relief;

(2)      amount uninsurable under the law pursuant to which this Coverage Part is construed;

(3)      tax, except solely for the purposes of Insuring Clause (A), Individual Non-Indemnified Liability Coverage, any tax imposed upon an **Insured Person** in his or her capacity as such in connection with any bankruptcy, receivership, conservatorship, or liquidation of an **Organization**, to the extent that such tax is insurable under the law pursuant to which this Coverage Part is construed;

(4)      amount (other than **Securityholder Derivative Demand Evaluation Costs**) incurred by an **Insured** in the defense or investigation of any action, proceeding or demand that was not then a **Claim** even if (a) such amount also benefits the defense of a covered **Claim**; or (b) such action, proceeding or demand subsequently gives rise to a **Claim**;

(5)      amount that represents or is substantially equivalent to an increase in the consideration paid (or proposed to be paid) by an **Organization** in connection with its purchase of any securities or assets; or

(6)      cost incurred in cleaning-up, removing, containing, treating, detoxifying, neutralizing, assessing the effects of, testing for, or monitoring **Pollutants**.

**Outside Capacity** means service by an **Insured Person** in an **Outside Entity** as any: (A) director or officer; (B) manager or member of the Board of Managers; (C) trustee, regent, governor; or (D) equivalent executive position of any of the foregoing, but solely during the time that such service is with the knowledge and express consent of an **Organization**.

**Outside Entity** means:

(A)      any non-profit corporation, community chest, fund or foundation that is exempt from federal income tax as an entity described in Section 501(c)(3), 501(c)(4), 501(c)(7) or 501(c)(10) of the Internal Revenue Code of 1986, as amended, or any other entity organized for a religious or charitable purpose under any non-profit organization act or statute; or

(B)      any other entity specifically added as an **Outside Entity** by written endorsement attached to this Coverage Part,

that is not an **Organization**.

**Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, asbestos, asbestos products or waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 34 of 143

 Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Directors & Officers and Entity Liability*
*Coverage Part*

**Professional Services** means services which are performed for others for a fee.

**Securityholder Derivative Demand Evaluation Costs** means reasonable costs, fees and expenses (other than regular or overtime wages, salaries, fees, or benefits of the directors, officers or employees of an **Organization**) incurred by an **Organization** (including its Board of Directors or any committee of its Board of Directors) solely with respect to an evaluation required to determine whether it is in the best interest of the **Organization** to prosecute the claims alleged in a securityholder derivative demand and prior to any **Claim** first made in connection with such securityholder derivative demand. In no event shall **Securityholder Derivative Demand Evaluation Costs** include any costs, fees or expenses incurred in a **Claim**.

**Wrongful Act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted by:

(A)     for purposes of coverage under Insuring Clauses (A), Individual Non-Indemnified Liability Coverage, and (B), Individual Indemnified Liability Coverage, any **Insured Person** while acting in his or her capacity as such or any matter claimed against any **Insured Person** solely by reason of his or her status as such; or

(B)     for purposes of coverage under Insuring Clause (C), Entity Liability Coverage, any **Organization**.


## V.     EXCLUSIONS

### (A)     EXCLUSIONS APPLICABLE TO ALL INSURING CLAUSES

The Company shall not be liable for **Loss** on account of any **Claim**:

(1)     <u>Prior Notice</u>
based upon, arising from or in consequence of any fact, circumstance, situation, transaction, event or **Wrongful Act** that, before the inception date set forth in Item 2(A), Policy Period, of the GTC Declarations, was the subject of any notice accepted under any policy or coverage part of which this Coverage Part is a direct or indirect renewal or replacement;

(2)     <u>Pending or Prior Proceedings</u>
based upon, arising from or in consequence of any written demand, suit or other proceeding pending against, or order, decree or judgment entered for or against any **Insured**, on or prior to the applicable Pending or Prior Proceedings Date set forth in Item 5 of the D&O Declarations, or the same or substantially the same fact, circumstance or situation underlying or alleged therein;

(3)     <u>Bodily Injury/Property Damage</u>
for bodily injury, mental anguish, humiliation, emotional distress, sickness, disease or death of any person or damage to or destruction of any tangible property including loss of use thereof whether or not it is damaged or destroyed, provided that this Exclusion (A)(3) shall not apply to **Loss** for any mental anguish, humiliation or emotional distress asserted in an employment-related **Claim** afforded coverage under Insuring Clauses (A), Individual Non-Indemnified Liability Coverage, or (B), Individual Indemnified Liability Coverage;

(4)     <u>Pollution</u>
based upon, arising from or in consequence of any:

(a)     discharge, emission, release, dispersal or escape of any **Pollutants** or any threat thereof;

(b)     treatment, removal or disposal of any **Pollutants**; or

(c)     regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Pollutants**,

including any **Claim** for financial loss to an **Organization**, its securityholders or its creditors based upon, arising from or in consequence of any matter described in Subparagraphs (a), (b) or (c) of this Exclusion (A)(4),

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 35 of 143

CHUBB®  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**<sup>SM</sup>
**Directors & Officers and Entity Liability**
**Coverage Part**

provided that this Exclusion (A)(4) shall not apply to **Loss** which an **Insured Person** becomes legally obligated to pay and for which such **Insured Person** is not indemnified by an **Organization** or **Outside Entity** either because the **Organization** or **Outside Entity** is not permitted by common or statutory law to grant such indemnification or because of the **Financial Impairment** of the **Organization** or **Outside Entity**, provided that this exception shall only apply to **Claims** first made during the **Policy Period** or the Extended Reporting Period, if applicable;

(5)  <u>ERISA</u>
for any violation of the responsibilities, obligations or duties imposed by **ERISA**;

(6)  <u>Insured versus Insured</u>
(a)  brought by an **Organization** against any other **Organization**;

(b)  brought by an **Organization** against an **Insured Person** of such **Organization**, provided that this Subparagraph (b) shall not apply to any **Claim** brought:

(i)  outside the United States of America or Canada;

(ii)  in the event of **Financial Impairment** of the **Organization**; or

(iii)  as a securityholder derivative action;

(c)  brought by an **Insured Person** in any capacity against an **Insured**, except with respect to a **Claim**:

(i)  for employment-related **Wrongful Acts** against an **Insured Person**;

(ii)  brought by an **Employee**, other than an **Executive**, in his or her capacity as a shareholder of an **Organization**;

(iii)  for contribution or indemnity arising from another **Claim** otherwise covered under this Policy;

(iv)  brought by an **Executive** who has ceased serving in his or her capacity as an **Executive** for at least one (1) year; or

(v)  brought by a whistleblower pursuant to any federal, state, local or foreign law against an **Insured Person**;

(7)  <u>Publicly Traded Securities</u>
based upon, arising from or in consequence of (a) any public offering of securities issued by any **Organization** or **Outside Entity**, or (b) the purchase or sale of any publicly traded securities for which the **Organization** is subject to the Securities Exchange Act of 1934, provided that this Exclusion (A)(7) shall not apply to **Loss**:

(i)  based upon, arising from or in consequence of an offering, sale or purchase of securities that are not required to be registered under the Securities Act of 1933 or any similar foreign law that regulates the offering, sale or purchase of securities;

(ii)  on account of a **Claim** made by any securityholder of an **Organization** for the failure of the **Organization** to undertake or complete the initial public offering or sale of securities of the **Organization**; or

(iii)  for any **Wrongful Act** relating to an **Organization's** preparation for any public offering, including any road show presentation to potential investors or other similar presentation, made by the **Organization** and its **Executives** via any medium in connection with such public offering, if such offering does not occur;

(8)  <u>Outside Entity versus Insured</u>
for a **Wrongful Act** by an **Insured Person** while serving in an **Outside Capacity** where such **Claim** is brought:

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 36 of 143

CHUBB®   Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**<sup>SM</sup>
**Directors & Officers and Entity Liability**
**Coverage Part**

(a) by an **Outside Entity** against an **Insured Person** who is acting in his or her **Outside Capacity** in such **Outside Entity** at the time such **Claim** is first made, except with respect to a **Claim** brought as a securityholder derivative action; or

(b) by a director, officer, trustee, governor or equivalent position of the **Outside Entity** in any capacity against an **Insured,** except with respect to a **Claim** for contribution or indemnity arising from another **Claim** otherwise covered under this Policy; or

(9) Conduct
based upon, arising from or in consequence of:

(a) any deliberately fraudulent act or omission, or any willful violation of any statute or regulation, by an **Insured,** if a final, non-appealable adjudication in any underlying proceeding or action (other than a declaratory proceeding or action brought by or against the Company) establishes such an act or omission or violation; or

(b) an **Insured** having gained any profit, remuneration or other advantage to which such **Insured** was not legally entitled, if a final, non-appealable adjudication in any underlying proceeding or action (other than a declaratory proceeding or action brought by or against the Company) establishes the gaining of such profit, remuneration or advantage,

provided that:

(i) no conduct pertaining to any **Insured Person** shall be imputed to any other **Insured Person**; and

(ii) any conduct pertaining to any past, present, or future chief financial officer, chief executive officer or chief operating officer (or any equivalent position to any of the foregoing) of an **Organization** shall be imputed to such **Organization** and its **Subsidiaries**.

**(B) EXCLUSIONS APPLICABLE TO INSURING CLAUSE (C), ENTITY LIABILITY COVERAGE, ONLY**

The Company shall not be liable for **Loss** on account of any **Claim** against an **Organization**:

(1) Contract
based upon, arising from or in consequence of any liability in connection with any oral or written contract or agreement to which an **Organization** is a party, provided that this Exclusion (B)(1) shall not apply to the extent that such **Organization** would have been liable in the absence of such contract or agreement;

(2) Employment Practices
based upon, arising from or in consequence of any employment-related **Wrongful Act**;

(3) Third Party Discrimination or Sexual Harassment
based upon, arising from or in consequence of any discrimination against, or sexual harassment of any third party;

(4) Antitrust
based upon, arising from or in consequence of price fixing, restraint of trade, monopolization, unfair trade practices or any violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other federal statutory provision involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, and any amendments thereto or any rules or regulations promulgated thereunder or in connection with such statutes; or any similar provision of any federal, state, or local statutory law or common law anywhere in the world;

(5) Personal Injury
based upon, arising from or in consequence of any libel, slander, oral or written publication of defamatory or disparaging material, invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, malicious use or abuse of process, assault, battery or loss of consortium; or

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 37 of 143

CHUBB·  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**<sup>SM</sup>
**Directors & Officers and Entity Liability**
**Coverage Part**

(6)  <u>Product Defect/Intellectual Property/Professional Services</u>
based upon, arising from or in consequence of:

(a)  any malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy or dangerous condition in such product or in its design or manufacture;

(b)  any infringement of copyright, patent, trademark, trade name, trade dress, or service mark; any misappropriation of ideas, trade secrets or  other intellectual property rights; any false patent marking; or any violation of a federal, state, local or foreign intellectual property law, or a rule or regulation promulgated under any such intellectual property law; or

(c)  the rendering of, or failure to render, any **Professional Services** by an **Insured**,

provided that this Exclusion (B)(6) shall not apply to **Loss** on account of any securities **Claim**, securityholder derivative demand or securityholder derivative action.

## VI.  REPORTING

(A)  An **Insured** shall, as a condition precedent to exercising any right to coverage under this Coverage Part, give to the Company written notice of any **Claim** as soon as practicable after the chief executive officer, chief financial officer, in-house general counsel, or any person with the responsibility for the management of insurance claims (or any equivalent position to any of the foregoing) of an **Organization** becomes aware of such **Claim**, but in no event later than:

(1)  if this Coverage Part expires (or is otherwise terminated) without being renewed with the Company, ninety (90) days after the effective date of such expiration or termination; or

(2)  the expiration date of the Extended Reporting Period, if applicable,

provided that if the Company sends written notice to the **Parent Organization** stating that this Coverage Part is being terminated for nonpayment of premium, an **Insured** shall give to the Company written notice of such **Claim** prior to the effective date of such termination.

(B)  If during the **Policy Period**, or any applicable Extended Reporting Period, an **Insured** becomes aware of circumstances which could give rise to a **Claim** and gives written notice of such circumstances to the Company, then any **Claim** subsequently arising from such circumstances shall be deemed made against the **Insured** during the **Policy Year** in which such circumstances were first reported to the Company, provided any such subsequent **Claim** is reported to the Company as soon as practicable, but in no event later than 90 days after the chief executive officer, chief financial officer, in-house general counsel or any person with the responsibility for the management of insurance claims (or any equivalent position to any of the foregoing) of an **Organization** becomes aware of such **Claim**.

(C)  An **Insured** shall, as a condition precedent to exercising any right to coverage under this Coverage Part, give to the Company such information, assistance and cooperation as the Company may reasonably require and shall include in any notice under Subsections (A) or (B) above a description of the **Claim** or circumstances, the nature of the alleged **Wrongful Act**, the nature of the alleged or potential damage, the names of the actual or potential claimants, and the manner in which such **Insured** first became aware of the **Claim**, circumstances or alleged **Wrongful Act**.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 38 of 143

CHUBB'  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0<sup>SM</sup>*
*Directors & Officers and Entity Liability*
*Coverage Part*

## VII.   RETENTION AND PRESUMPTIVE INDEMNIFICATION

(A)   The Company's liability under this Coverage Part shall apply only to that part of each **Loss** which is in excess of the applicable Retention set forth in Item 4 of the D&O Declarations, and such Retention shall be borne by the **Insureds** uninsured and at their own risk.

(B)   If different parts of a single **Claim** are subject to different Retentions in different Insuring Clauses within this Coverage Part, the applicable Retentions shall be applied separately to each part of such **Claim**, but the sum of such Retentions shall not exceed the largest applicable Retention.

(C)   If different parts of a single **Claim** are subject to different Retentions in different Coverage Parts, the applicable Retentions shall be applied separately to each part of such **Claim**, but the sum of such Retentions shall not exceed the largest applicable Retention.

(D)   **Claims** shall be subject to the Retention(s) applicable to the **Policy Year** during which such **Claims** are first made or first deemed to have been made.

(E)   If an **Organization** fails or refuses, other than for reason of **Financial Impairment**, to indemnify an **Insured Person** for **Loss** to the fullest extent permitted by statutory or common law, then any payment by the Company of such **Loss** shall be excess of the Insuring Clause (B), Individual Indemnified Liability Coverage, Retention set forth in Item 4 of the D&O Declarations.

(F)   For the purposes of determining an **Organization's** indemnification obligation to any Advisory Board Member, each Advisory Board Member shall be deemed a director or officer of such **Organization**. Accordingly, the **Organization** shall be deemed to have granted indemnification to each Advisory Board Member to the fullest extent permitted by statutory or common law to the same extent as any director or officer of the **Organization**.

## VIII.   DEFENSE AND SETTLEMENT

(A)   The Company shall have the right and duty to defend any **Claim** covered by this Coverage Part. Coverage shall apply even if any of the allegations are groundless, false or fraudulent.  The Company's duty to defend any **Claim** shall cease upon exhaustion of the applicable Limit of Liability.

(B)   The Company may make any investigation it deems necessary and may, with the consent of the **Insureds**, make any settlement of any **Claim** it deems appropriate.

(C)   No **Insured** shall settle any **Claim**, incur any **Defense Costs**, or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the Company's written consent, which shall not be unreasonably withheld.  The Company shall not be liable for any settlement, **Defense Costs**, assumed obligation or admission to which it has not consented.

(D)   The Company shall have no obligation to pay **Loss**, including **Defense Costs**, or to defend or continue to defend any **Claim** after the Company's Maximum Aggregate Limit of Liability set forth in Item 2 of the D&O Declarations or the Combined Maximum Aggregate Limit of Liability set forth in Item 3 of the GTC Declarations, if applicable, has been exhausted by the payment of **Loss** and the premium shall be deemed fully earned.

(E)   The **Insureds** agree to provide the Company with all information, assistance and cooperation which the Company reasonably requests and agrees to do nothing that may prejudice the Company's position or its potential or actual rights of recovery.

(F)   The Company shall not seek repayment from an **Insured Person** of any **Defense Costs** paid by the Company that are deemed uninsured pursuant to Exclusion (A)(9), Conduct, unless the applicable determination standard (whether a final, non-appealable adjudication or other determination standard) set forth in such Exclusion has been met.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 39 of 143

CHUBB'  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**<sup>SM</sup>
**Directors & Officers and Entity Liability**
**Coverage Part**

## IX.    ALLOCATION

If an **Insured** who is afforded coverage for a **Claim** incurs an amount consisting of both **Loss** that is covered by this Coverage Part and also loss that is not covered by this Coverage Part because such **Claim** includes both covered and uncovered matters, then coverage shall apply as follows:

(A)    **Defense Costs**: one hundred percent (100%) of **Defense Costs** incurred by such **Insured** on account of such **Claim** shall be covered **Loss**, provided that the foregoing shall not apply with respect to any **Insured** for whom coverage is excluded pursuant to Exclusion (B)(2), Employment Practices, or Subsection XIII(C), Representations and Severability.  Such **Defense Costs** shall be allocated between covered **Loss** and non-covered loss based on the relative legal exposures of the parties to such matters; and

(B)    loss other than **Defense Costs**: all remaining loss incurred by such **Insured** from such **Claim** shall be allocated between covered **Loss** and uncovered loss based upon the relative legal exposures of the parties to such matters.

## X.    PRIORITY OF PAYMENTS

(A)    In the event of **Loss** arising from a **Claim** for which payment is concurrently due under Insuring Clause (A), Individual Non-Indemnified Liability Coverage, and one or more of the other Insuring Clauses of this Coverage Part, the Company shall:

(1)    first, pay **Loss** for which coverage is provided under Insuring Clause (A), Individual Non-Indemnified Liability Coverage, then

(2)    with respect to whatever remaining amount of the Limit of Liability is available after payment under Subsection (A) above, pay such **Loss** for which coverage is provided under any other Insuring Clause.

(B)    Except as otherwise provided in Subsection (A) above, the Company may pay covered **Loss** as it becomes due under this Coverage Part without regard to the potential for other future payment obligations under this Coverage Part.

## XI.    OTHER INSURANCE OR INDEMNITY

(A)    If any **Loss** under this Coverage Part is insured under any other valid and collectible insurance policy (other than a policy that is issued specifically as excess of the insurance afforded by this Coverage Part), this Coverage Part shall be excess of and shall not contribute with such other insurance, regardless of whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

(B)    Any coverage afforded under this Coverage Part for a **Claim** in connection with an **Insured Person** serving in an **Outside Capacity** for an **Outside Entity** shall be specifically excess of any indemnity (other than any indemnity provided by an **Organization**) and insurance available to such **Insured Person** by reason of serving in such **Outside Capacity**.

(C)    If any **Claim** made against an **Insured Person** serving in an **Outside Capacity** gives rise to coverage both under this Coverage Part and under any other coverage part or policy issued by the Company or any subsidiary or affiliate of The Chubb Corporation to any other entity, then any payment under such other coverage part or policy shall reduce any applicable Limit of Liability under this Coverage Part by the amount of such payment.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 40 of 143

 Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Directors & Officers and Entity Liability*
*Coverage Part*

**XII.    SECURITIES TRANSACTIONS**

If, during the **Policy Period**, an **Organization** intends to sell or offers to sell securities that are required to be registered under the Securities Act of 1933, the **Organization** shall, no later than thirty (30) days prior to the effective date of the Registration Statement for such sale or offering, give the Company written notice of the proposed sale or offering and all information requested by the Company relating thereto.  The Company shall provide to the **Organization** a quotation for coverage with respect to such sale or offering, including for **Wrongful Acts** occurring in the course of any "road show" presentation to potential investors or other similar presentation; provided any such coverage offered shall be subject to such other terms, conditions, and limitations of coverage and such additional premium as the Company, in its sole discretion, may require.

**XIII.    REPRESENTATIONS AND SEVERABILITY**

(A)    In granting coverage to the **Insureds** under this Coverage Part, the Company has relied upon the declarations and statements in the **Application** for this Coverage Part.  Such declarations and statements are the basis of the coverage under this Coverage Part and shall be considered as incorporated in and constituting part of this Coverage Part.

(B)    The **Application** for coverage shall be construed as a separate **Application** for coverage by each **Insured Person**.  With respect to the declarations and statements in such **Application**, no knowledge possessed by an **Insured Person** shall be imputed to any other **Insured Person**.

(C)    However, in the event that such **Application** contains any misrepresentations made with the actual intent to deceive or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by the Company under this Coverage Part, then no coverage shall be afforded for any **Claim** based upon, arising from or in consequence of any such misrepresentations with respect to:

(1)    any **Insured Person** who knew of such misrepresentations (whether or not such **Insured Person** knew such **Application** contained such misrepresentations) or any **Organization** to the extent it indemnifies any such **Insured Person**; or

(2)    any **Organization** if any past or present chief executive officer or chief financial officer (or any equivalent position to any of the foregoing) of the **Parent Organization** knew of such misrepresentations (whether or not such individual knew such **Application** contained such misrepresentations).

(D)    The Company shall not be entitled under any circumstances to void or rescind this Coverage Part with respect to any **Insured**.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 41 of 143

Coverage Section: ForeFront Portfolio 3 0 Directors & Officers and Entity Liability Coverage Part

Effective date of
this endorsement/rider: March 10, 2019          Federal Insurance Company

                                                Endorsement/Rider No. 1

                                                To be attached to and
                                                form a part of Policy No. 8234-7252

Issued to:  THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

---

AMEND ADDITIONAL LIMIT OF LIABILITY DEDICATED FOR EXECUTIVES ENDORSEMENT

In consideration of the premium charged, it is agreed that Subsection (A) of Section III., Additional Limit of Liability Dedicated for Executives, of this Coverage Part is deleted and replaced with the following:

(A)     Notwithstanding anything in this Policy to the contrary, the Additional Limit of Liability Dedicated For Executives, if purchased as set forth in Item 3 of the D&O Declarations, shall be an additional Limit of Liability in an amount not to exceed $1,000,000, which amount is in addition to, and not part of, the Maximum Aggregate Limit of Liability set forth in Item 2 of the D&O Declarations.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 42 of 143

Coverage Section:  ForeFront Portfolio 3 0 Directors & Officers and Entity Liability Coverage Part

Effective date of
this endorsement: March 10, 2019

Company: Federal Insurance Company

Endorsement No. 2

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

---

AMEND BODILY INJURY/PROPERTY DAMAGE EXCLUSION ENDORSEMENT

In consideration of the premium charged, it is agreed that Exclusion (A)(3), Bodily Injury/Property Damage, of this Coverage Part is deleted and replaced with the following:

(3) <u>Bodily Injury/Property Damage</u>
based upon, arising from, or in consequence of any bodily injury, mental anguish, humiliation, emotional distress, sickness, disease or death of any person or damage to or destruction of any tangible property including loss of use thereof whether or not it is damaged or destroyed, provided that this Exclusion (A)(3) shall not apply to **Loss** for any mental anguish, humiliation or emotional distress asserted in an employment-related **Claim** afforded coverage under Insuring Clauses (A), Individual Non-Indemnified Liability Coverage, or (B), Individual Indemnified Liability Coverage;

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Coverage Section: ForeFront Portfolio 3 0 Directors & Officers and Entity Liability Coverage Part

Effective date of
this endorsement/rider: March 10, 2019          Federal Insurance Company

Endorsement/Rider No. 3

To be attached to and
form a part of Policy No. 8234-7252

Issued to:  THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

---

AMENDED REPORTING ENDORSEMENT

In consideration of the premium charged, it is agreed that Subsection (A) of Section VI, Reporting, of this Coverage Part is deleted and replaced with the following:

(A)     An **Insured** shall, as a condition precedent to exercising any right to coverage under this Coverage Part, give to the Company written notice of any **Claim** as soon as practicable after the General Counsel and/or Risk Manager (or any equivalent position to any of the foregoing) of an **Organization** becomes aware of such **Claim**, but in no event later than:

   (1)     if this Coverage Part expires (or is otherwise terminated) without being renewed with the Company, ninety (90) days after the effective date of such expiration or termination; or

   (2)     the expiration date of the Extended Reporting Period, if applicable,

   provided that if the Company sends written notice to the **Parent Organization**, stating that this Coverage Part is being terminated for nonpayment of premium, an **Insured** shall give to the Company written notice of such **Claim** prior to the effective date of such termination.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

`

Authorized Representative

14-02-18077 (02/2012)                    Page 1

Coverage Section: ForeFront Portfolio 3 0 Directors & Officers and Entity Liability Coverage Part

Effective date of
this endorsement/rider: March 10, 2019

Federal Insurance Company

Endorsement/Rider No. 4

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

ANTITRUST ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that:

(1)   Solely with respect to **Claims** for **Antitrust Activities**, the following shall apply:

    (a)   The Company's maximum aggregate Limit of Liability for **Loss** on account of any **Claim** for **Antitrust Activities** shall be $5,000,000.00 which amount shall be part of, and not in addition to, the Company's Maximum Aggregate Limit of Liability for this Coverage Part set forth in Item 2 of the D&O Declarations.

    (b)   At such time as the Retention set forth in paragraph (1)(c) of this endorsement, which shall be borne by the **Insureds** uninsured and at their own risk, has been satisfied, the Company shall pay on behalf of the **Insured** the One Hundred percent (100%) ("Covered Percentage") of **Loss** from each **Claim** for **Antitrust Activities** first made against an **Insured** during the **Policy Period**, or if applicable, the Extended Reporting Period.  Any amount of **Loss** in excess of the Covered Percentage shall be borne by the **Insureds** uninsured and at their own risk.

    (c)   Item 4, Retentions of the D&O Declarations is deleted and replaced with the following:

        (A)   $0.00 each **Claim** for **Antitrust Activities** for each **Insured Person** under Insuring Clause (A), but in no event to exceed, in the aggregate,

              $0.00 each **Claim** for **Antitrust Activities** for all **Insured Persons** under Insuring Clause (A).

        (B)   $250,000.00 each **Claim** for **Antitrust Activities** under Insuring Clause (B).

        (C)   $250,000.00 each **Claim** for **Antitrust Activities** under Insuring Clause (C), if applicable.

        With respect to all other **Claims**, Item 4 of the Declarations shall remain unchanged.

(2)   Section IV, Definitions, of this Coverage Part is amended to include the following:

**Antitrust Activity** means any actual or alleged price fixing; restraint of trade; monopolization; unfair trade practices; or violation of the Federal Trade Commission Act, the Sherman Anti-trust Act, the Clayton Act, or any other federal statutory provision involving antitrust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities and any amendments thereto or any rules or regulations promulgated thereunder or in connection with such statutes; or any similar provision of any federal, state, or local statutory law or common law anywhere in the world.

14-02-19167 (02/2012)                              Page 1

(3)    Exclusion (B)(4), Antitrust, of this Coverage Part is deleted.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 46 of 143

Coverage Section:  ForeFront Portfolio 3 0 Directors & Officers and Entity Liability Coverage Part

Effective date of
this endorsement: March 10, 2019

Company:  Federal Insurance Company

Endorsement No. 5

To be attached to and
form a part of Policy No. 8234-7252

Issued to:  THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

PENDING OR PRIOR PROCEEDINGS EXCLUSION FOR INCREASED LIMITS ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)    The Company shall not be liable under this Coverage Part for **Loss** on account of any **Claim** based upon, arising from, or in consequence of any written demand, suit or other proceeding pending against, or order, decree or judgment entered for or against any **Insured**, prior to March 10, 2007, or the same or substantially the same fact, circumstance or situation underlying or alleged therein.

(2)    This endorsement shall only apply to the limit of liability of $5,000,000.00 in excess of $5,000,000.00 for each **Claim** and $5,000,000.00 in excess of $5,000,000.00 for each **Policy Period**.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Coverage Section: ForeFront Portfolio 3 0 Directors & Officers and Entity Liability Coverage Part

Effective date of
this endorsement/rider: March 10, 2019     Federal Insurance Company

Endorsement/Rider No. 6

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

FALSE ADVERTISING ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)     Subsection (B) of Section V, Exclusions, of this Coverage Part is amended to add the following:

        Underline False Advertising
        based upon, arising from, or in consequence of any false advertising, misrepresentation in advertising or
        unfair or deceptive trade practices, with respect to the advertising of the **Insured's** own goods,
        publications or services; provided that this Exclusion shall not apply to **Loss** on account of any securities
        **Claim**, securityholder derivative demand or securityholder derivative action.

(2)     Solely with respect to the coverage afforded under this endorsement, Subsection (A) of Section IX,
        Allocation, of this Coverage Part is deleted and replaced with the following:

        (A)     **Defense Costs**: one hundred percent (100%) of **Defense Costs** incurred by such **Insured** on
                account of such **Claim** shall be covered **Loss**, provided that the foregoing shall not apply with respect
                to any **Insured** for whom coverage is excluded pursuant to the Exclusion in paragraph (1) of this
                endorsement, False Advertising, Exclusion (B)(2), Employment Practices, or Subsection XIII(C),
                Representations and Severability. Such **Defense Costs** shall be allocated between covered **Loss**
                and non-covered loss based on the relative legal exposures of the parties to such matters; and

The title and any headings in this endorsement are solely for convenience and form no part of the terms and
conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

_____
Authorized Representative

14-02-19646 (02/2013)          Page 1

Coverage Section: ForeFront Portfolio 3 0 Directors & Officers and Entity Liability Coverage Part

Effective date of
this endorsement/rider: March 10, 2019

Federal Insurance Company

Endorsement/Rider No. 7

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

JOBS ACT ENDORSEMENT

In consideration of the premium charged, it is agreed that

(1)     Exclusion (A)(7), Publicly Traded Securities, of this Coverage Part shall not apply to **Loss** on account of any **Claim**:

    (A)     based upon, arising from or in consequence of any general solicitation or general advertising by or on behalf of any **Organization** permitted pursuant to Title II, Access to Capital for Job Creators, of the JOBS Act (as defined below);

    (B)     based upon, arising from or in consequence of any offering, sale or purchase of securities that qualifies for a Securities Act registration exemption created pursuant to Title III, Crowdfunding, of the JOBS Act; or

    (C)     based upon, arising from or in consequence of any offering, sale or purchase of securities that qualifies for a Securities Act registration exemption created pursuant to Title IV, Small Company Capital Formation, of the JOBS Act ("Title IV Small Company Capital Formation Claim").

(2)     The Company's maximum aggregate Limit of Liability for **Loss** on account of all Title IV Small Company Capital Formation Claims shall be $250,000 which amount shall be part of, and not in addition to, the Company's Maximum Aggregate Limit of Liability for this Coverage Part set forth in Item 2 of the D&O Declarations.

(3)     For purposes of this Endorsement, JOBS Act means the Jumpstart Our Business Startups Act, any amendments thereto and any rules or regulations promulgated thereunder.

14-02-21084 (03/2014)          Page 1

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 50 of 143

Coverage Section: ForeFront Portfolio 3 0 Directors & Officers and Entity Liability Coverage Part

Effective date of
this endorsement/rider: March 10, 2019          Federal Insurance Company

Endorsement/Rider No. 8

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

PRIVACY AND DATA BREACH EXCLUSION ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)     The Company shall not be liable under this Coverage Part for **Loss** on account of any **Claim** based upon, arising from or in consequence of any:

    (A)     unauthorized or unlawful access to, alteration of, or damage to any computer, computer program, computer network or computer database, including but not limited to the infection of any of the foregoing through the transmission of a computer virus, malware, spyware or other fraudulent or unauthorized computer code that: (1) modifies, alters, damages, destroys, deletes, records or transmits information; (2) contaminates other computer programs or computer data; or (3) consumes computer resources or in some fashion usurps the normal operation of a computer system;

    (B)     denial of service or delay, disruption, impairment or failure of any computer or communication network, service, hardware or software including but not limited to any **Claim** for lost profits or opportunities as a result of such denial of service, delay, disruption, impairment or failure;

    (C)     unauthorized or unlawful access to, disclosure of, alteration of, theft, collection, storage, use or dissemination of, or loss of any confidential or proprietary business information or personally identifiable information as defined by: (1) applicable federal, state, local (or foreign equivalent) statutory law or common law anywhere in the world, or amendments thereto or rules or regulations promulgated thereunder; or (2) an **Organization's** publicly stated privacy policy; or

    (D)     violation of any federal, state or local (or foreign equivalent) privacy or data security statutory law or common law anywhere in the world or amendments thereto or rules or regulations promulgated thereunder,

provided that this Exclusion shall not apply to **Loss** on account of any securities **Claim**, securityholder derivative demand or securityholder derivative action.

(2)     Section XI, Other Insurance or Indemnity, of this Coverage Part is amended to add the following:

14-02-21382 (12/2014)                    Page 1

Solely with respect to any **Loss** that may be covered under both this Coverage Part and under any policy providing cyber liability, network liability, cybersecurity or security coverage or any similar type of policy (hereinafter "Other Policy"), this Coverage Part shall be specifically excess of, and shall not contribute with, any such Other Policy, or any renewal or replacement thereof.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 52 of 143

Coverage Section: ForeFront Portfolio 3 0 Directors & Officers and Entity Liability Coverage Part

Effective date of
this endorsement/rider: March 10, 2019

Federal Insurance Company

Endorsement/Rider No. 9

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

---

AMEND DEFENSE AND SETTLEMENT ENDORSEMENT
(OPTION TO TENDER DEFENSE)

In consideration of the premium charged, it is agreed that:

(1) Unless the **Insured** has tendered the defense of a **Claim** to the Company pursuant to paragraph (3) of this Endorsement, Section VIII, Defense and Settlement, of this Coverage Part (including any amendment by Endorsement) is deleted and replaced with the following:

VIII. DEFENSE AND SETTLEMENT

(A) The **Insured**:

(1) shall have the sole duty to defend **Claims** made against the **Insured**;

(2) agrees not to settle or offer to settle any **Claim**, incur any **Defense Costs** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the Company's prior written consent.

(3) agrees to provide the Company with all information, assistance and cooperation which the Company may reasonably require and agrees that, in the event of a **Claim**, the **Insured** shall not do anything that could prejudice the Company's position or its potential or actual rights of recovery; provided that the failure of any **Insured Person** to give the Company such information, assistance or cooperation shall not impair the rights of any other **Insured Person** under this Coverage Part.

(B) The Company:

(1) shall have the right and shall be given the opportunity to effectively associate with the **Insured** and shall be consulted in advance by the **Insured**, regarding the investigation, defense and settlement of any **Claim** that appears reasonably likely to be covered in whole or in part under this Coverage Part, including selecting appropriate defense counsel and negotiating any settlement; and

        (2)      shall not be liable for any element of **Loss** incurred in excess of the amount of the applicable Retention, for any obligation assumed, or for any admission made, by any **Insured** without the Company's prior written consent, which the Company shall not unreasonably withhold.

    (C)    The Company shall advance covered **Defense Costs** on account of any **Claim** reported pursuant to Section VI, Reporting, on a current basis after receipt by the Company of bills detailing such **Defense Costs** and all other information requested by the Company with respect to such bills until the applicable Limit of Liability set forth in Item 2 of the D&O Declarations has been satisfied.

    (D)    Any advancement of **Defense Costs** shall be repaid to the Company by the **Insureds**, severally according to their respective interests, if and to the extent it is determined that such **Defense Costs** are not insured under this Policy.  However, the Company shall not seek repayment from an **Insured** of advanced **Defense Costs** that are uninsured pursuant to Exclusion V(A)(9), Conduct, unless a final, non-appealable adjudication has occurred.

    (E)    Any advancement of **Defense Costs** by the Company shall reduce the Limit of Liability set forth in Item 2 of the D&O Declarations.  If the Company recovered any such **Defense Costs** paid, the amount of such **Defense Costs** less all costs incurred by the Company to obtain such recovery shall be reinstated to the Limit of Liability set forth in Item 2 of the D&O Declarations.

(2)    Unless the **Insured** has tendered the defense of a **Claim** to the Company pursuant to paragraph (3) of this Endorsement, Section IX, Allocation, of this Coverage Part (including any amendment by Endorsement) is deleted and replaced with the following:

    IX.    ALLOCATION

        The **Insureds** and the Company shall use their best efforts to determine an allocation between **Loss** that is covered by this Coverage Part and loss, or any other amount, that is not covered by this Coverage Part based on the relative legal and financial exposures of the covered parties to the covered matters.

(3)    Notwithstanding paragraph (1) of this Endorsement, the **Insureds** shall have the option to tender the defense of any **Claim** to the Company by notifying the Company within a reasonable time after such **Claim** is first received by the **Insured**, but in no event later than thirty (30) days after the date such **Claim** is first received by the **Insured**.

(4)    Unless the **Insured** has tendered the defense of a **Claim** to the Company pursuant to paragraph (3) of this Endorsement, the Defense and Settlement and Allocation provisions in this Endorsement shall supersede and take precedence over any Defense and Settlement and Allocation provisions in any other Endorsement.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.



Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 54 of 143

Authorized Representative

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 55 of 143

Coverage Section: ForeFront Portfolio 3 0 Directors & Officers and Entity Liability Coverage Part

Effective date of
this endorsement/rider: March 10, 2019

Federal Insurance Company

Endorsement/Rider No. 10

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

CRISIS MANAGEMENT COVERAGE ENDORSEMENT

In consideration of the premium charged, it is agreed that this Coverage Part is amended as follows:

(1) **CRISIS MANAGEMENT COVERAGE**

The Company shall pay, on behalf of an **Organization**, **Crisis Management Expenses** which the **Organization** becomes legally obligated to pay on account of a **Crisis Management Event** occurring during the **Policy Period** in an aggregate amount not to exceed $25,000 per **Policy Period** ("Crisis Management Sublimit"), which amount is part of, and not in addition to, the Maximum Aggregate Limit of Liability set forth in Item 2 of the D&O Declarations and no Retention shall apply to such amount.

(2) **AMEND DEFINITIONS**

Section IV, Definitions, is amended as follows:

(1) The definition of **Claim** shall not include any **Crisis Management Event**.

(2) The definition of **Loss** shall not include **Crisis Management Expenses**.

(3) The following definitions are added to the Section:

**Adverse Publicity** means the publication of unfavorable information regarding the **Organization** which can reasonably be considered to materially reduce public confidence in the competence, integrity or viability of the **Organization**. Such publication must occur in a report about an **Organization** appearing in:

(A) a daily newspaper of general circulation; or

(B) a radio or television news program.

**Crisis Management Event** means any one of the following events first occurring during the **Policy Period** which results in **Adverse Publicity**:

(A) an unanticipated death, incapacity, resignation or federal or state criminal indictment of the Chief Executive Officer or Chief Financial Officer of the **Organization**;

14-02-22215 (01/2017)          Page 1

(B)  an unanticipated loss to the **Organization** arising from a product recall, delay in production, loss of intellectual property rights (other than by expiration), loss of major contract or customer;

(C)  the **Organization's** intention to file or its actual filing for bankruptcy protection or a third party's intention to file or its actual filing for bankruptcy protection on behalf of the **Organization**, whether voluntary or involuntary;

(D)  the threatened or actual commencement by a third party of an action, audit or investigation alleging an employment-related **Wrongful Act** by the **Organization**;

(E)  the commencement or threat of litigation or other proceedings by any governmental or regulatory agency against the **Organization**; or

(F)  any other material event if such event is specifically added by written endorsement attached to this Coverage Part.

**Crisis Management Expenses** means the following expenses incurred by the **Organization**, with the Company's prior written consent:

(A)  reasonable and necessary expenses incurred by a marketing firm, public relations firm, law firm or crisis management firm retained on behalf of **Organization** to make a public communication or provide advice to prevent or minimize business disruption with respect to a **Crisis Management Event**;

(B)  reasonable and necessary expenses incurred by the **Organization** for publication and circulation of materials in connection with a **Crisis Management Event**; or

(C)  reasonable and necessary travel expenses incurred by any **Insured Person** in connection with a **Crisis Management Event**.

## (3)  AMEND REPORTING

Paragraph (B) of Section VI, Reporting, is amended to add the following:

A **Crisis Management Event** shall be deemed to have first commenced when an **Insured** becomes aware of a **Crisis Management Event**, and gives written notice thereof to the Company, and shall conclude at the earliest point in time when a marketing firm, public relations firm, law firm or crisis management firm retained on behalf of **Organization** advises the **Organization** that such **Crisis Management Event** no longer exists or when the Crisis Management Sublimit has been exhausted.

If during the **Policy Period**, an **Insured** becomes aware of a **Crisis Management Event**, and gives written notice thereof to the Company, then any **Claim** subsequently arising from such **Crisis Management Event** shall be deemed to have been first made against the **Insured** during the **Policy Year** in which such written notice was first given by the **Insured** to the Company, provided any such subsequent **Claim** is reported to the Company as soon as practicable, but in no event later than ninety (90) days after the chief executive officer, chief financial officer, in-house general counsel or any person with the responsibility for the management of insurance claims (or any equivalent position to any of the foregoing) of an **Organization** becomes aware of such **Claim**.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 57 of 143

_____
Authorized Representative

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 58 of 143

 **Chubb Group of Insurance Companies**
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Employment Practices Liability*
*Coverage Part*

EPL DECLARATIONS

**FEDERAL INSURANCE COMPANY**
A stock insurance company, incorporated under the laws of
Indiana, herein called the Company

Capital Center, 251 North Illinois, Suite 1100
Indianapolis, IN 46204-1927

**NOTICE: THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD", OR ANY APPLICABLE EXTENDED REPORTING PERIOD. THE LIMIT OF LIABILITY TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY "DEFENSE COSTS", AND "DEFENSE COSTS" WILL BE APPLIED AGAINST THE RETENTION. IN NO EVENT WILL THE COMPANY BE LIABLE FOR "DEFENSE COSTS" OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY. READ THE ENTIRE POLICY CAREFULLY.**

| | | |
|---|---|---|
| Item 1. | **Parent Organization:** | THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY |
| Item 2. | **Maximum Aggregate Limit of Liability for this Coverage Part:** | $10,000,000.00 |
| Item 3. | **Limits of Liability:** | |
| | (A) Insuring Clause (A) Employment Practices Liability Coverage: | $10,000,000.00 |
| | (B) Insuring Clause (B) Third Party Liability Coverage: | $10,000,000.00 |
| Item 4. | **Retentions:** | |
| | (A) Insuring Clause (A) Employment Practices Liability Coverage: | $50,000.00 |
| | (B) Insuring Clause (B) Third Party Liability Coverage: | $50,000.00 |
| Item 5. | **Pending or Prior Proceedings Dates:** | |
| | (A) Insuring Clause (A): | March 10, 1998 |
| | (B) Insuring Clause (B): | March 10, 2005 |

14-02-17272D (11/2010)

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 59 of 143


CHUBB® Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Employment Practices Liability*
*Coverage Part*

In consideration of payment of the premium and subject to the Declarations, General Terms and Conditions, and the limitations, conditions, provisions and other terms of this Coverage Part, the Company and the Insureds agree as follows:

## I.   INSURING CLAUSES

**Insuring Clause (A):  Employment Practices Liability Coverage**

(A)   The Company shall pay, on behalf of an **Insured, Loss** on account of an **Employment Claim** first made against the **Insured** during the **Policy Period**, or the Extended Reporting Period if applicable, provided the Company's maximum liability for this Insuring Clause (A) shall be the Limit of Liability set forth in Item 3(A) of the EPL Declarations or the unpaid portion of the Maximum Aggregate Limit of Liability set forth in Item 2 of the EPL Declarations for each **Policy Year**, whichever is less.

**Insuring Clause (B):  Third Party Liability Coverage**

(B)   The Company shall pay, on behalf of an **Insured**, **Loss** on account of a **Third Party Claim** first made against the **Insured** during the **Policy Period**, or the Extended Reporting Period if applicable, provided the Company's maximum liability for this Insuring Clause (B) shall be the Limit of Liability set forth in Item 3(B) of the EPL Declarations or the unpaid portion of the Maximum Aggregate Limit of Liability set forth in Item 2 of the EPL Declarations for each **Policy Year**, whichever is less.

## II.   DEFINITIONS

For purposes of this Coverage Part:

**Application** means:

(A)   any portion of an application given to the Company for this Policy, including any attachments, written information and materials provided to the Company by or on behalf of an **Insured** for the purposes of the Company's underwriting of this Coverage Part; and

(B)   any warranty provided to the Company within the past three years in connection with any coverage part or policy of which this Coverage Part is a renewal or replacement.

**Benefits** means perquisites, fringe benefits, deferred compensation or payments (including insurance premiums) in connection with an employee benefit plan and any other payment to or for the benefit of an employee arising out of the employment relationship.  **Benefits** shall not include salary, wages, commissions, bonuses, **Stock Benefits** or non-deferred cash incentive compensation.

**Breach of Employment Contract** means any breach of any oral, written or implied contract or contractual obligation including any contract or contractual obligation arising out of any personnel manual, employee handbook, policy statement or other representation.

**Claim** means any **Employment Claim** and any **Third Party Claim**.  Except as may otherwise be provided in Section V, Extended Reporting Period, of the General Terms and Conditions, or Section V(C), Reporting, a **Claim** shall be deemed to have first been made when such **Claim** is commenced as set forth in the respective definitions of **Employment Claim** and **Third Party Claim**.

**Defense Costs** means that part of **Loss** consisting of reasonable costs, charges, fees (including attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees, benefits of the **Insured Persons**) incurred in defending, opposing or appealing any **Claim**, and the premium for appeal, attachment or similar bonds.

**Employee** means any natural person whose labor or service was, is or will be engaged and directed by an **Organization**, including a part-time, seasonal, leased and temporary employee, intern or volunteer.  **Employee** shall not include any **Independent Contractor**.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 60 of 143

**CHUBB**  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*[SM]
*Employment Practices Liability*
*Coverage Part*

**Employment Claim** means:

(A)    (1)    any:

        (a)    written demand first received by an **Insured** for monetary or non-monetary relief, including a written demand for reinstatement, reemployment, re-engagement or injunctive relief;

        (b)    civil proceeding commenced by the service of a complaint or similar pleading;

        (c)    criminal proceeding outside the United States of America commenced by a return of an indictment, information or similar document;

        (d)    arbitration proceeding pursuant to an employment contract, policy or practice of an **Organization**, commenced by the receipt by an **Insured** of a demand for arbitration or similar document, or any other external alternative dispute resolution proceeding commenced by receipt by an **Insured** of a demand for an alternative dispute resolution or similar document; or

        (e)    administrative, regulatory or tribunal proceeding commenced by:

            (i)    the issuance of a notice of charge, formal investigative order or similar document; or

            (ii)    in the event the **Insured** is not issued notice as set forth in (e)(i) above, the receipt by an **Insured** of the administrative, regulatory or tribunal proceeding resulting from such notice of charge, formal investigative order or similar document,

        including any such proceeding brought by or in association with the Equal Employment Opportunity Commission or any similar governmental agency located anywhere in the world with jurisdiction over the **Organization's** employment practices; or

    (2)    in the context of an audit conducted by the Office of Federal Contract Compliance Programs, a Notice of Violation or Order to Show Cause or written demand for monetary relief or injunctive relief, commenced by the receipt by an **Insured** of such Notice, Order or written demand,

    which is brought and maintained by or on behalf of a past, present or prospective **Employee** or **Independent Contractor** of an **Organization** against any **Insured** for an **Employment Practices Wrongful Act** (even if such **Employment Practices Wrongful Act** is related to allegations in a criminal proceeding in the United States of America), including any appeal therefrom; or

(B)    a written request first received by an **Insured** to toll or waive a statute of limitations relating to a potential **Employment Claim** as described in Subsection (A) above.

Notwithstanding the foregoing, **Employment Claim** shall not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement.

**Employment Discrimination** means any violation of employment discrimination laws including any actual, alleged or constructive employment termination, dismissal, or discharge, employment demotion, denial of tenure, modification of any term or condition of employment, any failure or refusal to hire or promote, or any limitation, segregation or classification of any employee or applicant for employment in any way that would deprive or tend to deprive any person of employment opportunities or otherwise affect his or her status as an employee based on such person's race, color, religion, creed, genetic information, age, sex, disability, marital status, national origin, pregnancy, HIV status, sexual orientation or preference, Vietnam Era Veteran status or other protected military status or other status that is protected pursuant to any federal, state, or local statutory law or common law anywhere in the world.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 61 of 143

CHUBB®  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**$^{SM}$
**Employment Practices Liability**
**Coverage Part**

**Employment Harassment** means:

(A) sexual harassment, including unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature that is made a condition of employment with, used as a basis for employment decisions by, interferes with performance or creates an intimidating, hostile or offensive working environment within an **Organization**; or

(B) workplace harassment, including work related harassment or bullying of a non-sexual nature that interferes with performance or creates an intimidating, hostile or offensive working environment within an **Organization**.

**Employment Practices Wrongful Act** means any actual or alleged:

(A) **Breach of Employment Contract**;

(B) **Employment Discrimination**;

(C) **Employment Harassment**;

(D) **Retaliation**;

(E) **Workplace Tort**;

(F) **Wrongful Employment Decision**; or

(G) **Wrongful Termination**,

committed, attempted, or allegedly committed or attempted by an **Organization** or by an **Insured Person** while acting in his or her capacity as such.

**Executive** means any natural person who was, is or will be:

(A) a duly elected or appointed director, officer, or in-house general counsel of any **Organization** incorporated in the United States of America;

(B) a duly elected or appointed: (1) manager or member of the Board of Managers or equivalent position; or (2) in-house general counsel, of any **Organization** formed as a limited liability company in the United States of America; or

(C) a holder of an equivalent position to those described in Subsections (A) or (B) above in any **Organization** incorporated, formed or organized anywhere in the world.

**Financial Impairment** means the status of an **Organization** resulting from:

(A) the appointment by any federal or state official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate such **Organization**; or

(B) such **Organization** becoming a debtor in possession under the United States bankruptcy law or the equivalent of a debtor in possession under the law of any other country,

provided that the court or other judicial or administrative body overseeing the receivership, conservatorship, liquidation, rehabilitation, bankruptcy or equivalent proceeding has denied a request by the **Organization**, or other party determined to have standing, for authorization of the **Organization** to indemnify an **Insured Person** for **Loss**; provided further that, the Company may, in its sole discretion, waive the foregoing requirement.

**Independent Contractor** means any natural person working for an **Organization** in the capacity of an independent contractor and pursuant to an **Independent Contractor Services Agreement**.

**Independent Contractor Services Agreement** means any express contract or agreement between an **Independent Contractor**, or any entity on behalf of such **Independent Contractor**, and the **Organization** governing the nature of the **Organization's** engagement of such **Independent Contractor**.

**Insured** means any **Organization** and any **Insured Person**.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 62 of 143

CHUBB'  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Employment Practices Liability*
*Coverage Part*

**Insured Person** means any:

(A)  **Executive** or **Employee** of an **Organization**; or

(B)  **Independent Contractor** working for an **Organization**, but only while acting in his or her capacity as such and only if the **Organization** agrees to indemnify the **Independent Contractor** in the same manner as provided to the **Organization's Employees** for liability arising out of a **Claim**.

**Loss** means the amount which an **Insured** becomes legally obligated to pay as a result of any **Claim**, including:

(A)  compensatory damages;

(B)  (1)  punitive, exemplary or multiplied damages, if and to the extent such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages, provided such jurisdiction has a substantial relationship to the **Insured**, the Company, or to the **Claim** giving rise to such damages; or

(2)  liquidated damages awarded pursuant to the Age Discrimination in Employment Act, Family and Medical Leave Act or Equal Pay Act;

(C)  back pay, front pay, claimant's attorney's fees awarded by a court against an **Insured** or agreed to by the Company in connection with a settlement (but only if such claimant's attorney's fees are agreed to in writing by the Company at the time of or after a final settlement);

(D)  judgments, including pre-judgment and post-judgment interest;

(E)  settlements; and

(F)  **Defense Costs**,

provided that **Loss** does not include any portion of such amount that constitutes any:

(1)  cost of compliance with any order for, grant of, or agreement to provide non-monetary relief, including injunctive relief;

(2)  amount uninsurable under the law pursuant to which this Coverage Part is construed;

(3)  tax, fine or penalty imposed by law; except as provided above with respect to punitive, exemplary or multiplied damages, or liquidated damages;

(4)  future salary, wages, commissions, or **Benefits** of a claimant who has been or shall be hired, promoted or reinstated to employment pursuant to a settlement, order or other resolution of any **Claim**;

(5)  salary, wages, commissions, **Benefits** or other monetary payments which constitute severance payments or payments pursuant to a notice period;

(6)  **Benefits** due or to become due or the equivalent value of such **Benefits**, except with respect to any **Employment Claim** for **Wrongful Termination**, or **Stock Benefits**;

(7)  cost associated with providing any accommodation for persons with disabilities or any other status which is protected under any applicable federal, state, or local statutory law or common law anywhere in the world, including, the Americans with Disabilities Act, the Civil Rights Act of 1964, or any amendments to or rules or regulations promulgated under any such law;

(8)  amount incurred by an **Insured** in the defense or investigation of any action, proceeding or demand that was not then a **Claim** even if (a) such amount also benefits the defense of a covered **Claim**; or (b) such action, proceeding, investigation or demand subsequently gives rise to a **Claim**; or

(9)  cost incurred in cleaning-up, removing, containing, treating, detoxifying, neutralizing, assessing the effects of, testing for, or monitoring **Pollutants**.

**Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, asbestos, asbestos products or waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 63 of 143

**CHUBB®** Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Employment Practices Liability*
*Coverage Part*

**Potential Claim** means a complaint or allegation of a **Wrongful Act** by or on behalf of a potential claimant if such complaint or allegation:

(A)     does not constitute a **Claim** but may subsequently give rise to a **Claim**; and

(B)     is lodged with:

      (1)     any supervisory employee having management-level responsibility for personnel matters with respect to such claimant, if such supervisory employee provides notice of such complaint or allegation to any member of an **Organization's** human resources, general counsel or risk management departments, or other comparable department; or

      (2)     any member of an **Organization's** human resources, general counsel or risk management departments, or other comparable department.

**Retaliation** means retaliatory treatment against an **Employee** or **Independent Contractor** of an **Organization** on account of such individual:

(A)     exercising his or her rights under law, refusing to violate any law, or opposing any unlawful practice;

(B)     having assisted or testified in or cooperated with a proceeding or investigation (including any internal investigation conducted by the **Organization's** human resources department or legal department) regarding alleged violations of law by the **Insured**;

(C)     disclosing or threatening to disclose to a superior or to any governmental agency any alleged violations of law; or

(D)     filing any claim against the **Organization** under the Federal False Claims Act, Section 806 of the Sarbanes Oxley Act or any other federal, state, local or foreign whistleblower law.

**Stock Benefits** means any:

(A)     offering, plan or agreement between an **Organization** and any employee which grants stock, warrants, shares or stock options of the **Organization** to such employee, including grants of stock options, restricted stock, stock warrants, performance stock shares, membership shares, or any other compensation or incentive granted in the form of securities of the **Organization**; or

(B)     payment or instrument the amount or value of which is derived from the value of securities of the **Organization**, including stock appreciation rights or phantom stock plans or arrangements,

provided that **Stock Benefits** shall not include amounts claimed under any employee stock ownership plans or employee stock purchase plans.

**Third Party** means any natural person who is a customer, vendor, service provider or other business invitee of an **Organization**.

**Third Party Claim** means any:

(A)     written demand first received by an **Insured** for monetary or non-monetary relief, including injunctive relief;

(B)     civil proceeding commenced by the service of a complaint or similar pleading;

(C)     arbitration proceeding commenced by the receipt by an **Insured** of a demand for arbitration or similar document, or any other external alternative dispute resolution proceeding commenced by receipt by an **Insured** of a demand for an alternative dispute resolution or similar document; or

(D)     administrative, regulatory or tribunal proceeding commenced by the issuance of a notice of charge, formal investigative order or similar document,

which is brought and maintained by or on behalf of a **Third Party** against an **Insured** for a **Third Party Wrongful Act**, including any appeal therefrom; or

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 64 of 143

CHUBB˙ Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**<sup>SM</sup>
**Employment Practices Liability**
**Coverage Part**

(E)    a written request first received by an **Insured** to toll or waive a statute of limitations relating to a potential **Third Party Claim** as described in Subsections (A) through (D) above.

**Third Party Wrongful Act** means any actual or alleged:

(A)    discrimination against a **Third Party** based upon such **Third Party's** race, color, religion, creed, genetic information, age, sex, disability, marital status, national origin, pregnancy, HIV status, sexual orientation or preference, Vietnam Era Veteran status or other protected military status or other status that is protected pursuant to any federal, state, or local statutory law or common law anywhere in the world; or

(B)    harassment, including unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature against a **Third Party**,

committed, attempted, or allegedly committed or attempted by any **Organization** or by any **Insured Person** while acting in his or her capacity as such.

**Workplace Tort** means any:

(A)    employment-related:

    (1)    misrepresentation;

    (2)    defamation (including libel and slander);

    (3)    invasion of privacy (including the unauthorized use or disclosure of an **Employee's** (a) medical information in violation of the Health Insurance Portability and Accountability Act ("HIPAA"); (b) credit information or related information in violation of the Fair Credit Reporting Act; or (c) other information obtained through an employment-related background check);

    (4)    negligent evaluation;

    (5)    wrongful discipline; or

    (6)    wrongful deprivation of career opportunity; or

(B)    employment-related:

    (1)    negligent retention;

    (2)    negligent supervision;

    (3)    negligent hiring;

    (4)    negligent training;

    (5)    wrongful infliction of emotional distress, mental anguish or humiliation;

    (6)    failure to provide or enforce consistent employment-related corporate policies and procedures; or

    (7)    false imprisonment,

but only when alleged as part of an **Employment Claim** for any **Wrongful Employment Decision**, **Breach of Employment Contract**, **Employment Discrimination**, **Employment Harassment**, **Retaliation**, **Wrongful Termination**, or any act set forth in Subsection (A) of this definition.

**Wrongful Act** means an **Employment Practices Wrongful Act** and **Third Party Wrongful Act**.

**Wrongful Employment Decision** means any wrongful demotion, denial of tenure, or failure or refusal to hire or promote, failure to employ, or wrongful or negligent employee reference.

**Wrongful Termination** means any wrongful termination, dismissal or discharge of employment, including constructive termination, dismissal or discharge. **Wrongful Termination** does not include **Breach of Employment Contract**.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 65 of 143

CHUBB'  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Employment Practices Liability*
*Coverage Part*

III.  **EXCLUSIONS**

The Company shall not be liable for **Loss** on account of any **Claim**:

(A)  Prior Notice
based upon, arising from or in consequence of any fact, circumstance, situation, transaction, event or **Wrongful Act** that, before the inception date set forth in Item 2 (A), Policy Period, of the GTC Declarations, was the subject of any notice accepted under any employment practices liability policy or coverage part or any other liability policy or coverage part that includes coverage for employment practices liability of which this Coverage Part is a direct or indirect renewal or replacement;

(B)  Pending or Prior Proceedings
based upon, arising from or in consequence of a written demand alleging a **Wrongful Act**, suit, formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document, a Notice of Violation or Order to Show Cause resulting from an audit conducted by the Office of Federal Contract Compliance Programs or arbitration proceeding pending against or order, decree or judgment entered for or against any **Insured** on or prior to the applicable Pending or Prior Proceedings Date as set forth in Item 5 of the EPL Declarations or the same or substantially the same fact, circumstance or situation underlying or alleged therein;

(C)  Pollution
based upon, arising from or in consequence of any:

(1)  discharge, emission, release, dispersal or escape of any **Pollutants** or any threat thereof;

(2)  treatment, removal or disposal of any **Pollutants**; or

(3)  regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Pollutants**,

including any **Claim** for financial loss to an **Organization**, its securityholders or its creditors based upon, arising from or in consequence of any matter described in Paragraphs (1), (2) or (3) of this Exclusion (C), provided that this Exclusion (C) shall not apply to **Loss** on account of any **Employment Claim** for **Retaliation**;

(D)  Bodily Injury/ Property Damage
for bodily injury, mental anguish, humiliation, emotional distress, sickness, disease or death of any person or damage to or destruction of any tangible property including the loss of use thereof whether or not it is damaged or destroyed, provided that this Exclusion (D) shall not apply to **Loss** for any mental anguish, humiliation or emotional distress when alleged as part of an otherwise covered **Claim**;

(E)  Workers' Compensation, Unemployment, Social Security, Disability Benefits
for any obligation of an **Insured** pursuant to any workers compensation, unemployment insurance, social security, disability benefits or any similar federal, state, or local statutory law or common law anywhere in the world, provided that this Exclusion (E) shall not apply to **Loss** on account of any **Employment Claim** for **Retaliation**;

(F)  Breach of Independent Contractor Agreement
for any breach of any **Independent Contractor Services Agreement**;

(G)  Employee Benefits Program
for any violation of the responsibilities, obligations or duties imposed by any federal, state, or local statutory law or common law anywhere in the world (including the Employment Retirement Income Security Act of 1974 (except section 510 thereof) and the Consolidated Omnibus Budget Reconciliation Act of 1985) or amendments to or regulations promulgated under any such law that governs any employee benefit arrangement, program, policy, plan or scheme of any type (whether or not legally required or whether provided during or subsequent to employment with an **Organization**), including any:

(1)  retirement income or pension benefit program;

(2)  profit sharing plan, deferred compensation plan, employee stock purchase plan, or employee stock ownership plan;

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 66 of 143

CHUBB®  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Employment Practices Liability*
*Coverage Part*

(3)    vacation, maternity leave, personal leave, or parental leave;

(4)    severance pay arrangement;

(5)    apprenticeship program;

(6)    life insurance plan, welfare plan, supplementary unemployment compensation plan, or pre-paid legal service plan or scholarship plan;

(7)    health, sickness, medical, dental, disability or dependant care plan; or

(8)    similar arrangement, program, plan or scheme,

provided that this Exclusion (G) shall not apply to **Loss** on account of any **Employment Claim** for **Retaliation**;

(H)    Occupational Safety and Health
for any violation of the responsibilities, obligations or duties imposed by any federal, state, or local statutory law or common law anywhere in the world (including the Occupational Safety and Health Act) or amendments to or regulations promulgated under any such law that governs workplace safety and health, including any obligation to maintain a place of employment free from hazards likely to cause physical harm, injury or death, provided that this Exclusion (H) shall not apply to **Loss** on account of any **Employment Claim** for **Retaliation**;

(I)    Wage and Hour
for any violation of the responsibilities, obligations or duties imposed by any federal, state, or local statutory law or common law anywhere in the world (including the Fair Labor Standards Act) or amendments to or regulations promulgated under any such law that governs wage, hour and payroll policies and practices, except the Equal Pay Act, including:

(1)    the calculation, recordkeeping, timing or manner of payment of minimum wages, prevailing wage rates, overtime pay or other compensation alleged to be due and owing;

(2)    the classification of any organization or person for wage and hour purposes;

(3)    garnishments, withholdings or other deductions from wages;

(4)    child labor;

(5)    pay equity or comparable worth; or

(6)    any similar policies or practices,

provided that this Exclusion (I) shall not apply to **Loss** on account of any **Employment Claim** for **Retaliation**;

(J)    Workforce Notification
for any violation of the responsibilities, obligations or duties imposed by any federal, state, or local statutory law or common law anywhere in the world (including the Worker Adjustment and Retraining Notification Act) or amendments to or regulations promulgated under any such law that governs any obligation of an employer to notify, discuss or bargain with its employees or others in advance of any plant or facility closing, or mass layoff, or any similar obligation, provided that this Exclusion (J) shall not apply to **Loss** on account of any **Employment Claim** for **Retaliation**;

(K)    Labor Management Relations
for any violation of the responsibilities, obligations or duties imposed by any federal, state, or local statutory law or common law anywhere in the world (including the National Labor Relations Act) or any amendments to or regulations promulgated under any such law that governs:

(1)    the rights of employees to engage in, or to refrain from engaging in, union or other collective activities, including union organizing, union elections and other union activities;

Case 1:22-cv-00553-CCE-JEP    Document 1-2    Filed 07/15/22    Page 67 of 143

CHUBB·   Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**<sup>SM</sup>
*Employment Practices Liability*
*Coverage Part*

(2)   the duty or obligation of an employer to meet, discuss, notify or bargain with any employee or employee representative, collectively or otherwise;

(3)   the enforcement of any collective bargaining agreement, including grievance and arbitration proceedings;

(4)   strikes, work stoppages, boycotts, picketing and lockouts; or

(5)   any similar rights or duties,

provided that this Exclusion (K) shall not apply to **Loss** on account of any **Employment Claim** for **Retaliation**;

(L)   <u>Breach of Written Employment Contract</u>
based upon, arising from or in consequence of any breach of any written employment contract, provided that this Exclusion (L) shall not apply to:

(1)   **Loss** to the extent an **Insured** would have been liable for such **Loss** in the absence of such written employment contract; or

(2)   **Defense Costs**.

---

IV.   **REPORTING**

(A)   An **Insured** shall, as a condition precedent to exercising any right to coverage under this Coverage Part, give to the Company written notice of any **Claim** as soon as practicable after the chief executive officer, chief financial officer, any person with the responsibility for the management of insurance claims (or any equivalent position to any of the foregoing), or any member of the in-house general counsel or human resources departments, of an **Organization** becomes aware of such **Claim**, but in no event later than:

(1)   if this Coverage Part expires (or is otherwise terminated) without being renewed with the Company, ninety (90) days after the effective date of such expiration or termination; or

(2)   the expiration date of the Extended Reporting Period, if applicable,

provided that if the Company sends written notice to the **Parent Organization** stating that this Coverage Part is being terminated for nonpayment of premium, an **Insured** shall give to the Company written notice of such **Claim** prior to the effective date of such termination.

(B)   Notwithstanding the foregoing Subsection (A) and solely with respect to an **Employment Claim** that is brought as a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, an **Insured**, shall, as a condition precedent to exercising any right to coverage under this Coverage Part, give written notice thereof to the Company during the **Policy Period**, or, if applicable, in no event later than the earliest of the following dates:

(1)   if this Coverage Part is renewed, 180 days after the end of the **Policy Period**,

(2)   if this Coverage Part expires (or is otherwise terminated) without being renewed with the Company and if no Extended Reporting Period is purchased, ninety (90) days after the effective date of such expiration or termination; or

(3)   the expiration date of the Extended Reporting Period, if elected,

provided that if the Company sends written notice to the **Parent Organization**, stating that this Policy is being terminated for nonpayment of premium, an **Insured** shall give to the Company written notice of such **Employment Claim** prior to the effective date of such termination.

(C)   If during the **Policy Period**, or any applicable Extended Reporting Period, an **Insured** becomes aware of a **Potential Claim** and gives written notice of such **Potential Claim** to the Company, and requests coverage under this Coverage Part for any **Claim** subsequently resulting from such **Potential Claim**, then any **Claim** subsequently arising from the **Potential Claim** shall be deemed made against the **Insured**

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 68 of 143

**CHUBB** Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*[SM]
*Employment Practices Liability*
*Coverage Part*

during the **Policy Year** in which written notice of such **Potential Claim** was first given to the Company, provided any such subsequent **Claim** is reported to the Company as soon as practicable, but in no event later than ninety (90) days after the chief executive officer, chief financial officer, any position responsible for the management of insurance claims (or any position equivalent to any of the foregoing), or any member of the in-house general counsel or human resources departments of an **Organization** becomes aware of such **Claim**.

(D)    An **Insured** shall, as a condition precedent to exercising any right to coverage under this Coverage Part, give to the Company such information, assistance and cooperation as the Company may reasonably require and shall include in any notice under Subsections (A), (B) or (C) above, a description of the **Claim**, request or **Potential Claim**, the nature of any alleged **Wrongful Act**, the nature of the alleged or potential damage, the names of all actual or potential claimants, the names of all actual or potential defendants, the manner in which such **Insured** first became aware of the **Claim**, **Potential Claim** or alleged **Wrongful Act**, and with respect to notices of **Potential Claims** under Subsection (C) above, the consequences which have resulted or may result from such **Potential Claim**.

## V.    RETENTION

(A)    The Company's liability under this Coverage Part shall apply only to that part of each **Loss** which is excess of the applicable Retention set forth in Item 4 of the EPL Declarations and such Retention shall be borne by the **Insureds** uninsured and at their own risk.

(B)    If different parts of a single **Claim** are subject to different Retentions in different Insuring Clauses within this Coverage Part, the applicable Retentions shall be applied separately to each part of such **Claim**, but the sum of such Retentions shall not exceed the largest applicable Retention.

(C)    If different parts of a single **Claim** are subject to different Retentions in different Coverage Parts, the applicable Retentions shall be applied separately to each part of such **Claim**, but the sum of such Retentions shall not exceed the largest applicable Retention.

(D)    **Claims** shall be subject to the Retention(s) applicable to the **Policy Year** during which such **Claims** are first made or first deemed to have been made.

(E)    No Retention shall apply to any **Loss** under this Coverage Part incurred by an **Insured Person** if such **Loss** can not be indemnified by an **Organization** because such **Organization** is not permitted by common or statutory law to indemnify, or is permitted or required to indemnify, but is unable to do so by reason of **Financial Impairment**.

## VI.    DEFENSE AND SETTLEMENT

(A)    Except as provided in Subsection (B) below, the Company shall have the right and duty to defend any **Claim** covered by this Coverage Part. Coverage shall apply even if any of the allegations are groundless, false or fraudulent. The Company's duty to defend any **Claim** shall cease upon exhaustion of the applicable Limit of Liability.

(B)    Notwithstanding Subsection (A) above, it shall be the duty of the **Insureds** and not the duty of the Company to defend any **Claim** which is in part excluded from coverage pursuant to Exclusion III(I), Wage and Hour. For such portion of such **Claim** that is otherwise covered under this Coverage Part, the **Insureds** shall select as defense counsel for such **Claim** a law firm included in the Company's then current list of approved employment defense firms for the jurisdiction in which such **Claim** is pending.

(C)    The Company may make any investigation it deems necessary and may, with the consent of the **Insureds**, make any settlement of any **Claim** it deems appropriate.

(D)    No **Insured** shall settle any **Claim**, incur any **Defense Costs**, or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the Company's written consent, which

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 69 of 143

**C H U B B**  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

***ForeFront Portfolio 3.0<sup>SM</sup>***
***Employment Practices Liability***
***Coverage Part***

shall not be unreasonably withheld. The Company shall not be liable for any settlement, **Defense Costs**, assumed obligation or admission to which it has not consented.

(E)   The Company shall have no obligation to pay **Loss**, including **Defense Costs**, or to defend or continue to defend any **Claim** after the Company's Maximum Aggregate Limit of Liability set forth in Item 2 of the EPL Declarations or the Combined Maximum Aggregate Limit of Liability set forth in Item 3 of the GTC Declarations, if applicable, has been exhausted by the payment of **Loss** and the premium shall be deemed fully earned.

(F)   The **Insureds** agree to provide the Company with all information, assistance and cooperation which the Company reasonably requests and agrees they will do nothing that may prejudice the Company's position or its potential or actual rights of recovery.

---

## VII.   ALLOCATION

If the **Insureds** who are afforded coverage for a **Claim** incur an amount consisting of both **Loss** that is covered by this Coverage Part and also loss that is not covered by this Coverage Part because such **Claim** includes both covered and uncovered matters, then coverage shall apply as follows:

(A)   **Defense Costs**: one hundred percent (100%) of **Defense Costs** incurred by such **Insured** on account of such **Claim** shall be covered **Loss**, provided that the foregoing shall not apply with respect to any **Insured** for whom coverage is excluded pursuant to Exclusion III(I), Wage and Hour, or Subsection X(C), Representations and Severability. Such **Defense Costs** shall be allocated between covered **Loss** and non-covered loss based on the relative legal exposures of the parties to such matters; and

(B)   loss other than **Defense Costs**: all remaining loss incurred by such **Insured** from such **Claim** shall be allocated between covered **Loss** and uncovered loss based upon the relative legal exposures of the parties to such matters.

---

## VIII.   EMPLOYMENT CLAIM ARBITRATION

(A)   Any dispute between any **Insured** and the Company based upon, arising from or in any way involving any actual or alleged coverage under this Coverage Part, or the validity, termination or breach of this Coverage Part, including any dispute sounding in contract or tort, shall be submitted to binding arbitration.

(B)   An **Organization**, however, shall first have the option to resolve the dispute by non-binding mediation pursuant to such rules and procedures, and using such mediator, as the parties may agree. If the parties cannot so agree, the mediation shall be administered by the American Arbitration Association pursuant to its then prevailing commercial mediation rules.

(C)   If the parties cannot resolve the dispute by non-binding mediation, the parties shall submit the dispute to binding arbitration pursuant to the then prevailing commercial arbitration rules of the American Arbitration Association, except that the arbitration panel shall consist of one arbitrator selected by the **Insureds**, one arbitrator selected by the Company, and a third arbitrator selected by the first two arbitrators.

---

## IX.   OTHER INSURANCE

Unless specifically stated otherwise, the coverage afforded under this Coverage Part for:

(A)   **Employment Claims** shall be primary, provided that with respect to that portion of an **Employment Claim** made against any leased or temporary employee or **Independent Contractor**, **Loss**, including **Defense Costs**, payable on behalf of such leased or temporary employee or **Independent Contractor** under this Coverage Part shall be excess of and shall not contribute with any other valid and collectible insurance policy (other than a policy that is issued specifically as excess of the insurance afforded by the

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 70 of 143


Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Employment Practices Liability*
*Coverage Part*

Coverage Part), regardless of whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

(B)     **Third Party Claims** shall be excess of and shall not contribute with any other valid and collectible insurance policy (other than a policy that is issued specifically as excess of the insurance afforded by the Coverage Part), regardless of whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

X.     **REPRESENTATIONS AND SEVERABILITY**

(A)     In granting coverage to the **Insureds** under this Coverage Part, the Company has relied upon the declarations and statements in the **Application** for this Coverage Part. Such declarations and statements are the basis of the coverage under this Coverage Part and shall be considered as incorporated in and constituting part of this Coverage Part.

(B)     The **Application** for coverage shall be construed as a separate **Application** for coverage by each **Insured Person**. With respect to the declarations and statements in such **Application**, no knowledge possessed by an **Insured Person** shall be imputed to any other **Insured Person**.

(C)     However, in the event that such **Application** contains any misrepresentations made with the actual intent to deceive or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by the Company under this Coverage Part, then no coverage shall be afforded for any **Claim** based upon, arising from or in consequence of any such misrepresentations with respect to:

(1)     any **Insured Person** who knew of such misrepresentations (whether or not such **Insured Person** knew such **Application** contained such misrepresentations) or any **Organization** to the extent it indemnifies any such **Insured Person**; or

(2)     any **Organization** if any past or present director of human resources, chief executive officer, chief financial officer, in-house general counsel (or any equivalent position to any of the foregoing) of the **Parent Organization** knew of such misrepresentations (whether or not such individual knew such **Application** contained such misrepresentations).

(D)     The Company shall not be entitled under any circumstances to void or rescind this Coverage Part with respect to any **Insured**.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 71 of 143

Coverage Section: ForeFront Portfolio 3 0 Employment Practices Liability Coverage Part

Effective date of
this endorsement/rider: March 10, 2019

Federal Insurance Company

Endorsement/Rider No. 1

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

---

VIOLATION OF EMPLOYEE PRIVACY ENDORSEMENT
(DEFENSE COSTS ONLY WITH SUBLIMIT)

In consideration of the premium charged, it is agreed that solely with respect to this Employment Practices Liability Coverage Part, the following shall apply:

(1) The Company's maximum aggregate liability for all **Defense Costs** on account of all **Employment Claims** for a "Violation of Employee Privacy" (as defined below) shall be $250,000.00, which amount is part of, and not in addition to, the Company's Maximum Aggregate Limit of Liability set forth in Item 2 of the EPL Declarations.

(2) No coverage will be available under this Coverage Part for **Loss**, other than **Defense Costs**, on account of any **Employment Claim** for a Violation of Employee Privacy.

(3) The definition of **Employment Practices Wrongful Act**, as set forth in Section II. Definitions, of this Coverage Part is amended to include the following:

   **Employment Practices Wrongful Act** shall also mean any actual or alleged Violation of Employee Privacy committed, attempted, or allegedly committed or attempted by an **Organization** or by an **Insured Person** while acting in his or her capacity as such.

(4) Section XII. Coordination of Coverage, of the General Terms and Conditions is amended to include the following:

   Additionally, any **Loss** otherwise covered pursuant to the terms of this endorsement and the CyberSecurity Coverage Part, if purchased, shall be first covered under this Coverage Part, subject to its terms, conditions, and limitations.

(5) For the purposes of this endorsement, the following terms shall have the meanings set forth below:

   "Violation of Employee Privacy" means an **Organization's** failure to:

   (i) secure an employee's "Record" (as defined below) from actual or potential unauthorized access by another person or by an organization which results in injury to such employee; or

   (ii) provide notice as required by any state, federal or local statutory law or common law anywhere in the world to an employee whose Record was accessed or may have been accessed by an unauthorized person.

   "Record" means an employee's first name or first initial, and last name, in combination with:

   (i) their social security number, driver's license number or other personal identification number (including an employee identification number or student identification number);

14-02-14596 F3 (08/2011)           Page 1

<ol type="i" start="2">
<li>their financial account number (including a bank account number, retirement account number, or healthcare spending account number);</li>
<li>their credit, debit or other payment card number; or</li>
<li>any individually identifiable health information, pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), held by the **Organization**,</li>
</ol>

when any such information in (i) through (iv) above is intended by the **Organization** to be accessible only by persons or organizations specifically authorized by the **Organization** to have access to such information.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 73 of 143

Coverage Section: ForeFront Portfolio 3 0 Employment Practices Liability Coverage Part

Effective date of
this endorsement/rider: March 10, 2019     Federal Insurance Company

Endorsement/Rider No. 2

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

---

AMEND WAGE AND HOUR EXCLUSION ENDORSEMENT
(WITH SUBLIMIT FOR DEFENSE COSTS)

In consideration of the premium charged, it is agreed that solely with respect to this Employment Practices Liability Coverage Part the following shall apply:

(1)     Section I. Insuring Clauses, of this Coverage Part is amended to add the following Insuring Clause:

Wage and Hour Violation Defense Costs Coverage

Subject to the below "Conditions", the Company shall pay **Defense Costs** on behalf of the **Insureds** resulting from any "Wage and Hour Claim" (as defined below) first made against such **Insureds** during the **Policy Year**, or any applicable Extended Reporting Period, for "Wage and Hour Violation" (as defined below) committed or allegedly committed prior to the end of the **Policy Year**; provided, that the Company's maximum aggregate limit of liability for any such **Defense Costs** shall be $100,000.00, which amount is part of and not in addition to the Limit of Liability set forth in Item 3(A) of the EPL Declarations (hereinafter "Wage and Hour Defense Costs Sublimit").

(2)     No coverage will be available under this Coverage Part for **Defense Costs** resulting from any Wage and Hour Claim for a Wage and Hour Violation of which any CEO, CFO, Risk Manager, Dept of Human Resouces or Office of General Counsel of an **Organization** had knowledge prior to March 10, 2011.

(3)     Exclusion (I) of Section III. Exclusions, of this Coverage Part is amended to add the following exception:

provided that this Exclusion (I) shall not apply to **Defense Costs** afforded pursuant to the Wage and Hour Violation Defense Costs Coverage Insuring Clause set forth in paragraph (1) of this endorsement;

(4)     Section V. Extended Reporting Period, of the General Terms and Conditions, is amended to add the following paragraph:

If the Extended Reporting Period is purchased, then coverage otherwise afforded by the Wage and Hour Violation Defense Costs Coverage Insuring Clause as set forth in paragraph (1) of this endorsement will be extended to apply to **Defense Costs** resulting from any "Wage and Hour Claim" (as defined below) first made during such Extended Reporting Period but only for Wage and Hour Violations committed or allegedly committed prior to the end of the **Policy Period** or the date of any conversion of coverage described in Section VI. Changes in

14-02-17292 (7/2011)                    Page 1

Exposure, of the General Terms and Conditions, whichever is earlier. The limit of liability for any such **Defense Costs** for the Extended Reporting Period shall be part of and not in addition to the applicable Wage and Hour Defense Costs Sublimit.

(5)    The Retention set forth in Item 4. Retentions, of the EPL Declarations applicable to Insuring Clause (A), Employment Practices Liability Coverage Section, shall also be the Retention applicable to the Wage and Hour Violation Defense Costs Coverage.

(6)    For purposes of this endorsement, the following terms shall apply:

    "Wage and Hour Claim" means:

    (1)    any of the following:

        (a)    a written demand for monetary or non-monetary relief;

        (b)    a civil proceeding commenced by the service of a complaint or similar pleading;

        (c)    an arbitration proceeding; or

        (d)    a formal administrative or regulatory proceeding or tribunal proceeding, commenced by the filing of a notice of charges, formal investigative order or similar document;

    which is brought and maintained by or on behalf of any past, present or prospective **Employee** or **Independent Contractor**, against any **Insured** for a Wage and Hour Violation, including any appeal therefrom; or

    (2)    a written request received by an **Insured** to toll or waive a statute of limitations, relating to a potential Wage and Hour Claim as described in paragraph (1) above.

    Wage and Hour Claim shall not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement.

    "Wage and Hour Violation" means an actual or alleged violation of the responsibilities, obligations or duties imposed by any federal, state, or local statutory law or common law anywhere in the world (including the Fair Labor Standards Act) or amendments to or regulations promulgated under any such law that governs wage, hour and payroll policies and practices, except the Equal Pay Act.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 75 of 143

Coverage Section: ForeFront Portfolio 3 0 Employment Practices Liability Coverage Part

Effective date of
this endorsement/rider: March 10, 2019

Federal Insurance Company

Endorsement/Rider No. 3

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

AMEND RETALIATION DEFINITION ENDORSEMENT

In consideration of the premium charged, it is agreed that the lead-in wording of the definition of **Retaliation**, as set forth in Subsection II. Definitions, of this Coverage Part is deleted and replaced with the following:

> **Retaliation** means retaliatory treatment against any **Employee** or **Independent Contractor** of an **Organization** on account of such individual or another **Employee**:

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____

Authorized Representative

14-02-18340 (08/2011)            Page 1

Coverage Section: ForeFront Portfolio 3 0 Employment Practices Liability Coverage Part

Effective date of
this endorsement: March 10, 2019

Company: Federal Insurance Company

Endorsement No. 4

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

---

### PENDING OR PRIOR LITIGATION EXCLUSION FOR INCREASED LIMITS ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)   Solely with respect to any **Claim** made on or after March 10, 2007, Item 2 of the EPL Declarations is deleted and replaced with the following:

Item 2. Maximum Aggregate Limit of Liability for this Coverage Part:     $10,000,000.00

With respect to all other **Claims**, Item 2 of the EPL Declarations shall remain unchanged.

(2)   The Company shall not be liable under this Coverage Part for **Loss** on account of any **Claim** based upon, arising from or in consequence of a written demand alleging a **Wrongful Act**, suit, formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document, a Notice of Violation or Order to Show Cause resulting from an audit conducted by the Office of Federal Contract Compliance Programs or arbitration proceeding pending against or order, decree or judgment entered for or against any **Insured** prior to March 10, 2007 or the same or substantially the same fact, circumstance or situation underlying or alleged therein.

(3)   This endorsement shall only apply to the limit of liability of $5,000,000.00 in excess of $5,000,000.00 for each **Policy Year**.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

14-02-18717 (02/2012)          Page 2

All other terms, conditions and limitations of this policy shall remain unchanged.

_____
Authorized Representative

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 78 of 143

Coverage Section: ForeFront Portfolio 3 0 Employment Practices Liability Coverage Part

Effective date of
this endorsement/rider: March 10, 2019

Federal Insurance Company

Endorsement/Rider No. 5

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

AMEND REPORTING ENDORSEMENT

In consideration of the premium charged, it is agreed that Paragraph (B)(1) of Section IV, Reporting, of this
Coverage Part is deleted and replaced with the following:

(1)     if this Coverage Part is renewed, 365 days after the end of the **Policy Period,**

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and
conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____

Authorized Representative

14-02-21810 (05/2015)              Page 1


**CHUBB** Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Fiduciary Liability Coverage Part*

FL DECLARATIONS

**FEDERAL INSURANCE COMPANY**
A stock insurance company, incorporated under the laws of
Indiana, herein called the Company

Capital Center, 251 North Illinois, Suite 1100
Indianapolis, IN 46204-1927

**NOTICE: THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD", OR ANY APPLICABLE EXTENDED REPORTING PERIOD. THE LIMIT OF LIABILITY TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY "DEFENSE COSTS", AND "DEFENSE COSTS" WILL BE APPLIED AGAINST THE RETENTION. IN NO EVENT WILL THE COMPANY BE LIABLE FOR "DEFENSE COSTS" OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY. READ THE ENTIRE POLICY CAREFULLY.**

| | | |
|---|---|---|
| Item 1. | **Parent Organization:** | THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY |
| Item 2. | **Maximum Aggregate Limit of Liability for this Coverage Part:** | $5,000,000.00 |
| Item 3. | **Retentions:** | |
| | (A) Insuring Clause (A) Fiduciary Liability Coverage: | $0.00 |
| | (B) Insuring Clause (B) Voluntary Settlement Program Coverage: | $0.00 |
| Item 4. | **Pending or Prior Proceedings Dates:** | |
| | (A) Insuring Clause (A): | March 10, 2013 |
| | (B) Insuring Clause (B): | March 10, 2013 |

14-02-17273D (11/2010)

1 of 1

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 80 of 143

In consideration of payment of the premium and subject to the Declarations, General Terms and Conditions, and the limitations, conditions, provisions and other terms of this Coverage Part, the Company and the Insureds agree as follows:

## I.   INSURING CLAUSES

### Insuring Clause (A):  Fiduciary Liability Coverage

(A)  The Company shall pay, on behalf of an **Insured**, **Loss** on account of a **Claim** first made against the **Insured** during the **Policy Period**, or the Extended Reporting Period if applicable, for a **Wrongful Act** by the **Insured** or by any natural person for whose **Wrongful Acts** the **Insured** is legally liable.

### Insuring Clause (B):  Voluntary Settlement Program Coverage

(B)  The Company shall pay, on behalf of an **Insured**, **Voluntary Program Loss** and **Defense Costs** with respect to a **Voluntary Program Notice** that is first given to the Company during the **Policy Period**, provided that the Company's maximum liability for all **Voluntary Program Loss** and **Defense Costs** for the **Policy Year** shall be $150,000, which amount is part of, and not in addition to, the Maximum Aggregate Limit of Liability set forth in Item 2 of the FL Declarations.

## II.   DEFINITIONS

For purposes of this Coverage Part:

**Administration** means:

(A)  advising, counseling, or failing to provide proper or timely notice to **Employees**, **Executives**, participants or beneficiaries with respect to any **Plan**;

(B)  providing interpretations with respect to any **Plan**; or

(C)  handling of records or effecting enrollment, termination or cancellation of **Employees**, **Executives**, participants or beneficiaries under any **Plan**.

**Application** means:

(A)  any portion of an application given to the Company for this Policy including any attachments, written information and materials provided to the Company by or on behalf of an **Insured** for the purposes of the Company's underwriting of this Coverage Part;

(B)  all schedules filed with the U.S. Department of the Treasury Internal Revenue Service, the U.S. Department of Labor Employee Benefits Security Administration and the Pension Benefit Guarantee Corporation, and the audited financial statements last filed for all **Sponsored Plans**; and

(C)  any warranty provided to the Company within the past three years in connection with any coverage part or policy of which this Coverage Part is a renewal or replacement.

**Claim** means any:

(A)  written demand first received by an **Insured** for monetary or non-monetary relief, including injunctive relief;

(B)  civil proceeding commenced by the service of a complaint or similar pleading;

(C)  criminal proceeding commenced by: (1) an arrest, or (2) return of an indictment, information or similar document;

(D)  formal administrative or formal regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;

(E)  arbitration or mediation proceeding commenced by the receipt of a demand for arbitration, demand for mediation, or similar document;

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 81 of 143

(F)     written notice of commencement of a fact-finding investigation by the U.S. Department of Labor, the U.S. Pension Benefit Guaranty Corporation, or any similar governmental authority located outside the United States, including, the Pensions Ombudsman appointed by the United Kingdom Secretary of State for Work and Pensions or by the United Kingdom Occupational Pensions Regulatory Authority or any successor thereto; or

(G)     official request for **Extradition** of an **Insured Person**,

against an **Insured** for a **Wrongful Act**, including any appeal therefrom; or

(H)     a written request first received by an **Insured** to toll or waive a statute of limitations relating to a potential **Claim** as described in Subsections (A) through (G) above.

**Committee** means any committee established by an **Organization** with respect to a **Sponsored Plan**, which consists only of natural person members who are **Executives** or **Employees**.

**Defense Costs** means that part of **Loss** consisting of reasonable costs, charges, fees (including attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of the **Insured Persons**) incurred in investigating, defending, opposing or appealing any **Claim** or any **Voluntary Program Notice**, and the premium for appeal, attachment or similar bonds.

**Employee** means any natural person whose labor or service was, is or will be engaged and directed by an **Organization**, including a part-time, seasonal, leased and temporary employee, intern or volunteer. **Employee** shall not include any independent contractor.

**ERISA** means:

(A)     the Employee Retirement Income Security Act of 1974, as amended and any rules or regulations promulgated thereunder (including, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"));

(B)     the English Pension Scheme Act 1993, and the English Pensions Act 1995, as such Acts are amended and any rules or regulations promulgated under such Acts, and

any similar statutory or common law anywhere in the world, and any rules or regulations promulgated thereunder; and

(C)     the privacy provisions under HIPAA.

**Executive** means any natural person who was, is or will be:

(A)     a duly elected or appointed director, officer, member of the Advisory Board or in-house general counsel of any **Organization** incorporated in the United States of America;

(B)     a duly elected or appointed: (1) manager, member of the Board of Managers or equivalent position; (2) member of the Advisory Board; or (3) in-house general counsel, of any **Organization** formed as a limited liability company in the United States of America; or

(C)     a holder of an equivalent position to those described in Subsections (A) or (B) above in any **Organization** incorporated, formed or organized anywhere in the world.

**Extradition** means any formal process by which an **Insured Person** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation, or the execution of a warrant for the arrest of an Insured Person where such execution is an element of **Extradition**.

**Financial Impairment** means the status of an **Organization** resulting from:

(A)     the appointment by any federal or state official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate such **Organization**; or

(B)     such **Organization** becoming a debtor in possession under the United States bankruptcy law or the equivalent of a debtor in possession under the law of any other country,

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 82 of 143


provided that the court or other judicial or administrative body overseeing the receivership, conservatorship, liquidation, rehabilitation, bankruptcy or equivalent proceeding has denied a request by the **Organization**, or other party determined to have standing, for authorization of the **Organization** to indemnify an **Insured Person** for **Loss**; provided further that, the Company may, in its sole discretion, waive the foregoing requirement.

**Insured** means any **Organization**, any **Plan**, any **Committee** and any **Insured Person**.

**Insured Person** means any:

(A)     **Executive** or **Employee** of an **Organization**;

(B)     employee of a **Sponsored Plan**;

(C)     past, present or future natural person trustee of an **Organization** or of the **Sponsored Plan**; and

(D)     past, present or future natural person trustee or fiduciary, when such natural person is added as an **Insured Person** by specific written endorsement to this Coverage Part.

**Loss** means:

(A)     solely for purposes of Insuring Clause (A), Fiduciary Liability Coverage, the amount which any **Insured** becomes legally obligated to pay as a result of any **Claim**, including:

      (1)     compensatory damages;

      (2)     punitive, exemplary or multiplied damages, if and to the extent such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages, provided such jurisdiction has a substantial relationship to the **Insured**, the Company, or the **Claim** giving rise to such damages;

      (3)     judgments, including pre-judgment and post-judgment interest;

      (4)     settlements; and

      (5)     **Defense Costs**; and

(B)     solely for purposes of Insuring Clause (B), Voluntary Settlement Program Coverage, **Voluntary Program Loss**,

provided that **Loss** does not include any portion of such amount that constitutes any:

(1)     cost of compliance with any order for, grant of or agreement to provide non-monetary relief, including injunctive relief;

(2)     amount uninsurable under the law pursuant to which this Coverage Part is construed;

(3)     tax imposed by law;

(4)     fine or penalty imposed by law, except:

      (a)     as provided in Paragraph (A)(2) above with respect to punitive, exemplary or multiplied damages;

      (b)     the five percent (5%) or less, or the twenty percent (20%) or less, civil penalties imposed upon an **Insured** as a fiduciary under Section 502(i) or (l), respectively, of the Employee Retirement Income Security Act of 1974, as amended;

      (c)     solely with respect to Insuring Clause (B), Voluntary Settlement Program Coverage, **Voluntary Program Loss**;

      (d)     civil penalties imposed by:

            (i)     the Pension Ombudsman appointed by the United Kingdom Secretary of State for Work and Pensions or any successor thereto, by the United Kingdom Occupational Pensions Regulatory Authority, or the Pensions Regulator or any successor thereto, pursuant to the Pension Scheme Act 1993, the Pensions Act 1995, the Pensions Act 2004, or rules or regulations thereunder; or

            (ii)     Ireland's Pensions Board or Pensions Ombudsman,

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 83 of 143


provided that any coverage for such civil penalties applies only if the funds or assets of the pension scheme are not used to fund, pay or reimburse the premium for this Coverage Part;

(e) civil penalties imposed upon an **Insured** as a fiduciary under Section 502(c) of the Employee Retirement Income Security Act of 1974, as amended (including, any amendments pursuant to Section 507 of Title V of the Pension Protection Act of 2006); provided the Company's maximum limit of liability for all such civil penalties on account of all **Claims** first made during the **Policy Year** shall be $50,000, which amount is part of, and not in addition to, the Maximum Aggregate Limit of Liability set forth in Item 2 of the FL Declarations;

(f) civil money penalties imposed upon an **Insured** for such **Insured's** violation of the privacy provisions of the Health Insurance Portability and Accountability Act of 1996, as amended; provided the Company's maximum limit of liability for all such civil money penalties on account of all **Claims** first made during the **Policy Year** shall be $150,000, which amount is part of, and not in addition to, the Maximum Aggregate Limit of Liability set forth in Item 2 of the FL Declarations;

(5) amounts incurred by an **Insured** in the defense or investigation of any action, proceeding, investigation or demand that was not then a **Claim** or a **Voluntary Program Notice**, even if (a) such amount also benefits the defense of a covered **Claim** or **Voluntary Program Notice**; or (b) such action, proceeding, investigation or demand subsequently gives rise to a **Claim** or to a **Voluntary Program Notice**;

(6) cost incurred in cleaning-up, removing, containing, treating, detoxifying, neutralizing, assessing the effects of, testing for, or monitoring **Pollutants**; or

(7) (a) benefits due or to become due under any **Plan**, or (b) benefits which would be due under any **Plan** if such **Plan** complied with all applicable law, including loss resulting from the payment of plaintiff attorneys' fees based upon a percentage of such benefits or payable from a common fund established to pay such benefits, except to the extent that:

(i) an **Insured** is a natural person and the benefits are payable by such **Insured** as a personal obligation, and recovery for the benefits is based upon a covered **Wrongful Act**; or

(ii) a **Claim** made against an **Insured** alleges a loss to the **Plan** and/or to the accounts of such **Plan's** participants by reason of a change in the value of the investments held by such **Plan**, regardless of whether the amounts sought or recovered by the plaintiffs in such **Claim** are characterized by plaintiffs as "benefits" or held by a court as "benefits".

**Plan** means:

(A) any **Sponsored Plan**; and

(B) any government-mandated insurance for workers compensation, unemployment, social security or disability benefits for **Employees** and **Executives**.

**Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, asbestos, asbestos products or waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**Sponsored Plan** means:

(A) any employee benefit plan, pension benefit plan or welfare benefit plan, as defined in and subject to the Employee Retirement Income Security Act of 1974, as amended, including any **VEBA**, which is operated solely by an **Organization** or jointly by an **Organization** and a labor organization solely for the benefit of the **Employees** or **Executives** of an **Organization**, located anywhere in the world and which existed on or before the inception date of this Policy, or, subject to Section VI, Changes in Exposure, of the General Terms and Conditions, which is created or acquired after such inception date, provided that any coverage with respect to an employee stock ownership plan created or acquired during the **Policy Period** shall be further subject to Section IV, Creation or Acquisition of an ESOP;

(B) any other employee benefit plan or program not subject to the Employee Retirement Income Security Act of 1974, as amended which is operated solely by an **Organization** or jointly by an **Organization** and a labor organization solely for the benefit of the **Employees** or **Executives** of an **Organization**, including any fringe benefit or excess benefit plan located anywhere in the world and which existed on or before the

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 84 of 143


inception date of this Policy, or, subject to Section VI, Changes in Exposure, of the General Terms and Conditions, which is created or acquired after such inception date; and

(C)    any other plan, fund, or program specifically included as a **Sponsored Plan** by endorsement to this Coverage Part,

provided that **Sponsored Plan** shall not include any employee stock ownership plan created or acquired by the **Organization** during the **Policy Period** (except as otherwise provided in Section IV, Creation or Acquisition of an ESOP).

**VEBA** means any Voluntary Employees' Beneficiary Associations as defined in Section 501(c)(9) of the Internal Revenue Code of 1986, as amended and any regulations thereunder, the purpose of which is to provide for life, sick, accident or other benefits for voluntary members who are **Employees, Executives**, their dependents or designated beneficiaries.

**Voluntary Program** means any voluntary compliance resolution program or similar voluntary settlement program administered by the U.S. Internal Revenue Service or U.S. Department of Labor, including the Delinquent Filer Voluntary Compliance Program, the Voluntary Fiduciary Correction Program and the Employee Plans Compliance Resolution System, or any similar program administered by a governmental authority located outside the United States.

**Voluntary Program Loss** means fees, fines, penalties or sanctions paid by an **Insured** to a governmental authority pursuant to a **Voluntary Program** for the actual or alleged inadvertent non-compliance by a **Plan** with any statute, rule or regulation, provided that the **Voluntary Program Notice** relating thereto was given to the Company during the **Policy Period**.

**Voluntary Program Notice** means, with respect to any **Plan**, prior written notice to the Company by any **Insured** of the **Insured's** intent to enter into any **Voluntary Program**, provided that no **Insured Person** knew the **Plan** to be actually or allegedly non-compliant as of the earlier of the inception of this Policy or the inception of the first policy in an uninterrupted series of policies issued by the Company of which this Coverage Part is a direct or indirect renewal or replacement.

**Wrongful Act** means any actual or alleged:

(A)    breach of the responsibilities, obligations or duties imposed by **ERISA** upon fiduciaries of the **Sponsored Plan** committed, attempted or allegedly committed or attempted   by an **Insured** while acting in the **Insured's** capacity as a fiduciary;

(B)    negligent act, error or omission in the **Administration** of any **Plan** committed, attempted or allegedly committed or attempted by an **Insured**; or

(C)    matter, other than as set forth in (A) or (B) above, claimed against an **Insured** solely by reason of the **Insured's** service as a fiduciary of any **Sponsored Plan**.

## III.    EXCLUSIONS

The Company shall not be liable for **Loss** on account of any **Claim** or for any **Voluntary Program Notice**:

(A)    <u>Prior Notice</u>:
based upon, arising from or in consequence of any fact, circumstance, situation, transaction, event or **Wrongful Act** that, before the inception date set forth in Item 2(A), Policy Period, of the GTC Declarations, was the subject of any notice accepted under any fiduciary liability or employee benefit liability policy or coverage part of which this Coverage Part is a direct or indirect renewal or replacement;

(B)    <u>Pending or Prior Proceedings</u>:
based upon, arising from or in consequence of a written demand, suit, or other proceeding pending against, or order, decree or judgment entered for or against any **Insured**, on or prior to the applicable Pending or Prior Proceedings Date set forth in Item 4 of the FL Declarations, or the same or substantially the same fact, circumstance or situation underlying or alleged therein;

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 85 of 143

(C)     Bodily Injury/Property Damage:
        for bodily injury, mental anguish, humiliation, emotional distress, sickness, disease or death of any person or damage to or destruction of any tangible property including loss of use thereof whether or not it is damaged or destroyed;

(D)     Pollution:
        based upon, arising from or in consequence of any:

        (1)     discharge, emission, release, dispersal or escape of any **Pollutants**, or any threat thereof;

        (2)     treatment, removal or disposal of any **Pollutants**; or

        (3)     regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Pollutants**,

        including any **Claim** for financial loss to an **Organization**, its securityholders or its creditors, or to the **Plan**, based upon, arising from or in consequence of any matter described in Paragraphs (1), (2) or (3) of this Exclusion (D),

        provided that this Exclusion (D) shall not apply:

        (1)     to **Loss** on account of any **Claim** by or on behalf of a beneficiary of or participant in any **Sponsored Plan** based upon, arising from or in consequence of the diminution in value of any securities owned by the **Sponsored Plan** in any organization if such diminution in value is allegedly as a result of the matters described above in this Exclusion (D); or

        (2)     to **Loss** which an **Insured Person** becomes legally obligated to pay and for which such **Insured Person** is not indemnified by an **Organization** either because the **Organization** is not permitted by statutory or common law to grant such indemnification or because of the **Financial Impairment** of the **Organization**, provided that this exception shall only apply to **Claims** first made during the **Policy Period** or the Extended Reporting Period, if applicable;

(E)     Assumed Liability Under Contract:
        based upon, arising from or in consequence of liability of others assumed by any **Insured** under any written or oral contract or agreement, provided that this Exclusion (E) shall not apply to **Loss** to the extent that:

        (1)     an **Insured** would have been liable in the absence of the contract or agreement; or

        (2)     the liability was assumed under the agreement or declaration of trust pursuant to which the **Plan** was established;

(F)     Workers' Compensation, Unemployment, Social Security, Disability Benefits:
        for any failure of any **Insured** to comply with any workers' compensation, unemployment insurance, social security or disability benefits law or any amendments to or rules or regulations promulgated under any such law, or any similar provisions of any federal, state, or local statutory law or common law anywhere in the world, except, to the extent otherwise covered hereunder, **Wrongful Acts** in connection with: (a) the Consolidated Omnibus Budget Reconciliation Act of 1985, (b) the Health Insurance Portability and Accountability Act of 1996, or (c) any amendments to or any rules or regulations promulgated under such Acts;

(G)     Wage and Hour:
        for any violation of the responsibilities, obligations or duties imposed by any federal, state, or local statutory law or common law anywhere in the world (including the Fair Labor Standards Act) or amendments to or regulations promulgated under any such law that governs wage, hour and payroll policies and practices; or

(H)     Conduct:
        based upon, arising from or in consequence of:

        (1)     any deliberately fraudulent act or omission, or any willful violation of any statute or regulation, by an **Insured**, if a final, non-appealable adjudication in any underlying proceeding or action (other than a declaratory proceeding or action brought by or against the Company) establishes such an act or omission or violation; or

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 86 of 143

    (2)    an **Insured** having gained any profit, remuneration or other advantage to which such **Insured** was not legally entitled, if a final, non-appealable adjudication in any underlying proceeding or action (other than a declaratory proceeding or action brought by or against the Company) establishes the gaining of such a profit, remuneration or advantage,

provided that,

    (a)    no conduct pertaining to any **Insured Person** shall be imputed to any other **Insured Person** or to any **Plan**; and

    (b)    any conduct pertaining to any past, present, or future chief financial officer, chief executive officer, chief operating officer or head of benefits (or any equivalent position to any of the foregoing) of an **Organization** shall be imputed to such **Organization** and its **Subsidiaries**.

## IV.    CREATION OR ACQUISITION OF AN ESOP

Notwithstanding anything in this Coverage Part to the contrary, if during the **Policy Period** any **Organization** creates or directly or indirectly acquires an employee stock ownership plan ("ESOP"), the **Organization** shall promptly give to the Company written notice thereof together with such other information requested by the Company. The Company shall, at the request of the **Organization**, provide to the **Organization** a quotation for coverage for **Claims** based upon, arising from or in consequence of such ESOP, subject to such terms, conditions, limitations of coverage and such additional premium as the Company, in its sole discretion, may require.

## V.    TERMINATION OF PLAN

In the event:

    (A)    an **Organization** terminates a **Plan** before or after the inception date of this Policy, coverage under this Coverage Part, with respect to such terminated **Plan**, shall continue until termination of this Coverage Part for those who were **Insureds** at the time of such **Plan** termination or who would have been an **Insured** at the time of such termination if this Coverage Part had been in effect, with respect to **Wrongful Acts** prior to or after the date the **Plan** was terminated; or

    (B)    the Pension Benefit Guaranty Corporation ("PBGC") becomes the Trustee of a **Plan** before or after the inception date of this Policy, coverage under this Coverage Part, with respect to such **Plan**, shall continue until termination of this Coverage Part for those who were **Insureds** at the time the PBGC became the Trustee of such **Plan** with respect to **Wrongful Acts** prior to the effective date the PBGC became the Trustee of such **Plan**.

## VI.    REPORTING

    (A)    An **Insured** shall, as a condition precedent to exercising any right to coverage under this Coverage Part, give to the Company written notice of any **Claim** as soon as practicable after the chief executive officer, chief financial officer, in-house general counsel, head of benefits, or any person responsible for the management of insurance claims (or any equivalent position to any of the foregoing) of an **Organization** becomes aware of such **Claim**, but in no event later than:

    (1)    if this Coverage Part expires (or is otherwise terminated) without being renewed with the Company, ninety (90) days after the effective date of such expiration or termination; or

    (2)    the expiration date of the Extended Reporting Period, if applicable,

provided that if the Company sends written notice to the **Parent Organization**, stating that this Coverage Part is being terminated for nonpayment of premium, an **Insured** shall give to the Company written notice of such **Claim** prior to the effective date of such termination.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 87 of 143


(B)    If during the **Policy Period**, or any applicable Extended Reporting Period, an **Insured** becomes aware of circumstances which could give rise to a **Claim** and gives written notice of such circumstances to the Company, then any **Claim** subsequently arising from such circumstances shall be deemed made against the **Insured** during the **Policy Year** in which such circumstances were first reported to the Company, provided any such subsequent **Claim** is reported to the Company as soon as practicable, but in no event later than ninety (90) days after the chief executive officer, chief financial officer, in-house general counsel, head of benefits, or any person responsible for the management of insurance claims (or any equivalent position to any of the foregoing) of an **Organization** becomes aware of such **Claim**.

(C)    If during the **Policy Period** an **Insured** gives a **Voluntary Program Notice** to the Company, then any **Claim** subsequently arising from such **Voluntary Program Notice**, or arising from the same or related facts, circumstances or situations alleged therein, shall be deemed to have been first made during the **Policy Year** in which such **Voluntary Program Notice** was first given to the Company, provided any such subsequent **Claim** is reported to the Company as soon as practicable, but in no event later than ninety (90) days after the chief executive officer, chief financial officer, in-house general counsel, head of benefits, or any person responsible for the management of insurance claims (or any equivalent position to any of the foregoing) of an **Organization** becomes aware of such **Claim**.

(D)    An **Insured** shall, as a condition precedent to exercising any right to coverage under this Coverage Part, give to the Company such information, assistance and cooperation as the Company may reasonably require, and shall include in any notice under Subsections (A), (B) or (C) above a description of the **Claim**, circumstances, or **Voluntary Program Notice** (including the facts, circumstances or situations alleged therein), the nature of the alleged **Wrongful Act** or circumstances, the nature of the alleged or potential damage, the names of the actual or potential claimants, and the manner in which such **Insured** first became aware of the **Claim**, circumstances, or alleged **Wrongful Act** or **Voluntary Program Notice**.

## VII.    RETENTION AND PRESUMPTIVE INDEMNIFICATION

(A)    The Company's liability under this Coverage Part shall apply only to that part of each **Loss** which is in excess of the applicable Retention set forth in Item 3 of the FL Declarations and such Retention shall be borne by the **Insureds** uninsured and at their own risk.

(B)    If different parts of a single **Claim** are subject to different Retentions in different Insuring Clauses within this Coverage Part, the applicable Retentions shall be applied separately to each part of such **Claim**, but the sum of such Retentions shall not exceed the largest applicable Retention.

(C)    If different parts of a single **Claim** are subject to different Retentions in different Coverage Parts, the applicable Retentions will be applied separately to each part of such **Claim**, but the sum of such Retentions shall not exceed the largest applicable Retention.

(D)    **Claims** and **Voluntary Program Notices** shall be subject to the Retention(s) applicable to the **Policy Year** during which such **Claims** or **Voluntary Program Notices** are made or deemed to have been made.

(E)    No Retention shall apply to:

    (1)    any **Loss** under this Coverage Part incurred by an **Insured Person** if such **Loss** cannot be indemnified by an **Organization** or **Plan** because such **Organization** or **Plan** is not permitted by common or statutory law to indemnify, or is permitted or required to indemnify, but is unable to do so by reason of **Financial Insolvency**; or

    (2)    any **Loss** constituting civil penalties imposed by law pursuant to Subparagraphs (4)(e) and (4)(f) as set forth within the definition of **Loss**.

(F)    For the purposes of determining an **Organization's** indemnification obligation to any Advisory Board Member, each Advisory Board Member shall be deemed a director or officer of the **Organization**. Accordingly, the **Organization** shall be deemed to have granted indemnification to each Advisory Board Member to the fullest extent permitted by statutory or common law to the same extent as any director or officer of the **Organization**.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 88 of 143


## VIII. DEFENSE AND SETTLEMENT

(A)  Except as provided in Subsection (B) below, the Company shall have the right and duty to defend any **Claim** covered by this Coverage Part. Coverage shall apply even if any of the allegations are groundless, false or fraudulent. The Company's duty to defend any **Claim** shall cease upon exhaustion of the applicable Limit of Liability.

(B)  Notwithstanding Subsection (A) above, it shall be the duty of the **Insureds** and not the duty of the Company to defend any **Claim** which is in part excluded from coverage pursuant to Exclusion III(G), Wage and Hour. For such portion of such **Claim** that is otherwise covered under this Coverage Part, the **Insureds** shall select as defense counsel for such **Claim** a law firm included in the Company's then current list of approved fiduciary liability defense firms for the jurisdiction in which such **Claim** is pending.

(C)  It shall be the duty of the **Insureds** and not the duty of the Company to defend any **Voluntary Program Notice**, provided that the **Insureds** shall select as defense counsel for such **Voluntary Program Notice** a law firm included in the Company's then current list of approved fiduciary liability defense firms for the jurisdiction applicable to such **Voluntary Program Notice**.

(D)  The Company may make any investigation it deems necessary and may, with the consent of the **Insureds**, make any settlement of any **Claim** or **Voluntary Program Notice** it deems appropriate.

(E)  No **Insured** shall settle any **Claim** or **Voluntary Program Notice**, incur any **Defense Costs** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** or **Voluntary Program Notice**, without the Company's written consent, which shall not be unreasonably withheld. The Company shall not be liable for any settlement, **Defense Costs**, assumed obligation or admission to which it has not consented.

(F)  The Company shall have no obligation to pay **Loss**, including **Defense Costs**, or to defend or continue to defend any **Claim** or **Voluntary Program Notice** after the Company's Maximum Aggregate Limit of Liability set forth in Item 2 of the FL Declarations or the Combined Maximum Aggregate Limit of Liability set forth in Item 3 of the GTC Declarations, if applicable, has been exhausted by the payment of **Loss** and the applicable premium shall be deemed fully earned.

(G)  The **Insureds** agree to provide the Company with all information, assistance and cooperation which the Company reasonably requests and agree they will do nothing that may prejudice the Company's position or its potential or actual rights of recovery.

(H)  The Company will not seek repayment from an **Insured Person** of any **Defense Costs** paid by the Company that are deemed uninsured pursuant to Exclusion III(H), Conduct, unless the applicable determination standard (whether a final, non-appealable adjudication; or other determination standard) set forth in such Exclusion has been met.

## IX. ALLOCATION

If the **Insureds** who are afforded coverage for a **Claim** incur an amount consisting of both **Loss** that is covered by this Coverage Part and also loss that is not covered by this Coverage Part because such **Claim** includes both covered and uncovered matters, then coverage shall apply as follows:

(A)  **Defense Costs**: one hundred percent (100%) of **Defense Costs** incurred by such **Insured** on account of such **Claim** shall be covered **Loss**, provided that the foregoing shall not apply with respect to any **Insured** for whom coverage is excluded pursuant to Exclusion III(G), Wage and Hour, or Subsection XII(C), Representations and Severability. Such **Defense Costs** shall be allocated between covered **Loss** and non-covered loss based on the relative legal exposures of the parties to such matters; and

(B)  loss other than **Defense Costs**: all remaining loss incurred by such **Insured** from such **Claim** shall be allocated between covered **Loss** and uncovered loss based upon the relative legal exposures of the parties to such matters.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 89 of 143


## X.  PRIORITY OF PAYMENTS

(A)  If a liquidation or reorganization proceeding is commenced by or against an **Organization** pursuant to the United States Bankruptcy Code or any similar state or local law and in the event payment of **Loss** is due under this Coverage Part but, in the sole discretion of the Company, the amount of such **Loss** in the aggregate potentially exceeds the remaining available Limit of Liability for this Coverage Part, the Company shall:

    (1)  first pay such covered **Loss** incurred by the **Insured Persons** and the **Plans**; then

    (2)  to the extent of any remaining amount of the Limit of Liability available after payment under Paragraph (1) above, pay such covered **Loss** incurred by an **Organization**.

(B)  Except as otherwise provided in Subsection (A) above, the Company may pay covered **Loss** as it becomes due under this Coverage Part without regard to the potential for other future payment obligations under this Coverage Part.

## XI.  OTHER INSURANCE

If any **Loss** under this Coverage Part is insured under any other valid and collectible insurance policy (other than a policy that is issued specifically as excess of the insurance afforded by this Coverage Part), this Coverage Part shall be excess of and shall not contribute with such other insurance, regardless of whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

## XII.  REPRESENTATIONS AND SEVERABILITY

(A)  In granting coverage to the **Insureds** under this Coverage Part, the Company has relied upon the declarations and statements in the **Application** for this Coverage Part. Such declarations and statements are the basis of the coverage under this Coverage Part and shall be considered as incorporated in and constituting part of this Coverage Part.

(B)  The **Application** for coverage shall be construed as a separate **Application** for coverage by each **Insured Person**. With respect to the declarations and statements in such **Application**, no knowledge possessed by an **Insured Person** shall be imputed to any other **Insured Person**.

(C)  However, in the event that such **Application** contains any misrepresentations made with the actual intent to deceive or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by the Company under this Coverage Part, then no coverage shall be afforded for any **Claim** based upon, arising from or in consequence of any such misrepresentations with respect to:

    (1)  any **Insured Person** who knew of such misrepresentations (whether or not such individual knew such **Application** contained such misrepresentations) or any **Organization** or **Plan** to the extent it indemnifies any such **Insured Person**; or

    (2)  any **Organization** or **Plan** if any past or present chief executive officer or chief financial officer (or any equivalent position to the foregoing) of the **Parent Organization** knew of such misrepresentations (whether or not such individual knew such **Application** contained such misrepresentations).

(D)  The Company shall not be entitled under any circumstances to rescind this Coverage Part with respect to any **Insured**.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 90 of 143

Coverage Section:  ForeFront Portfolio 3.0 Fiduciary Liability Coverage Part Federal

Effective date of
this endorsement: March 10, 2019          Company:  Federal Insurance Company

Endorsement No. 1

To be attached to and
form a part of Policy No. 8234-7252

Issued to:  THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

---

### PLAN PURCHASER PROTECTION ENDORSEMENT

In consideration of the premium charged, it is agreed that solely with respect to the coverage afforded pursuant to Insuring Clause (A), Fiduciary Liability Coverage, of this Coverage Part:

(1)     Section II, Definitions, is amended to include the following terms:

     (a)     **Managed Care Services** means the administration or management of a health care plan utilizing cost control mechanisms, including but not limited to utilization review, case management, disease management or the use of a preferred provider network; provided, however, **Managed Care Services** does not include (i) any services provided by a health care plan administered by an **Insured** (a "Self-Administered Plan"), or (ii) any acts, errors or omissions in the rendering of or failure to render **Medical Services** by an **Insured**.

     (b)     **Medical Services** means health care, medical care or treatment provided to any person, including medical, surgical, dental, psychiatric, mental health, chiropractic, osteopathic, nursing or other professional health care; the use, prescription, furnishing or dispensing of medications, drugs, blood, blood products or medical, surgical, dental or psychiatric supplies, equipment or appliances in connection with such care; the furnishing of food or beverages in connection with such care; the providing of counseling or other social services in connection with such care; the performance of post-mortem examinations and the handling of human bodies; provided, however, **Medical Services** shall not include utilization review.

(2)     Exclusion III (C), Bodily Injury/Property Damage, is deleted and replaced with the following:

     (C)     <u>Bodily Injury/Property Damage</u>
         for bodily injury, mental anguish, humiliation, emotional distress, sickness, disease or death of any person or damage to or destruction of any tangible property including loss of use thereof whether or not it is damaged or destroyed; provided that this Exclusion (C) shall not apply to any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease, exacerbation of existing illness or wrongful death of any person resulting from (a) selection of any **Managed Care Services** provider, or (b) denial or delay of any benefit under a health care plan, other than a "Self-Administered Plan";

14-02-10684 F3 (05/2011)          Page 1

(3)    Solely with respect to the coverage afforded pursuant to this Endorsement, no coverage will be available for **Loss** on account of any **Claim** against an **Insured**:

    (a)    based upon, arising from, or in consequence of any fact, circumstance, situation, transaction, event or **Wrongful Act**, or series of facts, circumstances, situations, transactions, events or **Wrongful Acts**, which: (i) underlies or is alleged in any demand, suit, order, decree, judgment, litigation or administrative or regulatory proceeding brought prior to and/or pending as of March 10, 2013; (ii) was the subject of any **Claim** made prior to March 10, 2013; or (iii) was the subject of any notice given prior to March 10, 2013 under any other policy of insurance or plan or program of self-insurance; and

    (b)    the Company's maximum aggregate limit of liability for all **Loss** on account of all **Claims** covered by reason of this Endorsement shall be $1,000,000.00, which amount shall be part of, and not in addition to, the Company's Maximum Aggregate Limit of Liability set forth in Item 2 of the FL Declarations.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

_____
Authorized Representative

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 92 of 143

Coverage Section: ForeFront Portfolio 3.0 Fiduciary Liability Coverage Part Federal

Effective date of
this endorsement/rider: March 10, 2019

Federal Insurance Company

Endorsement/Rider No. 2

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

---

AMEND VOLUNTARY SETTLEMENT PROGRAM COVERAGE ENDORSEMENT

In consideration of the premium charged, it is agreed that Section I. Insuring Clause (B), Voluntary Settlement Program Coverage, of this Coverage Part is deleted and replaced with the following:

(B) The Company shall pay, on behalf of an **Insured**, **Voluntary Program Loss** and **Defense Costs** with respect to a **Voluntary Program Notice** that is first given to the Company during the **Policy Period**, provided that the Company's maximum liability for all **Voluntary Program Loss** and **Defense Costs** for the **Policy Year** shall be $250,000.00, which amount is part of, and not in addition to, the Maximum Aggregate Limit of Liability set forth in Item 2 of the FL Declarations.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

14-02-17297 (12/2010)         Page 1

Coverage Section:  ForeFront Portfolio 3.0 Fiduciary Liability Coverage Part Federal

Effective date of
this endorsement/rider: March 10, 2019          Federal Insurance Company

Endorsement/Rider No. 3

To be attached to and
form a part of Policy No. 8234-7252

Issued to:  THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

---

AMEND HIPAA CIVIL MONEY PENALTIES ENDORSEMENT

In consideration of the premium charged, it is agreed that Subparagraph (4)(f) of the definition of **Loss** as set forth in Section II. Definitions, of this Coverage Part is deleted and replaced with the following:

  (f)    civil money penalties imposed upon an **Insured** for such **Insured's** violation of the privacy provisions of the Health Insurance Portability and Accountability Act of 1996, as amended; provided the Company's maximum limit of liability for all such civil money penalties on account of all **Claims** first made during the **Policy Year** shall be $1,000,000.00, which amount is part of, and not in addition to, the Maximum Aggregate Limit of Liability set forth in Item 2 of the FL Declarations;

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

14-02-17298 (12/2010)          Page 1

Coverage Section:  ForeFront Portfolio 3.0 Fiduciary Liability Coverage Part Federal

Effective date of
this endorsement/rider: March 10, 2019                    Federal Insurance Company

Endorsement/Rider No. 4

To be attached to and
form a part of Policy No. 8234-7252

Issued to:  THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

---

AMEND 502(c) CIVIL PENALTIES ENDORSEMENT

In consideration of the premium charged, it is agreed that Subparagraph (4)(e) of the definition of **Loss** as set forth in Section II. Definitions, of this Coverage Part is deleted and replaced with the following:

    (e)    civil penalties imposed upon an **Insured** as a fiduciary under Section 502(c) of the Employee Retirement Income Security Act of 1974, as amended (including any amendments pursuant to Section 507 of Title V of the Pension Protection Act of 2006); provided the Company's maximum limit of liability for all such civil penalties on account of all **Claims** first made during the **Policy Year** shall be $ 250,000.00, which amount is part of, and not in addition to, the Maximum Aggregate Limit of Liability set forth in Item 2 of the FL Declarations;

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

14-02-17299 (12/2010)                    Page 1

Coverage Section: ForeFront Portfolio 3.0 Fiduciary Liability Coverage Part Federal

Effective date of
this endorsement/rider: March 10, 2019

Federal Insurance Company

Endorsement/Rider No. 5

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

PPACA CIVIL MONEY PENALTIES ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)     The definition of **Loss** as set forth in Section II. Definitions, of this Coverage Part is amended by
adding the following exception to Paragraph (4):

civil money penalties imposed upon an **Insured** for inadvertent violation of the
Patient Protection and Affordable Care Act, as amended ("PPACA"), and any
rules or regulations promulgated thereunder; provided the Company's maximum
limit of liability for all such civil money penalties on account of all **Claims** first
made during the **Policy Year** shall be $250,000.00, which amount is part of, and
not in addition to, the Maximum Aggregate Limit of Liability set forth in Item 2 of
the FL Declarations;

(2)     No Retention shall apply to **Loss** constituting civil money penalties imposed by law upon an
**Insured** for inadvertent violation of PPACA, and any rules or regulations promulgated thereunder.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and
conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

14-02-17300 (12/2010)                    Page 1

Coverage Section: ForeFront Portfolio 3.0 Fiduciary Liability Coverage Part Federal

Effective date of
this endorsement/rider: March 10, 2019          Federal Insurance Company

Endorsement/Rider No. 6

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

_____

IRS SECTION 4975 COVERAGE ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)     The definition of **Loss** as set forth in Section II. Definitions, of this Coverage Part is amended by
          adding the following exception to Paragraph (4):

> with respect to covered judgments, the fifteen percent (15%) or less tax penalty imposed
> upon an **Insured** under Section 4975 of the Internal Revenue Code of 1986; provided the
> Company's maximum limit of liability for all such tax penalties on account of all **Claims**
> first made during the **Policy Year** shall be $250,000.00, which amount is part of, and not
> in addition to, the Maximum Aggregate Limit of Liability set forth in Item 2 of the FL
> Declarations;

(2)     Solely with respect to the tax penalties described in paragraph (1) of this endorsement, no
          Retention shall apply.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the
terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

14-02-17301 (01/2011)          Page 1

Coverage Section:  ForeFront Portfolio 3.0 Fiduciary Liability Coverage Part Federal

Effective date of
this endorsement/rider: March 10, 2019

Federal Insurance Company

Endorsement/Rider No. 7

To be attached to and
form a part of Policy No. 8234-7252

Issued to:  THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

SEPARATE DEFENSE COSTS LIMIT ENDORSEMENT
(Separate Defense Costs Limit for this Coverage Part)

In consideration of the premium charged, it is agreed that:

(1)     Solely with respect to this Coverage Part, Paragraph (A)(3) of Section III, Limit of Liability of the General Terms and Conditions is deleted and replaced with the following:

(3)     (a)     Except as otherwise expressly provided in any **Liability Coverage Part** and subject to Subparagraph (b) below, **Defense Costs** are part of and not in addition to the applicable Maximum Aggregate Limit of Liability as set forth in Item 2 of the Declarations of each **Liability Coverage Part** and payment by the Company of **Defense Costs** shall reduce and may exhaust such Limit(s) of Liability.

(b)     A single additional limit of liability applicable only to **Defense Costs** (a "Separate Defense Costs Limit") shall be provided for this Coverage Part.  The amount of the Separate Defense Costs Limit shall be $1,000,000.00, and the Separate Defense Costs Limit shall be in addition to, and not part of, the Maximum Aggregate Limit of Liability otherwise applicable to this Coverage Part as shown in Item 2 of the Declarations thereof.  Accordingly, the Separate Defense Costs Limit provided for this Coverage Part may not be applied to **Defense Costs** incurred under any other **Liability Coverage Part**.  Payment of **Defense Costs** by the Company under this Coverage Part shall first reduce the Separate Defense Costs Limit, and, if the Separate Defense Costs Limit is exhausted, any further payment of **Defense Costs** by the Company under this Coverage Part shall thereafter reduce, and may exhaust, the Limit of Liability set forth in Item 2 of the Declarations thereof.  In no event shall the Company be obligated to pay **Defense Costs** or other **Loss** under this Coverage Part after the Limit of Liability shown in Item 2 of the Declarations thereof is exhausted.

(2)     This endorsement shall only be available if the Combined Maximum Aggregate Limit of Liability is not purchased.  If the Combined Maximum Aggregate Limit of Liability is purchased, this endorsement shall have no effect.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 98 of 143

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 99 of 143

Coverage Section: ForeFront Portfolio 3.0 Fiduciary Liability Coverage Part Federal

Effective date of
this endorsement: March 10, 2019

Company: Federal Insurance Company

Endorsement No. 8

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

---

### ADD SPONSORED PLAN(S) ENDORSEMENT

In consideration of the premium charged, it is agreed that the term **Sponsored Plan**, as defined in Section II, Definitions, of this Coverage Part shall include the following:

North Carolina Mutual Wholesale Drug Company, Inc. Employees' Profit Sharing Plan
North Carolina Mutual Wholesale Drug Company, Inc. Employees' Pension Plan

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

_____
Authorized Representative

 **Chubb Group of Insurance Companies**
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Kidnap Ransom and Extortion*
*Coverage Part*

**KR&E DECLARATIONS**

**FEDERAL INSURANCE COMPANY**
A stock insurance company, incorporated under the laws of
Indiana, herein called the Company

Capital Center, 251 North Illinois, Suite 1100
Indianapolis, IN 46204-1927

**Item 1.**   **Parent Organization:**     THE NORTH CAROLINA MUTUAL WHOLESALE
DRUG COMPANY

**Item 2.**   **Limits of Liability:**

| Insuring Clauses Applicable to this Coverage Part: | Limits of Liability: |
|---|---|
| [X] (A) Kidnapping, Extortion Threat and Express Kidnap Coverage: | $1,000,000.00 |
| [X] (B) Custody Coverage: | $1,000,000.00 |
| [X] (C) Expense Coverage: | $1,000,000.00 |
| [X] (D) Accidental Loss Coverage: | |

| Types of **Accidental Loss**: | Benefit Amounts: |
|---|---|
| (i) **Loss of Life Benefit Amount**: | $250,000.00 |
| (ii) **Event Benefit Amount**: | $1,000,000.00 |
| (iii) **Mutilation**: | 100% of **Loss of Life Benefit Amount** |
| (iv) **Accidental Loss** other than **Mutilation** or **Loss of Life**: | 100% of **Loss of Life Benefit Amount** |

| | |
|---|---|
| [X] (E) Legal Liability Costs Coverage: | $1,000,000.00 |
| [X] (F) Emergency Political Repatriation Expense Coverage: | $1,000,000.00 |
| [X] (G) Disappearance Investigation Expense Coverage: | $250,000.00 |
| [X] (H) Express Kidnap Costs Coverage: | $250,000.00 |
| [X] (I) Hostage Crisis Costs Coverage: | $250,000.00 |

**Item 3.**   **Retention**:     $0.00

14-02-17278D (11/2010)                    1 of 1

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 101 of 143

**CHUBB**  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*[SM]
*Kidnap Ransom and Extortion*
*Coverage Part*

In consideration of payment of the premium and subject to the Declarations, General Terms and Conditions, and the limitations, conditions, provisions and other terms of this Coverage Part, the Company and the Insureds agree as follows:

## I.   INSURING CLAUSES

### Insuring Clause (A):  Kidnapping, Extortion Threat and Express Kidnap Coverage

(A)   The Company shall reimburse the **Parent Organization** for loss of property or other consideration surrendered as payment by or on behalf of an **Organization** resulting from **Kidnapping**, **Extortion Threat** or **Express Kidnap**.

### Insuring Clause (B):  Custody Coverage

(B)   The Company shall reimburse the **Parent Organization** for loss caused by actual destruction, disappearance, confiscation or unlawful taking of property or other consideration, which is intended as payment for a covered **Kidnapping** or **Extortion Threat** while being held or conveyed by a person authorized by an **Organization**.

### Insuring Clause (C):  Expense Coverage

(C)   The Company shall reimburse the **Parent Organization** for **Expenses** paid by an **Insured** resulting from a covered **Kidnapping** or **Extortion Threat**, or resulting from a **Hijacking**, **Political Threat** or **Wrongful Detention**.

### Insuring Clause (D):  Accidental Loss Coverage

(D)   The Company shall pay the applicable Benefit Amount set forth in Item 2(D) of the KR&E Declarations for **Accidental Loss** from a covered **Kidnapping**, or resulting from a **Hijacking**, **Political Threat**, **Wrongful Detention**, **Express Kidnap**, or **Hostage Crisis**.

### Insuring Clause (E):  Legal Liability Costs Coverage

(E)   The Company shall reimburse the **Parent Organization** for **Legal Liability Costs**.

### Insuring Clause (F):  Emergency Political Repatriation Expense Coverage

(F)   The Company shall reimburse the **Parent Organization** for **Repatriation Expenses** incurred by an **Organization** resulting from **Emergency Political Repatriation** in the amount set forth in Item 2(F), Emergency Political Repatriation Expense Coverage, of the KR&E Declarations, which amount is part of and not in addition to the Limit of Liability set forth in Item 2(C), Expense Coverage, of the KR&E Declarations.

### Insuring Clause (G):  Disappearance Investigation Expense Coverage

(G)   The Company shall reimburse the **Parent Organization** for **Expenses** paid by an **Insured** resulting from a covered **Disappearance** in the amount set forth in Item 2(G), Disappearance Investigation Expense Coverage, of the KR&E Declarations, which amount is part of and not in addition to the Limit of Liability set forth in Item 2(C), Expense Coverage, of the KR&E Declarations.

### Insuring Clause (H):  Express Kidnap Costs Coverage

(H)   The Company shall reimburse the **Parent Organization** for **Express Kidnap Costs**.

### Insuring Clause (I):  Hostage Crisis Costs Coverage

(I)   The Company shall reimburse the **Parent Organization** for **Hostage Crisis Costs**.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 102 of 143

CHUBB®    Chubb Group of Insurance Companies
          202B Hall's Mill Road
          Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Kidnap Ransom and Extortion*
*Coverage Part*

II.    **DEFINITIONS**

For purposes of this Coverage Part:

**Accidental Loss** means **Loss of Life**, **Loss of Use**, **Loss of Sight**, **Loss of Speech and/or Hearing**, or **Mutilation** of an **Insured Person** when such **Accidental Loss**:

(A)    is sudden, unforeseen, unexpected and independent of any illness, disease or other bodily malfunction of such **Insured Person**; and

(B)    happens by chance and arises from a source external to such **Insured Person**.

**Computer System** means any computer or network of computers of an **Organization** including its input, output, processing, storage and communication facilities, and shall include off-line media libraries.

**Computer Violation** means an unauthorized:

(A)    entry into or deletion of data from a **Computer System**;

(B)    change to data elements or program logic of a **Computer System**, which is kept in machine readable format; or

(C)    introduction of instructions, programmatic or otherwise, which propagate themselves through a **Computer System**,

directed solely against any **Organization**.

**Contaminate** means to introduce a foreign material or substance, which would render any tangible property unfit for use or sale.

**Disappearance** means the unexplained vanishing by an **Insured Person** for a period of longer than thirty-six (36) hours (other than a **Hijacking**, **Wrongful Detention**, **Express Kidnap**, or **Hostage Crisis**), provided the vanishing has been reported to the local authorities, and a ransom demand has not been made in connection therewith. The **Disappearance** of two or more **Insured Persons** last seen or reported together shall be treated as one **Disappearance**.

**Disappearance Investigation** means an investigation launched by an **Organization** as the direct result of a **Disappearance**.

**Emergency Political Repatriation** means the return of an **Insured Person**, who is a temporary resident or temporary business traveler in another country, to his or her **Resident Country** necessitated by:

(A)    an official of the **Resident Country** or the **Temporary Resident Country** issuing, for reasons other than medical, a recommendation that categories of persons which include the **Insured Person** should leave such **Temporary Resident Country**;

(B)    an **Insured Person** being expelled or declared *persona non grata* on the written authority of the recognized government of the **Temporary Resident Country**; or

(C)    wholesale seizure, confiscation or expropriation of the property, plant and equipment of an **Organization**.

**Employee** means any natural person in the regular service of an **Organization** in the ordinary course of such **Organization's** business, whom such **Organization** governs and directs in the performance of such service, including any **Executive**, a part-time, seasonal, leased and temporary employee, intern or volunteer; or an **Independent Contractor**, while acting within the scope of his or her duties as an **Independent Contractor**.

**Event Benefit Amount** means the amount set forth in Item 2(D)(ii) of the KR&E Declarations.

**Executive** means any natural person specified below:

(A)    a duly elected or appointed director, officer, trustee, in-house general counsel or duly constituted committee member of any **Organization** incorporated in the United States of America;

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 103 of 143

**CHUBB**

Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Kidnap Ransom and Extortion*
*Coverage Part*

(B)    a duly elected or appointed: (1) manager or member of the Board of Managers or equivalent position; (2) duly constituted committee member; (3) in-house general counsel; or (4) trustee, of any **Organization** formed as a limited liability company in the United States of America; or

(C)    a holder of an equivalent position to those described in Subsections (A) or (B) above in any **Organization** incorporated, formed or organized anywhere in the world.

**Expenses** means:

(A)    in connection with **Kidnapping, Extortion Threat, Political Threat, Hijacking, Wrongful Detention** or **Disappearance Investigation** only the reasonable fees and expenses for, or cost of:

    (1)    an independent security consultant;

    (2)    an independent public relations consultant;

    (3)    travel and accommodations of an **Insured Person**;

    (4)    independent legal advice (other than those described in Insuring Clause (E), Legal Liability Costs Coverage);

    (5)    temporary independent security measures set up solely for protecting an **Insured Person**, or property, in the country where the **Kidnapping, Extortion Threat, Political Threat, Hijacking, Wrongful Detention** or **Disappearance** has occurred, at the specific direction of The Ackerman Group or any other security consultant, incurred with the Company's prior written approval;

    (6)    independent security guard services for up to ninety (90) days;

    (7)    advertising, communications and recording equipment;

    (8)    an independent forensic analyst;

    (9)    assessment of an **Extortion Threat** or **Political Threat** by an independent security consultant;

    (10)    interest for a loan taken by an **Insured** for property or other consideration surrendered as payment under Insuring Clause (A), Kidnapping, Extortion Threat and Express Kidnap Coverage;

    (11)    a reward paid by an **Organization** to a natural person who provides information leading to the arrest and conviction of the person(s) responsible for **Kidnapping, Extortion Threat, Wrongful Detention, Hijacking** or **Disappearance**;

    (12)    the **Salary** which an **Organization** continues to pay an **Employee** following the **Kidnapping, Wrongful Detention, Hijacking** or **Disappearance** of such **Employee**; such coverage shall apply to the **Salary** in effect at the time of such **Kidnapping, Wrongful Detention, Hijacking** or **Disappearance** and will end ninety (90) days after such **Employee** is released or suffers **Loss of Life**, or solely with respect to **Wrongful Detention** or **Hijacking**, for sixty (60) months thereafter; whichever is more recent;

    (13)    the **Salary** or wages which an **Organization** pays a newly hired natural person to conduct the duties of an **Employee** following the **Kidnapping, Wrongful Detention, Hijacking** or **Disappearance** of such **Employee**; such coverage shall apply to such **Salary** in effect at the time of such **Kidnapping, Wrongful Detention, Hijacking,** or **Disappearance** and will end ninety (90) days after such **Employee** is released or suffers **Loss of Life**, or solely with respect to **Wrongful Detention** or **Hijacking**, for sixty (60) months thereafter; whichever is more recent;

    (14)    the **Salary** which an **Organization** pays an **Employee** or the amount paid by an **Organization** to a **Relative** equal to the salary or wages of such **Relative**, who assists in negotiations and rehabilitation of the victim during and following an incident of **Kidnapping, Wrongful Detention, Hijacking** or **Disappearance** not to exceed a period of ninety (90) days following the end of the **Kidnapping, Wrongful Detention, Hijacking** or **Disappearance** incident, provided that the **Insured** submits a written account of such **Employee's** or **Relative's** involvement in the negotiation and rehabilitation process, and such **Employee's** or **Relative's** specific compensable services and expenses;

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 104 of 143

CHUBB® Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**<sup>SM</sup>
***Kidnap Ransom and Extortion***
***Coverage Part***

(15)    reasonable fees and expenses for, or cost of retraining, an **Employee** after his or her release from a covered **Kidnapping**, **Wrongful Detention**, **Hijacking** or **Disappearance** including the **Salary** that an **Organization** continues to pay such **Employee** while being retrained, and the reasonable fees and expenses for the cost of external training courses;

(16)    consequential personal financial loss which an **Insured Person** suffers as the result of such **Insured Person's** inability to attend to personal financial matters;

(17)    reasonable medical, mental health, dental and cosmetic expenses, including the cost of plastic surgery, incurred following an **Insured Person's** release;

(18)    reasonable expenses of rest and rehabilitation, including meals and recreation, for up to ninety (90) days when such expenses are incurred within twelve (12) months following an **Insured Person's** release; and

(B)    in connection with an **Extortion Threat** to **Contaminate Merchandise**, **Recall Expenses**; and

(C)    other reasonable expenses incurred by an **Organization**, subject to the Company's prior written approval.

**Express Kidnap** means the unlawful detention of an **Insured Person** (other than a **Kidnapping**, **Hijacking**, **Hostage Crisis** or **Wrongful Detention**) that:

(A)    lasts for less than six (6) hours;

(B)    is carried out by violence or threat of violence by a person or group;

(C)    commences while the **Insured Person** is traveling in or entering/exiting a motor vehicle; and

(D)    involves the perpetrator(s)' demand of property or other consideration as a condition of that **Insured Person's** release.

**Express Kidnap Costs** means, in connection with an **Express Kidnap**, only the reasonable fees and expenses for, or cost of:

(A)    an independent security consultant, independent public relations consultant and an independent forensic analyst;

(B)    travel and accommodations of an **Insured Person**;

(C)    independent legal advice (other than those described in Insuring Clause (E), Legal Liability Costs Coverage) and reasonable medical, mental health, dental and cosmetic expenses, including the cost of plastic surgery, incurred following an **Insured Person's** release;

(D)    consequential personal financial loss which an **Insured Person** suffers as the result of such **Insured Person's** inability to attend to personal financial matters;

(E)    reasonable expenses of rest and rehabilitation, including meals and recreation, for up to ninety (90) days when such expenses are incurred within twelve (12) months following an **Insured Person's** release; and

(F)    the **Salary** or wages which an **Organization** pays a natural person temporarily hired to conduct the duties of an **Employee** following the **Express Kidnap** of such **Employee**; such coverage shall apply to such **Salary** or wages in effect at the time of such **Express Kidnap** and will end 180 days after such **Employee** is released or suffers **Loss of Life**.

**Extortion Threat** means a threat or threats against an **Insured** to:

(A)    commit a **Kidnapping** of, do bodily harm to, wrongfully abduct or detain any **Insured Person**;

(B)    damage, destroy or **Contaminate** an **Organization's Property**;

(C)    disseminate, divulge or utilize **Proprietary Information**;

(D)    disseminate or make public negative information regarding **Merchandise**; or

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 105 of 143

CHUBB'  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Kidnap Ransom and Extortion*
*Coverage Part*

(E)     adulterate or destroy any **Computer System** by a **Computer Violation**,

made by a person or group, whether acting alone or in collusion with others, demanding payment or a series of payments in exchange for the mitigation or removal of such threats. All such threats:

(1)     related by a common committed, attempted or threatened wrongful act; or

(2)     made contemporaneously against the same **Insured**,

shall be deemed to constitute a single **Extortion Threat**.

**Hijacking** means the unlawful detention of an **Insured Person** (other than a **Kidnapping**, **Wrongful Detention**, **Disappearance**, **Express Kidnap** or **Hostage Crisis**) by violence or threat of violence by a person or group, where such unlawful detention occurs while traveling on or in an aircraft, watercraft, railroad car or motor vehicle.

**Hostage Crisis** means an actual wrongful abduction and holding of an **Insured Person** under duress (other than a **Kidnapping, Hijacking, Wrongful Detention, Disappearance** or **Express Kidnap**) by one party in a conflict with another party, where the holding party demands from the other party satisfaction of specified terms in exchange for the release of such **Insured Person**, and the person from whom such satisfaction of specified terms is demanded is within hearing or sight distance of the **Insured Person**.

**Hostage Crisis Costs** means:

(A)     in connection with a **Hostage Crisis**, only the reasonable fees and expenses for, or cost of:

(1)     an independent security consultant and independent public relations consultant;

(2)     travel and accommodations of an **Insured Person**;

(3)     independent legal advice (other than those described in Insuring Clause (E), Legal Liability Costs Coverage);

(4)     temporary independent security measures set up solely for protecting an **Insured Person**, or property, in the country where the **Hostage Crisis** has occurred, at the specific direction of The Ackerman Group or any other security consultant, incurred with the Company's prior written approval;

(5)     independent security guard services for up to ninety (90) days;

(6)     the **Salary** which an **Organization** continues to pay an **Employee** following the **Hostage Crisis** of such **Employee**; such coverage shall apply to the **Salary** in effect at the time of such **Hostage Crisis** and will end ninety (90) days after such **Employee** is released or suffers **Loss of Life**;

(7)     the **Salary** or wages which an **Organization** pays a newly hired natural person to conduct the duties of an **Employee** following the **Hostage Crisis** of such **Employee**; such coverage shall apply to such **Salary** in effect at the time of such **Hostage Crisis** and will end ninety (90) days after such **Employee** is released or suffers **Loss of Life**;

(8)     the **Salary** which an **Organization** pays an **Employee** or the amount paid by an **Organization** to a **Relative** equal to the salary or wages of such **Relative**, who assists in negotiations and rehabilitation of the victim during and following an incident of **Hostage Crisis** not to exceed a period of ninety (90) days following the end of the **Hostage Crisis** incident, provided that the **Insured** submits a written account of such **Employee's** or **Relative's** involvement in the negotiation and rehabilitation process, and such **Employee's** or **Relative's** specific compensable services and expenses;

(9)     reasonable medical, mental health, dental and cosmetic expenses, including the cost of plastic surgery, incurred following such **Insured Person's** release; and

(B)     other reasonable expenses incurred by an **Organization**, subject to the Company's prior written approval.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 106 of 143

CHUBB®   Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Kidnap Ransom and Extortion*
*Coverage Part*

**Independent Contractor** means any natural person independent contractor while in the regular service of an **Organization** in the ordinary course of such **Organization's** business, pursuant to a written contract for services between such **Organization** and either (A) such natural person independent contractor or (B) any other entity acting on behalf of such natural person independent contractor, provided that coverage for such **Independent Contractor** is not provided by any other policy of insurance. **Independent Contractor** shall not include any person other than the person who performs the services for the **Organization**, nor shall it include family members or guests or any other individuals in similar relationships to, any **Independent Contractor**.

**Insured** means any **Organization** and any **Insured Person**.

**Insured Event** means **Kidnapping, Extortion Threat, Wrongful Detention, Political Threat, Hijacking, Disappearance, Express Kidnap** or **Hostage Crisis**.

**Insured Person** means any :

(A)     **Employee**;

(B)     **Relative** of an **Employee**;

(C)     natural person who is employed in the household of an **Employee** while in the home of such **Employee**;

(D)     natural person who is a normal resident or a guest while in the home of an **Employee**;

(E)     customer or guest of an **Organization** while on the **Premises**;

(F)     guest of an **Employee**, or customer or guest of an **Organization**, while traveling with an **Employee**; or

(G)     natural person who is temporarily retained by any **Insured** or an independent security consultant to deliver a ransom or extortion payment.

**Kidnapping** means an actual or alleged wrongful abduction, and holding under duress or by fraudulent means (other than a **Hijacking, Hostage Crisis** or an **Express Kidnap**), of an **Insured Person,** by a person or a group, whether acting alone or in collusion with others which includes a demand or a series of demands for payment or a series of payments by an **Insured,** in exchange for the release of such **Insured Person**.

**Legal Liability Costs** means the reasonable defense costs incurred by an **Organization** and damages which such **Organization** becomes legally obligated to pay as a result of a judgment or settlement in any suit brought by an **Insured Person** (or the estate, heirs or legal representatives of such **Insured Person**) alleging negligence or legal incompetence:

(A)     in the hostage retrieval operations or negotiations in a covered **Kidnapping, Hijacking, Political Threat, Wrongful Detention, Express Kidnap** or **Hostage Crisis** or a covered event as described in Subsection (A) of the definition of **Extortion Threat** of such **Insured Person**; or

(B)     in the prevention of a covered **Kidnapping, Hijacking, Political Threat, Wrongful Detention, Express Kidnap** or **Hostage Crisis** or a covered event as described in Subsection (A) of the definition of **Extortion Threat** of such **Insured Person,**

provided that the **Organization** agrees as a condition precedent to coverage hereunder to cooperate with the Company in conducting the defense or in negotiating the settlement of such suit.

**Loss of Life** means:

(A)     death, including clinical death, determined by a medical examiner or similar local governing medical authority; or

(B)     the absence of communication from an **Insured Person** or those responsible for the **Kidnapping, Hijacking, Wrongful Detention, Express Kidnap** or **Hostage Crisis** of such **Insured Person** for a period of two (2) years following the later of:

(1)     such **Kidnapping, Hijacking, Wrongful Detention, Express Kidnap** or **Hostage Crisis**;

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 107 of 143



    (2)    the last communication from such **Insured Person**; or

    (3)    the last communication from those responsible for such **Kidnapping, Hijacking, Wrongful Detention, Express Kidnap** or **Hostage Crisis**.

**Loss of Life Benefit Amount** means that amount set forth in Item 2(D)(i) of the KR&E Declarations.

**Loss of Sight** means legal blindness or the permanent total loss of sight.

**Loss of Speech and/or Hearing** means the permanent total loss of the capability of speech and/or hearing.

**Loss of Use** means the permanent total loss of function of a foot, hand or both thumb and index finger.

**Merchandise** means an **Organization's** inventory, raw materials, work in progress or products manufactured or distributed by an **Organization**.

**Mutilation** means the permanent total loss of an entire finger, toe, ear, nose or genital organ.

**Organization's Property** means all **Premises** and **Merchandise** of an **Organization** and any other real or tangible personal property, owned by or leased by an **Organization**, for which an **Organization** is legally liable, or located on such **Premises** or on any land adjacent to or occupied by an **Organization** in conducting its business.

**Political Threat** means the threat to do bodily harm to any **Insured Person** by a person or group:

(A)    acting as an agent of, or with tacit approval of, any government or governmental entity; or

(B)    acting or purporting to act on behalf of any political terrorist or insurgent party, organization or group.

**Premises** means buildings, facilities or properties occupied by an **Organization** in conducting its business.

**Proprietary Information** means any confidential, private or secret information unique to the **Organization's** business including client lists, drawings, negatives, microfilm, tapes, transparencies, manuscripts, prints, computer discs or other records of a similar nature which are protected by physical or electronic control or other reasonable efforts to maintain nondisclosure of such information.

**Recall Expenses** means only the reasonable fees and expenses for, or the costs of:

(A)    transportation; and

(B)    other reasonable expenses, subject to the Company's prior written approval,

incurred by an **Organization** in the withdrawal, physical inspection or destruction of **Merchandise**.

**Relative** means spouse, domestic partner, siblings, spouse's siblings, ancestors, spouse's ancestors, lineal descendants or lineal descendants' spouses. Lineal descendants include adopted children, foster children and stepchildren. Ancestors include adoptive parents and stepparents.

**Repatriation Expenses** means only the following reasonable fees and expenses incurred by any **Insured Person** who is a temporary resident or temporary business traveler:

(A)    for travel to the nearest place of safety or to his or her **Resident Country**;

(B)    for accommodations for a maximum of seven (7) days;

(C)    the **Salary** which an **Organization** continues to pay an **Employee** who is the subject of an **Emergency Political Repatriation**; provided that such coverage shall apply to the **Salary** in effect at the time of the **Emergency Political Repatriation** and shall end on the earlier of 120 days thereafter, or the date of the return of the **Employee** to his or her **Resident Country**; and

(D)    other reasonable fees and expenses incurred with the Company's prior written approval,

resulting from an **Emergency Political Repatriation** of an **Insured Person**.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 108 of 143

CHUBB®  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**<sup>SM</sup>
*Kidnap Ransom and Extortion*
*Coverage Part*

**Resident Country** means, for the purposes of:

(A)    an **Emergency Political Repatriation**, the country of which the **Insured Person** is a national; or

(B)    a **Wrongful Detention**, the country of which the **Insured Person** is a national or the country where an **Organization** is headquartered.

**Salary** means compensation an **Organization** pays an **Employee**, including bonus, commission, incentive payments and the cost of health, welfare and pension benefits.

**Temporary Resident Country** means the country in which the **Insured Person** is a temporary resident.

**Wrongful Detention** means wrongful involuntary confinement of an **Insured Person** (other than **Kidnapping**, **Hijacking**, **Express Kidnap** or **Hostage Crisis**) for a period of not less than four (4) hours by others.

---

III.    **EXCLUSIONS**

(A)    No coverage will be available for:

(1)    <u>Fraudulent or Dishonest Acts</u>
(a)    loss due to any fraudulent, dishonest or criminal acts of an identifiable **Employee** of an **Organization** acting alone or in collusion with others, unless the loss is in excess of the amount available to the **Organization**, whether collectible or not, under any other bond, insurance or indemnity which would cover the loss in whole or in part, in which case this Coverage Part shall cover only such excess; or

(b)    loss sustained by one **Insured** to the advantage of any other **Insured**;

(2)    <u>Reasonable Efforts</u>
loss resulting from fraud by an **Insured Person** allegedly the subject of a **Kidnapping**, **Extortion Threat**, **Wrongful Detention**, **Political Threat**, **Hijacking**, **Disappearance**, **Express Kidnap** or **Hostage Crisis**, if an **Organization** had not made reasonable efforts to determine that such a **Kidnapping**, **Extortion Threat**, **Wrongful Detention**, **Political Threat**, **Hijacking**, **Disappearance**, **Express Kidnap** or **Hostage Crisis** was genuine;

(3)    <u>Personal Assets</u>
loss of property or other consideration surrendered or intended to be surrendered as payment by or on behalf of an **Insured Person** unless an **Organization** agrees that such payment is on behalf of such **Organization**;

(4)    <u>Business Income</u>
loss of income not realized by an **Organization** as the result of a covered loss;

(5)    <u>Recall Expenses</u>
**Recall Expenses** caused by:

(a)    refunds for, the value of or the cost of replacing any withdrawn, damaged or destroyed **Merchandise**; or

(b)    any loss, fees or expenses incurred for any known or suspected defect, deficiency or use of substandard or flawed materials necessitating the withdrawal, physical inspection or destruction of **Merchandise** in the absence of an **Extortion Threat** against such **Merchandise**;

(6)    <u>Violation of Law or Regulation</u>
loss from **Wrongful Detention** or **Political Threat** caused by:

(a)    any violation of criminal law by an **Insured** if such violation would be considered a criminal violation in such **Insured's Resident Country**, unless it is determined by the Company that such allegations are fraudulent and politically motivated; or

Case 1:22-cv-00553-CCE-JEP    Document 1-2    Filed 07/15/22    Page 109 of 143

CHUBB®   Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**<sup>SM</sup>
*Kidnap Ransom and Extortion*
*Coverage Part*

        (b)    failure of an **Organization** or an **Insured Person** to procure or maintain proper immigration, work, residence or similar visas, permits or other documentation;

  (7)  <u>Emergency Political Repatriation</u>
loss from **Emergency Political Repatriation** caused by:

        (a)    violation by an **Organization** or an **Insured Person** of the laws or regulations of the country from which the **Insured Person** is repatriated;

        (b)    an **Organization** or an **Insured Person** failing to procure or maintain proper immigration, work, residence or similar visas, permits or other documentation;

        (c)    a debt, insolvency, commercial failure, repossession of any property by a title holder or any other financial cause;

        (d)    an **Insured's** failure to honor any contractual obligation or bond or to obey any conditions in a license;

        (e)    any natural disasters, including any earthquake, flood, fire, famine, volcanic eruption or windstorm;

        (f)    ionizing radiations or contamination by radioactivity from any irradiated nuclear fuel or nuclear waste; or the radioactive, toxic, explosive or other hazardous properties of any nuclear assembly or nuclear component thereof; or

        (g)    the relocation of any **Insured Person** from their **Resident Country**;

  (8)  <u>Accidental Loss Fraud</u>
loss resulting from fraud by an **Insured Person** allegedly the subject of an **Accidental Loss**; or

  (9)  <u>Notice</u>
loss, unless the **Kidnapping**, **Extortion Threat**, **Wrongful Detention**, **Political Threat**, **Hijacking**, **Disappearance**, **Express Kidnap** or **Hostage Crisis** occurs or is directly or indirectly communicated to any **Insured** prior to:

        (a)    termination of this Coverage Part as to such **Insured** and is discovered and communicated in writing to the Company within one (1) year following the effective date of such termination;

        (b)    termination of any Insuring Clause or termination of any particular coverage offered under any Insuring Clause and is discovered and communicated in writing to the Company within one (1) year following the effective date of such termination;

        (c)    termination in its entirety of this Coverage Part and is discovered and communicated in writing to the Company within one (1) year following the effective date of such termination, if this Coverage Part is not renewed with the Company; or

        (d)    termination in its entirety of this Coverage Part and is discovered and communicated in writing to the Company prior to such termination, if this Coverage Part is renewed with the Company.

(B)    In addition to the Exclusions in Subsection (A) above, no coverage will be available under:

  (1)  <u>Non-Aggregation</u>
Insuring Clauses (B), Custody Coverage; (C), Expense Coverage; (D), Accidental Loss Coverage; (E), Legal Liability Costs Coverage; (F) Emergency Political Repatriation Expense Coverage; (G), Disappearance Investigation Expense Coverage; (H), Express Kidnap Costs Coverage and (I), Hostage Crisis Costs Coverage, for loss of property and other consideration actually surrendered as a ransom or extortion payment covered under Insuring Clause (A), Kidnapping, Extortion Threat and Express Kidnap Coverage;

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 110 of 143


Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Kidnap Ransom and Extortion*
*Coverage Part*

(2) **Robbery**

Insuring Clause (A), Kidnapping, Extortion Threat and Express Kidnap Coverage, for loss of property or other consideration surrendered away from any **Premises** in any face to face encounter involving the use or threat of force or violence unless surrendered by a person in possession of such property or other consideration at the time of such surrender for the sole purpose of conveying it to pay a previously communicated ransom or extortion demand and unless actually surrendered to those responsible for such demand or their designee, provided that this Exclusion (B)(2) shall not apply to loss resulting from **Express Kidnap**;

(3) **Burglary or Armed Robbery**

Insuring Clause (A), Kidnapping, Extortion Threat and Express Kidnap Coverage, for loss of property or other consideration surrendered on any **Premises** unless brought onto the **Premises** after receipt of the ransom or extortion demand for the purpose of paying such demand, provided that this Exclusion (B)(3) shall not apply to loss resulting from **Express Kidnap**; or

(4) **Voluntary Disappearance, Natural Disaster, Unsafe Area**

Insuring Clause (G), Disappearance Investigation Expense Coverage, for **Expenses** or **Legal Liability Costs** resulting from **Disappearance Investigation** if:

    (a) an **Insured Person** disappears of his or her own volition, provided that any amounts paid to the **Parent Organization** in connection with such voluntary **Disappearance** shall be refunded by the **Parent Organization** to the Company in the event the **Disappearance** is determined to be voluntary;

    (b) the **Disappearance** occurs within twenty-four hours of a natural disaster which is reported by local or global media; or

    (c) the **Disappearance** occurs while an **Insured Person** is located in an area declared unsafe or uninhabitable by a local government.

---

**IV.  PERSONAL ASSETS**

In the event of a ransom or extortion demand directed against an **Insured Person** rather than against an **Organization**, property or other consideration surrendered or intended to be surrendered by or on behalf of such **Insured Person** and only the:

(A) **Expenses** set forth in Paragraphs II(A)(1) through (A)(11) and (A)(16) through (A)(18) of the definition of **Expenses**; and

(B) **Express Kidnap Costs** set forth in Paragraphs II(A) through (E) of the definition of **Express Kidnap Costs**,

incurred by or on behalf of such **Insured Person** shall, at the option of the **Organization**, be considered property or other consideration surrendered or intended to be surrendered on behalf of an **Organization** and **Expenses** incurred by an **Organization**.

---

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 111 of 143

CHUBB'  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Kidnap Ransom and Extortion*
*Coverage Part*

**V.  PROOF OF LOSS AND LEGAL PROCEEDINGS**

(A)  Knowledge possessed by, or discovery by, an **Insured** shall be deemed knowledge possessed by, or discovery by, all **Insureds**.

(B)  It is a condition precedent to coverage that at the earliest practicable moment after the occurrence of any loss hereunder the **Parent Organization** shall give the Company written notice thereof and shall furnish to the Company affirmative proof of loss with full particulars.

(C)  No **Insured** shall institute legal proceedings against the Company after the expiration of a period of two (2) years immediately following the time such loss was sustained.

**VI.  LIMITS OF LIABILITY**

(A)  The Company's maximum liability for each loss shall not exceed the applicable Limits of Liability set forth in Item 2 in the KR&E Declarations, regardless of the number of **Insureds** sustaining the loss.

(B)  The payment of loss under this Coverage Part shall not reduce the liability of the Company for other losses, provided that the maximum liability of the Company will not exceed the dollar amount set forth in Item 2 in the KR&E Declarations:

(1)  applicable to Insuring Clause (A), Kidnapping, Extortion Threat and Express Kidnap Coverage: for all loss of property and other consideration actually surrendered as ransom and extortion payments arising from one **Extortion Threat**, **Kidnapping** or **Express Kidnapping** or a series of related **Extortion Threats**, **Kidnappings** or **Express Kidnappings**;

(2)  applicable to Insuring Clause (B), Custody Coverage: for all loss of property and other consideration intended as ransom and extortion payments arising from one **Extortion Threat** or **Kidnapping** or a series of related **Extortion Threats** or **Kidnappings**;

(3)  applicable to Insuring Clause (C), Expense Coverage: for all **Expenses** arising from one **Kidnapping**, **Extortion Threat**, **Political Threat**, **Hijacking** or **Wrongful Detention** or a series of related **Kidnappings**, **Extortion Threats**, **Political Threats**, **Hijackings** or **Wrongful Detentions**;

(4)  applicable to Insuring Clause (D), Accidental Loss Coverage:

(a)  if an **Insured Person** suffers a covered **Mutilation**, the Company's maximum liability for such **Mutilation** shall be the amount equal to the percentage set forth in Item 2(D)(iii) of the KR&E Declarations of the **Loss of Life Benefit Amount**;

(b)  if an **Insured Person** suffers a covered **Accidental Loss** (other than **Mutilation** or **Loss of Life**) the Company's maximum liability for such **Accidental Loss** shall be the amount equal to the percentage set forth in Item 2(D)(iv) of the KR&E Declarations of the **Loss of Life Benefit Amount**;

(c)  if an **Insured Person** suffers a covered **Loss of Life** the Company's maximum liability for such **Loss of Life** shall be the **Loss of Life Benefit Amount**;

(d)  if an **Insured Person** suffers more than one covered **Accidental Loss** the Company's maximum liability for all such **Accidental Loss** shall be calculated based on Subparagraph (a), (b) and (c) above, provided that in no event shall the Company's maximum liability for all such **Accidental Loss** exceed the **Loss of Life Benefit Amount**; or

(e)  if more than one **Insured Person** suffers covered **Accidental Loss** resulting from the same **Kidnapping**, **Wrongful Detention**, **Extortion Threat**, **Political Threat** or **Hijacking**, the Company's maximum liability for all such **Accidental Loss** shall be calculated based on Subparagraphs (a), (b), (c) and (d) above, provided that in no event

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 112 of 143

CHUBB®  Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**[SM]
**Kidnap Ransom and Extortion**
**Coverage Part**

shall the Company's maximum liability for all such **Accidental Loss** exceed the **Event Benefit Amount**;

(5)  applicable to Insuring Clause (E), Legal Liability Costs Coverage: for all **Legal Liability Costs** arising from one **Kidnapping**, **Hijacking**, **Political Threat**, **Wrongful Detention**, **Hostage Crisis** or **Express Kidnap** or one event described in Subsection (A) of the definition of **Extortion Threat** or a series of related **Kidnappings**, **Hijackings**, **Political Threats**, **Wrongful Detentions**, **Hostage Crises** or **Express Kidnaps** or a series of related events as described in Subparagraph (A) of the definition of **Extortion Threat**;

(6)  applicable to Insuring Clause (F), Emergency Political Repatriation Expense Coverage: for all **Repatriation Expenses** arising from one **Emergency Political Repatriation** or a series of related **Emergency Political Repatriations**;

(7)  applicable to Insuring Clause (G), Disappearance Investigation Expense Coverage: for all **Expenses** for **Disappearance Investigation** arising from one **Disappearance** or a series of related **Disappearances**;

(8)  applicable to Insuring Clause (H): for all **Express Kidnap Costs** arising from one **Express Kidnap** or a series of related **Express Kidnaps**; or

(9)  applicable to Insuring Clause (I), Hostage Crisis Costs Coverage: for all **Hostage Crisis Costs** arising from one **Hostage Crisis** situation or a series of related **Hostage Crisis** situations.

(C)  For all covered **Recall Expenses** occurring during the **Policy Year**, the Company's maximum liability shall be twenty-five percent (25%) of the Limit of Liability set forth in Item 2(C), Expense Coverage, of the KR&E Declarations, up to a maximum limit of liability of one million dollars ($1,000,000), which amount is part of, and not in addition to, the Limits of Liability set forth in Item 2(C), Expense Coverage, of the KR&E Declarations.

(D)  For all covered rest and rehabilitation expenses incurred during the **Policy Year**, the Company's maximum liability shall be one hundred thousand dollars ($100,000), which amount is part of, and not in addition to, the Limits of Liability set forth in Item 2(C), Expense Coverage, of the KR&E Declarations.

---

## VII.  LIABILITY FOR PRIOR LOSSES

(A)  Coverage shall be available for loss as a result of a **Kidnapping**, **Extortion Threat**, **Wrongful Detention**, **Political Threat**, **Hijacking**, **Disappearance**, **Express Kidnap** or **Hostage Crisis** which occurred or was communicated to the **Organization**, prior to the inception date of this Policy, prior to the effective date of coverage for any additional **Insureds** or prior to the effective date of any coverage added by endorsement, if:

(1)  an **Organization** or some predecessor in interest of such **Organization** carried a prior policy, which at the time such **Kidnapping**, **Extortion Threat**, **Wrongful Detention**, **Political Threat**, **Hijacking**, **Disappearance**, **Express Kidnap** or **Hostage Crisis** occurred or was communicated, afforded some or all of the coverage of an Insuring Clause under this Coverage Part applicable to such prior loss;

(2)  such coverage continued without interruption from the time such **Kidnapping**, **Extortion Threat**, **Wrongful Detention**, **Political Threat**, **Hijacking**, **Disappearance**, **Express Kidnap** or **Hostage Crisis** occurred or was communicated, until the inception date or effective date(s) as described above; and

(3)  such **Kidnapping**, **Extortion Threat**, **Wrongful Detention**, **Political Threat**, **Hijacking**, **Disappearance**, **Express Kidnap** or **Hostage Crisis** was first discovered by an **Organization** after the time allowed for discovery under the last such policy.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 113 of 143

**CHUBB**   Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Kidnap Ransom and Extortion*
*Coverage Part*

(B)     If such prior policy carried by an **Organization** or predecessor in interest of such **Organization** was issued by the Company or any subsidiary or affiliate of The Chubb Corporation, such prior policy shall terminate as of the inception of this Policy and such prior policy shall not cover any loss not discovered and noticed to the Company prior to the inception of this Policy.

(C)     The **Insured** will neither be entitled to a separate recovery under each policy in force at the time the **Kidnapping, Extortion Threat, Wrongful Detention, Political Threat, Hijacking, Disappearance, Express Kidnap** or **Hostage Crisis** occurred or was communicated, sustained or discovered, nor will the **Insured** be entitled to recover the sum of the limits of liability of any such policies.  The Company's maximum liability shall not exceed the lesser of the limit of liability of the policy in force at the time such **Kidnapping, Extortion Threat, Wrongful Detention, Political Threat, Hijacking, Disappearance, Express Kidnap** or **Hostage Crisis** occurred or was communicated, or the applicable Limit of Liability set forth in Item 2 of the KR&E Declarations.

## VIII.   BENEFICIARY

(A)     The **Loss of Life Benefit Amount** for **Loss of Life** shall be paid to an **Insured Person's** designated beneficiary.  The Benefit Amount set forth in Item 2(D) of the KR&E Declarations for all other **Accidental Loss** shall be paid to the **Insured Person**, unless otherwise directed by the **Insured Person**.

(B)     If an **Insured Person** suffers **Loss of Life** and has not designated a beneficiary, or if the designated beneficiary is not alive, the Company shall pay covered loss in the following order:

(1)     to the spouse or domestic partner;

(2)     in equal shares to the surviving children;

(3)     in equal shares to the surviving parents;

(4)     in equal shares to the surviving brothers and sisters; or

(5)     to the estate,

of the **Insured Person**.

## IX.   NON-ACCUMULATION OF LIABILITY

(A)     When there is more than one **Insured**, the maximum liability of the Company for loss sustained by one or all **Insureds** shall not exceed the amount for which the Company would be liable if all losses were sustained by any one **Insured**.

(B)     Regardless of the number of years this coverage remains in effect and the total premium amounts due or paid, the limit of liability of the Company with respect to any loss shall not be cumulative from **Policy Year** to **Policy Year** or from **Policy Period** to **Policy Period**.

## X.   LOSS SUSTAINED

A loss shall be deemed to have been sustained under:

(A)     Insuring Clause (A), Kidnapping, Extortion Threat and Express Kidnap Coverage, at the time of surrender of the ransom or extortion payment;

(B)     Insuring Clause (B), Custody Coverage, at the time of actual destruction, disappearance, confiscation or wrongful abstraction of the property or other consideration;

(C)     Insuring Clause (C), Expense Coverage, at the time of payment of incurred **Expenses** by an **Organization**;

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 114 of 143

CHUBB®   Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Kidnap Ransom and Extortion
Coverage Part*

(D)    Insuring Clause (D), Accidental Loss Coverage, at the time of **Accidental Loss**;

(E)    Insuring Clause (E), Legal Liability Costs Coverage, at the time an **Organization** has made payment for any incurred expense, judgment or settlement;

(F)    Insuring Clause (F), Emergency Political Repatriation Expense Coverage, at the time of payment of incurred **Repatriation Expenses** by an **Organization**;

(G)    Insuring Clause (G), Disappearance Investigation Expense Coverage, at the time of payment of incurred **Disappearance Investigation Expenses** by an **Organization**;

(H)    Insuring Clause (H), Express Kidnap Costs Coverage, at the time of payment of incurred **Express Kidnap Costs** by an **Organization**; or

(I)    Insuring Clause (I), Hostage Crisis Costs Coverage, at the time of payment of incurred **Hostage Crisis Costs** by an **Organization**.

## XI. OTHER INSURANCE

(A)    If any loss under this Coverage Part is insured under any other valid and collectible insurance policy (other than a policy that is issued specifically as excess of the insurance afforded by this Coverage Part), this Coverage Part shall be excess of and shall not contribute with such other insurance, regardless of whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

(B)    The Company's liability under this Coverage Part for any loss of personal assets under Section IV, Personal Assets, other than a loss sustained by an **Employee**, shall be reduced by any amount paid or payable on account of such loss under such other insurance issued by the Company or any subsidiary or affiliate of The Chubb Corporation.

## XII. VALUATION AND FOREIGN CURRENCY

The Company shall pay:

(A)    the least of:

      (1)    the actual market value of lost, damaged or destroyed securities at the closing price of such securities on the business day immediately preceding the day on which a loss is discovered;

      (2)    the cost of replacing securities; or

      (3)    the cost to post a Lost Instrument Bond,

    such cost shall be paid by the Company on behalf of an **Organization**; or

(B)    the cost of blank books, pages or tapes or other blank materials to replace lost or damaged books of account or other records; or

(C)    the least of:

      (1)    the actual cash value of any other property or other consideration at the time of loss; or

      (2)    the actual cost to repair or replace such other property or consideration with that of similar quality and value; or

(D)    the United States of America dollar value of foreign currency based on the rate of exchange published in *The Wall Street Journal* on the day loss involving foreign currency is discovered.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 115 of 143

Coverage Section: ForeFront Portfolio 3.0 Kidnap Ransom and Extortion Coverage Part Federal

Effective date of
this endorsement/rider: March 10, 2019          Federal Insurance Company

                                                Endorsement/Rider No. 1

                                                To be attached to and
                                                form a part of Policy No. 8234-7252

Issued to:  THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

THREAT RESPONSE EXPENSE COVERAGE ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)     Section 1. Insuring Clauses, of this Coverage Part is amended to add the following Insuring Clause:

        Threat Response Expense Coverage Insuring Clause

        The Company shall reimburse the **Parent Organization** for **Threat Response Expenses** paid by
        an **Organization** or an **Insured Person** resulting directly from a **Threat**.

(2)     Solely with respect to loss covered under the Threat Response Expense Coverage Insuring
        Clause, Item 3 of the KR&E Declarations is deleted and replaced with the following:

        Item 3. Retention: $0.00

(3)     Section II. Definitions, of this Coverage Part is amended to include the following definitions:

        **Threat** means a threat or threats made solely and directly against an **Organization** or an
        **Insured Person** to:

        (a)     commit a **Kidnapping** of, do bodily harm to, or wrongfully abduct or detain any **Insured
                Person**; or

        (b)     damage, destroy or **Contaminate** any **Organization's Property**,

        by a person or group, whether acting alone or in collusion with others.

        All such threats:

        (i)     related by a common committed, attempted or threatened act; or

        (ii)    made contemporaneously against the same **Organization** or the same **Insured Person** or
                involving the same **Insured Person** or **Organization's Property**,

        will be deemed to constitute a single **Threat**.

        **Threat Response Expenses** means, solely in connection with a **Threat**, only the reasonable
        fees and expenses for or cost of:

        (a)     assessment of such **Threat** by The Ackerman Group;

14-02-17304 (12/2010)              Page 1

(b) security guard services for the threatened **Insured Person** or **Organization's Property** provided by The Ackerman Group.

(4) No coverage will be available under the Threat Response Expense Coverage Insuring Clause for loss:

   (a) resulting from fraud by an **Insured Person**, whether acting alone or in collusion with others;

   (b) unless the **Threat** occurs or is directly or indirectly communicated to any **Insured** prior to:

      (i) termination of this Coverage Part as to such **Insured** and is discovered and communicated in writing to the Company within one (1) year following the effective date of such termination;

      (ii) termination of any Insuring Clause or termination of any particular coverage offered under any Insuring Clause and is discovered and communicated in writing to the Company within one (1) year following the effective date of such termination;

      (iii) termination in its entirety of this Coverage Part and is discovered and communicated in writing to the Company within one (1) year following the effective date of such termination, if this Coverage Part is not renewed with the Company; or

      (iv) termination in its entirety of this Coverage Part and is discovered and communicated in writing to the Company prior to such termination, if this Coverage Part is renewed with the Company.

(5) Section VI. Limits of Liability, of this Coverage Part is amended to include the following:

   The Company shall only be liable for a **Threat** that first occurs during the **Policy Period**.

   The Company's maximum liability shall be $250,000.00, for all **Threat Response Expenses** arising from one **Threat** or a series of related **Threats**.

(6) A loss shall be deemed to have been sustained under the Threat Response Expense Coverage Insuring Clause at the time of the payment of incurred **Threat Response Expenses** by the **Organization**.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 117 of 143

Coverage Section: ForeFront Portfolio 3.0 Kidnap Ransom and Extortion Coverage Part Federal

Effective date of
this endorsement/rider: March 10, 2019          Federal Insurance Company

Endorsement/Rider No. 2

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

---

BUSINESS INCOME COVERAGE ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)     Section 1. Insuring Clauses, of this Coverage Part is amended to add the following Insuring Clause:

Business Income Coverage Insuring Clause

The Company shall pay the **Parent Organization** for actual **Business Income** loss sustained by an **Organization** resulting from the actual suspension of **Operations** during the **Period of Restoration.**

Such actual suspension of **Operations** must result solely and directly from:

(a)     a **Kidnapping**, **Hijacking**, **Political Threat** or **Wrongful Detention**;

(b)     an **Extortion Threat** described in Subsection (A), (B) or (E) of the definition of **Extortion Threat**;

(c)     a **Computer Violation**; or

(d)     an order by a civil authority prohibiting access to the **Premises** because of a threat against a real property adjacent to the **Premises.**

(2)     Section II. Definitions, of this Coverage Part is amended to include the following definitions:

**Business Income** means:

(a)     the sum of:

(1)     net profit before income taxes that would have been earned by an **Organization** had no actual suspension of **Operations** described in the Business Income Coverage Insuring Clause occurred;

(2)     the actual cost of continuing, on a curtailed basis, business activities of an **Organization** that are necessary for an **Organization** to resume **Operations** with substantially the same quality of service that existed immediately preceding the actual suspension of **Operations** described in the Business Income Coverage Insuring Clause; and

14-02-17305X (06/2011)          Page 1

(3)     reasonable expenses that would not have been incurred had no actual suspension of **Operations** described in the Business Income Coverage Insuring Clause occurred and that were incurred by an **Organization** for the sole purpose of reducing loss described in (a)(1) and (a)(2) above, not to exceed the amount of the actual reduction of such loss;

(b)     less the sum of:

(1)     all recoveries, insurance, suretyship and other indemnity which would cover loss described in (a) above in the absence of this coverage; and

(2)     the amount by which an **Organization** fails to reduce loss described in (a) above through any reasonable measures.

**Operations** means normal business activities of an **Organization** at the **Premises** directly affected by the event described in subparagraph (a), (b), or (c) of the Business Income Coverage Insuring Clause and existing prior to such event.

**Period of Restoration** means the period of time that:

(a)     begins six (6) hours following the actual suspension of **Operations** described in the Business Income Coverage Insuring Clause; and

(b)     ends on the earlier of:

(1)     the date such **Operations** are restored, with due diligence and dispatch, to the condition that existed prior to the event described in subparagraph (a), (b), or (c) of the Business Income Coverage Insuring Clause; or

(2)     One hundred twenty (120) days after the actual suspension of **Operations** described in the Business Income Coverage Insuring Clause.

Termination of this Coverage Part will not reduce the **Period of Restoration**.

(3)     Section VI. Limits of Liability, of this Coverage Part is amended to include the following:

The Company shall only be liable for an actual suspension of **Operations** that first occurs during the **Policy Period**.

The Company's maximum liability shall be $1,000,000.00, for all **Business Income** loss arising from one event described in subparagraph (a), (b), or (c) of the Business Income Coverage Insuring Clause, or any related event(s) described in subparagraph (a), (b), or (c) of the Business Income Coverage Insuring Clause, or a series of related events described in subparagraph (a), (b), or (c) of the Business Income Coverage Insuring Clause.

(4)     A loss shall be deemed to have been sustained under the Business Income Coverage Insuring Clause of this Coverage Part at the time income would have been earned and at the time of the payment of incurred costs and expenses by an **Organization**.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 119 of 143

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 120 of 143

Coverage Section:  ForeFront Portfolio 3.0 Kidnap Ransom and Extortion Coverage Part Federal

Effective date of
this endorsement/rider: March 10, 2019        Federal Insurance Company

                                              Endorsement/Rider No. 3

                                              To be attached to and
                                              form a part of Policy No. 8234-7252

Issued to:  THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

---

VALUE OF PRODUCTS ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)    The definition of **Recall Expenses**, as set forth in Section II. Definitions, of this Coverage Part is
       deleted and replaced with the following:

              **Recall Expenses** means only the reasonable fees and expenses for, or the costs of:

              (A)    refunds for, or the value of, or the cost of repairing or replacing any withdrawn,
                     damaged, or destroyed **Merchandise**, whichever of the foregoing options is least
                     expensive; or

              (B)    transportation during the withdrawal, physical inspection or destruction of
                     **Merchandise**; or

              (C)    other reasonable expenses, subject to the Company's prior written approval.

(2)    Section III. Exclusions, of this Coverage Part is amended to delete Exclusion (A)(5) and replace it
       with the following:

              (A)(5)    Recall Expenses
                        any loss, fees or expenses incurred for any known or suspected defect, deficiency
                        or use of substandard or flawed materials necessitating the withdrawal, physical
                        inspection or destruction of **Merchandise** in the absence of an **Extortion Threat**
                        against such **Merchandise**;

(3)    The Company's maximum liability for any **Recall Expenses** for refunds for, or the value of, or the
       cost of repairing or replacing any withdrawn, damaged or destroyed **Merchandise** resulting
       directly from a covered loss shall be $1,000,000.00, which amount shall be part of, and not in
       addition to the applicable Limit(s) of Liability set forth on the Declarations for this Coverage Part.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 122 of 143

Coverage Section: ForeFront Portfolio 3.0 Kidnap Ransom and Extortion Coverage Part Federal

Effective date of
this endorsement: March 10, 2019    Federal Insurance Company

              Endorsement No. 4

              To be attached to and
              form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

NORTH CAROLINA AMENDATORY ENDORSMENT
TO THE KIDNAP RANSOM & EXTORTION COVERAGE PART

In consideration of the premium charged, it is agreed that:

Section V, Proof of Loss and Legal Proceedings, is amended so that reference to "two (2) years" in Subsection (C) thereof is changed to "three (3) years".

The Policy will be deemed to have been amended to the extent necessary to effect the purposes and intent of this Amendatory Endorsement.

The regulatory requirements set forth in this Amendatory Endorsement shall supercede and take precedence over any provisions of the Policy or any endorsement to the Policy, whenever added, that are inconsistent with or contrary to the provisions of this Amendatory Endorsement, unless such Policy or endorsement provisions comply with the applicable insurance laws of the State of North Carolina.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

            _____
            Authorized Representative

14-02-17897 (12/2010)    Page 1

Coverage Section: ForeFront Portfolio 3.0 Kidnap Ransom and Extortion Coverage Part Federal

Effective date of
this endorsement/rider: March 10, 2019

Federal Insurance Company

Endorsement/Rider No. 5

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

---

RECOVERIES SECTION ADDED ENDORSEMENT

In consideration of the premium charged, it is agreed that this Coverage Part is amended to include the following section:

**RECOVERIES**

(A)  Recoveries for any loss covered under this Coverage Part, whether effected by the Company or by an **Insured**, less the cost of recovery, shall be distributed as follows:

(1)  first, to an **Insured** for the amount of such loss, otherwise covered, in excess of the applicable Limits of Liability;

(2)  second, to the Company for the amount of such loss paid to an **Insured** as covered loss;

(3)  third, to an **Insured** for the Retention applicable to such loss;

(4)  fourth, to an **Insured** for the amount of such loss not covered under this coverage section.

(B)  Recovery from reinsurance or indemnity of the Company shall not be deemed a recovery hereunder.


The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

14-02-18107 (05/2011)          Page 1

Coverage Section:  ForeFront Portfolio 3.0 Kidnap Ransom and Extortion Coverage Part Federal

Effective date of
this endorsement/rider: March 10, 2019                    Federal Insurance Company

                                                          Endorsement/Rider No. 6

                                                          To be attached to and
                                                          form a part of Policy No. 8234-7252


Issued to:  THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

---

CYBER AMENDATORY ENDORSEMENT

In consideration of the premium charged, it is agreed that the following changes are made:

(1)    Item 3. of the KR&E Declarations is amended as follows:

       Item 3. Retention:        None

       Notwithstanding anything to the contrary, solely with respect to any **Cyber Extortion Threat**, Item
       3. is deleted and replaced with the following:  $50,000.00; provided, however, that this Retention
       shall not apply to the costs and fees of any independent negotiator engaged by the **Insured**.


(2)    For purposes of coverage under this Coverage Part, the term **Extortion Threat** as used in
       Insuring Clauses (A), (B) and (C) is replaced with the phrase "**Extortion Threat** or **Cyber
       Extortion Threat**" wherever the term appears.

(3)    Section II. Definitions, is amended as follows:

       A.    The definition of **Cyber Extortion Threat** is added:

             **Cyber Extortion Threat** means a threat or a series of threats:

             (A)    received by an **Insured** prior to a **Computer Violation** to adulterate or destroy
                    any **Computer System** by means of a **Computer Violation;** or to damage,
                    destroy, or **Contaminate** any **Organization's Property** by means of a
                    **Computer Violation;**

             (B)    to disseminate, divulge or utilize any **Proprietary Information** obtained directly
                    or indirectly from a **Computer Violation;** or

             (C)    to disseminate or make public negative information regarding **Merchandise**
                    obtained directly or indirectly from a **Computer Violation,**

provided, however that such threat(s) shall not constitute a **Cyber Extortion Threat** unless directed solely against an **Insured**, and such **Insured** conducts and contemporaneously documents an investigation which reasonably determines that such threat is technologically credible, prior to surrendering property or other consideration as payment by or on behalf of an **Organization**.

All such threats:

    (1)    involving a related or common wrongful act, whether committed, attempted or threatened; or

    (2)    made contemporaneously against the same **Insured**,

shall be deemed to constitute a single **Cyber Extortion Threat**.

B.    The definition of **Extortion Threat** is amended to include the following to the end thereof:

    Provided, however, that **Extortion Threat** shall not include any threat, act or incident involving a **Computer Violation**.

C.    Solely with respect to any **Cyber Extortion Threat** subparagraph (C) of the definition of **Expenses** is deleted and replaced with the following:

    (C)    solely in connection with a **Cyber Extortion Threat**, only the reasonable fees and expenses for or cost of:

        (1)    an independent negotiator;

        (2)    an independent public relations consultant;

        (3)    travel and accommodations of an **Insured Person**;

        (4)    interest for a loan taken by an **Organization** for property or other consideration surrendered as payment under Insuring Clause (A); or

        (5)    a reward paid by an **Organization** to a natural person who provides information not otherwise available leading to the arrest and conviction of the person(s) responsible for such **Cyber Extortion Threat**.

(4)    Section III.(A) Exclusions, is amended by adding the following to end thereof:

    (10)    costs or other expenses incurred by an **Insured** to replace, restore, recreate, re-collect or recover digital data;

    (11)    costs or expenses incurred to identify or remediate software program errors or vulnerabilities, or costs to update, replace, restore, upgrade, maintain, or improve a **Computer System**;

    (12)    cost or expenses of any independent forensic analysts or network security consultants engaged to investigate or assess any actual or alleged **Cyber Extortion Threat**.

(5)    Section VI. Limits of Liability, is amended to include the following at the end thereof:

    The Company's liability under this Coverage Part for all loss resulting directly or indirectly from any **Cyber Extortion Threat** or series of related threats, or any endorsement(s) attached thereto

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 126 of 143

which provides coverage for business interruption costs associated with a **Computer Violation** shall be $1,000,000 (the "Aggregate Limit"). Upon exhausting the Aggregate Limit by payment of loss, the Company shall have no further liability for loss or losses regardless of when discovered and whether or not previously reported to the Company.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

14-02-23003 (10/2017)                    Page 3

Coverage Section: ForeFront Portfolio 3.0 Kidnap Ransom and Extortion Coverage Part Federal

Effective date of
this endorsement/rider: March 10, 2019

Federal Insurance Company

Endorsement/Rider No. 7

To be attached to and
form a part of Policy No. 8234-7252

Issued to: THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

AMEND DEFINITION OF EMPLOYEE ENDORSEMENT

In consideration of the premium charged, it is agreed that the definition of **Employee**, as set forth in Section II. Definitions, of this Coverage Part, is amended to include any former or retired **Executive** of an **Organization** retained as a consultant to such **Organization** pursuant to a written contract.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 128 of 143

March 20, 2019
THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY
816 ELLIS ROAD
DURHAM, NC 27703

Thank you for purchasing your Workplace Violence coverage from Chubb. As a leading provider of this specialized coverage, Chubb has the safety of your employees and corporate assets as our top priority. To accomplish this goal, we can provide you with the following tools:

**Threat of Violence Consultancy**
Your Chubb Workplace Violence coverage provides you with access to professional threat of violence assessment and defusing services provided by Crisis Management International (CMI). This consultancy provides 24/7 access to experienced Threat of Violence Consultants (TOVCs) who are former FBI and Secret Service agents and mental health professionals with comprehensive workplace violence expertise. *For more information on available professionals and services, see below.*

**IN THE EVENT OF A THREATENING WORKPLACE VIOLENCE SITUATION**
As a client of Chubb, you will receive immediate response from Crisis Management International, Inc. In the event of a threatening work-related situation, you may **immediately** contact CMI at **Chubb's ForeFront 3.0 Threat Consultation Hotline 855-896-0710** (day or night) and identify your organization as a Chubb insured.

**RISK MANAGEMENT GUIDES**
To obtain your free copy of *Managing Threats of Violence in the Workplace: Take-And-Use Guidelines*, a useful guide for managers, please contact your agent or broker.

**CMI THREAT ASSESSMENT AND DEFUSING SERVICES**
Your Chubb Workplace Violence coverage provides you with access to CMI's threat consultancy services 24/7. Experienced professionals will help your management team orchestrate an effective and efficient response to address the situation.

**What are Threat of Violence (TOV) consultations?**
• TOV consultations are specialty services designed to minimize the likelihood that threatening individuals will act out violently in the workplace and to restore a sense of employee safety.

• TOV consultations orchestrate an experience-based answer to the question "Now what?" when a situation or individual is assessed to be potentially violent and management must take appropriate action.

**What are the qualifications of TOV consultants?**
• They include former law enforcement, specifically FBI and Secret Service Agents, experienced threat management mental health professionals, employment attorneys, fitness-for-duty evaluators, threat assessment professionals, forensic evaluators for testimony, and specialists in surveillance, investigations, undercover, executive protection, dispute resolution, hostility management, linguistic analysis, polygraph testing, and IT forensics.

**What are the methods used by TOV consultants?**
• TOV consultations typically begin through a phone conversation between the TOV Consultant and the organization's management team. The fact pattern is obtained, the threatening

14-02-21397 (12/2014)

situation is assessed, and response actions are conjointly strategized. Onsite threat assessment and defusing services are provided, when appropriate.

- Strategic decisions are made regarding (1) immediate management actions, (2) investigations and threat assessment, (3) actions to protect people and defuse threatening individuals, (4) reasonable follow up methods, (5) legally compliant documentation, and at the appropriate time, (6) purposeful disengagement.

**Do TOV consultants assist individuals who feel threatened?**
- Upon request by management, TOV Consultants may assist threatened individuals with: (1) how to get a Temporary Restraining Order or Criminal Trespass Warning and the pros and cons of each; (2) what to do if confronted, personal protection, and hostility management strategies; (3) stress debriefing type consults; (4) discussions about the likelihood of the person acting out violently, or not; (5) coaching about how to avoid inadvertently provoking the threatening individual; (6) safety precautions on- and off-worksite.

- Additional consultations may include situation-specific guidelines, like stalking, domestic violence in the workplace, and how to address threatening voicemails, emails, websites, letters, harassing employees or customers, and other threatening situations.

**When is it appropriate to use external TOV consultants?**
- Any time a work-related situation is deemed to be seriously threatening, there is a threat of violence, history of violence, or simply a gut feeling the threatening person is high risk for acting out.

- When an upcoming employee termination or disciplinary meeting includes a concern about hostility or potential violence.

- When management isn't sure how best to respond to a threatening situation or how to respond with comprehensive, best-practice, and benchmarked methods.

**What is outside the scope of TOV consultations?**
- While TOV consultants will help to integrate these services, TOV consultations do not provide, psychiatric treatment, EAP counseling, or legal advice.

- TOV consultations are not a substitute for HR and supervisory responsibilities.

- Unilateral TOV interventions are not provided. All TOV consultations services are strategized and enacted in conjunction with management throughout the threat management process.

**What additional services are available?**
- Where permitted by law, CMI offers Chubb customers the first hour of "Threat of Violence Management" consulting free of charge, up to three times per insured per year, with a discounted rate on additional hours.

- Under separate agreement, training can be provided for: (1) Threat Response Teams, (2) employee workplace violence orientation, (3) understanding the violent mind, (4) hostility management, (5) termination meetings when violence is a concern, (6) post-workplace violence crisis response, (7) crisis leadership, and (8) related programs.

- Licensing is available for the CMI ProGuide™ Threat Response Team Manual and protocol system that provides field-tested guidelines and a legally scrutinized methodology for addressing threats of violence related to the workplace.

- A defensible, benchmarked, and comprehensive Workplace Violence Preparedness Program can be established on a project basis.

14-02-21397 (12/2014)

**Before a Threatening Situation Occurs . . .**
Perhaps the most important step your company can take to react effectively to a threatening situation is to plan ahead, appoint and train the right people to a Threat Response Team, and make certain team members (or their backups) can be rapidly mobilized.

**About Crisis Management International, Inc.**
As a Workplace Violence Policy customer of Chubb, you are guaranteed immediate response from Crisis Management International Inc., an independent national threat of violence consulting firm retained to assist your organization when threatening, intimidating or fear inducing incidents occur that are related to the workplace. Crisis Management International can handle all aspects of threat response, including threat assessment, safety advisory for potential victims, and orchestration of an effective and comprehensive management threat response.

Crisis Management International provides crisis and business continuity preparedness services for all sizes of organizations both domestic and worldwide, including planning, training and exercise programs. While comprehensive in nature, their specialty areas include (1) the Human Side of Crisis, (2) Strategic Crisis Leadership, (3) Workplace Violence Prevention and Preparedness, and (4) Threat of Management Consultations through a network of threat experienced mental health specialists, and former FBI and Secret Service agents.

If you would like more information about your Threat Assessment and Defusing Services, simply call **Chubb's ForeFront 3.0 Threat Consultation Hotline 855-896-0710.** A CMI consultant will be available to discuss the scope of services available to you.

This document is for information only. It is offered as a resource to be used together with your professional insurance advisers in maintaining a loss prevention program. No liability is assumed by reason of the information this document contains.

For promotional purposes, Chubb refers to member insurers of the Chubb Group of Insurance Companies underwriting coverage.

The precise coverage afforded is subject to the terms, conditions and exclusions of the policies as issued. Not all insurers do business in all jurisdictions.

14-02-21397 (12/2014)

March 20, 2019
THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY
816 ELLIS ROAD
DURHAM, NC 27703

## Important Information: Please read!

Thank you for purchasing your Workplace Violence coverage from Chubb. As a leading provider of this specialty coverage, Chubb has the safety of your employees and corporate assets as our top priority. To accomplish this goal, we can provide you with the following tools:

**Threat of Violence Consultancy**

Your Chubb Workplace Violence coverage provides you with access to professional Threat of Violence Assessment and Defusing Services provided by R3 Continuum (R3). This consultancy provides 24/7 access to experienced Threat of Violence Consultants (TOVCs) with comprehensive workplace violence expertise. *For more information on available professionals and services, see below.*

**IN THE EVENT OF A THREATENING WORKPLACE VIOLENCE SITUATION**
As a Chubb policy holder, you are provided freedom of choice regarding which consulting firm responds to a claim. However, Chubb has partnered with R3 Continuum (R3), an independent international security consulting firm to provide you a guaranteed and immediate response in a time of crisis.

There is NO requirement to contact Chubb at the outset of an incident. If you wish to retain R3 Continuum (R3), you may **immediately** contact them at **Chubb's Workplace Violence Threat Consultation Hotline 855-896-0710** (day or night) and identify your organization as a Chubb insured.

Please note that R3 Continuum cannot address or respond to coverage questions, which should be directed to your agent or broker.

**RISK MANAGEMENT GUIDES**

To obtain your free copy of *Managing Threats of Violence in the Workplace: Take-And-Use Guidelines*, a useful guide for managers, please contact your agent or broker or visit: http://www.chubb.com/businesses/csi/chubb15311.pdf to download a digital copy.

**R3 THREAT ASSESSMENT AND DEFUSING SERVICES**

Your Chubb Workplace Violence coverage provides you with access to R3's threat consultancy services 24/7. Experienced professionals will help your management team orchestrate an effective and efficient response to address the situation.

Form 14-02-21832 (06/2017)

**What are Threat of Violence (TOV) consultations?**

- TOV consultations are specialty services designed to minimize the likelihood that threatening individuals will act out violently in the workplace and to restore a sense of employee safety.

- TOV consultations orchestrate an experience-based answer to the question "Now what?" when a situation or individual is assessed to be potentially violent and management must take appropriate action.

**What are the qualifications of TOVCs?**

- They include former law enforcement, specifically FBI and Secret Service Agents, experienced threat management mental health professionals, employment attorneys, fitness-for-duty evaluators, threat assessment professionals, forensic evaluators for testimony, and specialists in surveillance, investigations, undercover, executive protection, dispute resolution, hostility management, linguistic analysis, polygraph testing, and IT forensics.

**What are the methods used by TOVCs?**

- TOVCs typically begin through a phone conversation between the TOVC and the organization's management team. The fact pattern is obtained, the threatening situation assessed, and response actions are conjointly strategized. Onsite threat assessment and defusing services are provided, when appropriate.

- Strategic decisions, if applicable, are made regarding (1) immediate management actions; (2) investigations and threat assessment; (3) actions to protect people and defuse threatening individuals; (4) reasonable follow up methods; (5) legally compliant documentation; and (6) purposeful disengagement at the appropriate time.

**Do TOVCs assist individuals who feel threatened?**

- Upon request by management, TOVCs may assist threatened individuals with: (1) obtaining a Temporary Restraining Order or Criminal Trespass Warning and explaining the pros and cons associated with  each; (2) confrontation, personal protection and hostility management strategies; (3) stress debriefing consults; (4) advice about the likelihood of person acting out violently; (5) coaching on how to avoid provoking the threatening individual; and (6) understanding safety precautions for on- and off-worksite.

- Additional consultations may include situation-specific guidelines on how to address stalking, domestic violence in the workplace, threatening voicemails, emails, websites or letters, harassing employees or customers, and other threatening situations.

**When is it appropriate to use external TOVCs?**

- Any time a work-related situation is deemed to be seriously threatening or there is a threat of violence, history of violence or simply a gut feeling the threatening person is high risk for acting out.

- When an upcoming employee termination or disciplinary meeting includes concern about hostility or potential violence.

- When management isn't sure how best to respond to a threatening situation or how to respond with comprehensive, best-practice, and benchmarked methods.

Form 14-02-21832 (06/2017)

**What is outside the scope of TOVCs?**

- While TOVCs will help to integrate these services, TOVCs do not provide, psychiatric treatment, EAP counseling, or legal advice.
- TOV consultations are not a substitute for HR and supervisory support and services.
- Unilateral TOV interventions are not provided. All TOV consultations services are strategized and enacted in conjunction with management throughout the threat management process.

**What additional services are available?**

- Where permitted by law, R3 offers Chubb customers the first hour of "Threat of Violence Management" consulting free of charge, up to three times per insured per year, with a discounted rate on additional hours.
- Under separate agreement, the following training can be provided: (1) training for Threat Response Teams; (2) employee workplace violence orientation training; (3) training related to understanding the violent mind; (4) hostility management training; (5) training regarding how to conduct termination meetings when violence is a concern; (6) post-workplace violence crisis response training; and (7) crisis leadership training.
- Licensing is available for the R3 ProGuide™ Threat Response Team Manual and protocol system that provides a field-tested guidelines and a legally scrutinized methodology for addressing threats of violence related to the workplace.
- A defensible, benchmarked, and comprehensive Workplace Violence Preparedness Program can be established on a project basis.

**Before a Threatening Situation Occurs . . .**

Perhaps the most important step your company can take to react effectively to a threatening situation is to plan ahead by appointing and training the right people for a Threat Response Team, and make sure these team members (or their backups) can be rapidly mobilized.

**About R3 Continuum**

We believe people have a right to lead productive, meaningful lives. We help them do that with a suite of services that deal with potentially disruptive life events. Collectively, our services ensure that organizations are ready for major crisis events, able to respond successfully to these events (including workplace or threat of violence incidents), and equipped to accelerate employee recovery and return to work outcomes. R3 Continuum is a recognized leader in providing comprehensive solutions for complex claims and situations, and we guarantee to provide the right solutions with the right people at the right time. Visit our website at http://www.r3continuum.com.

For additional information, (non-crisis) about R3's Threat Assessment and Defusing Services, simply call **R3 Continuum** at **952-641-0626,** or email at **megan.wedl@r3continuum.com.** An R3 consultant will be available to discuss the scope of services available to you.

-------------------

The services provided are advisory in nature. While this program is offered as a resource in developing or maintaining a loss prevention program, you should consult competent legal counsel to design and implement your own program. No liability is assumed by reason of the services, access or information provided. All services are subject to change without notice.

Form 14-02-21832 (06/2017)

CHUBB'

**Chubb Group of Insurance Companies**
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*[SM]
*Workplace Violence Expense Coverage Part*

**WPV DECLARATIONS**

**FEDERAL INSURANCE COMPANY**
A stock insurance company, incorporated under the laws of
Indiana, herein called the Company

Capital Center, 251 North Illinois, Suite 1100
Indianapolis, IN  46204-1927

| | | |
|---|---|---|
| **Item 1.** | **Parent Organization:** | THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY |
| **Item 2.** | **Limit of Liability for this Coverage Part**: | $1,000,000.00 |
| **Item 3.** | **Retention:** | $0.00 |

14-02-17279D (11/2010)                    1 of 1

**C H U B B'**

Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0<sup>SM</sup>*
*Workplace Violence Expense*
*Coverage Part*

In consideration of payment of the premium and subject to the Declarations, General Terms and Conditions, and the limitations, conditions, provisions and other terms of this Coverage Part, the Company and the Insureds agree as follows:

I.  **INSURING CLAUSES**

    **Insuring Clause (A): Expense Coverage**

    (A)    The Company shall reimburse the **Parent Organization** for:

        (1)    **Workplace Violence Expenses** incurred by an **Organization** resulting from **Workplace Violence**; or

        (2)    **Stalking Threat Expenses** incurred by an **Organization** resulting from a **Stalking Threat**.

    **Insuring Clause (B): Business Income Coverage**

    (B)    The Company shall reimburse the **Parent Organization** for the actual lost **Business Income** incurred by an **Organization** due to:

        (1)    the actual suspension of **Operations** during the **Period of Restoration**; or

        (2)    an order by a civil authority prohibiting access to the **Premises**, in whole or in part,

        resulting from **Workplace Violence**.

    **Insuring Clause (C): Loss of Life Coverage**

    (C)    The Company shall pay a **Benefit Amount** for **Loss of Life** of an **Employee** resulting from **Workplace Violence**.

II.  **DEFINITIONS**

    For purposes of this Coverage Part:

    **Benefit Amount** means the amount of fifty thousand dollars ($50,000), which the Company shall pay as a result of **Loss of Life** of an **Employee**.

    **Business Income** means:

    (A)    the sum of:

        (1)    net profit before income taxes that would have been earned had no **Workplace Violence** occurred;

        (2)    the actual cost of continuing, on a curtailed basis, activities which are necessary for an **Organization** to resume operations with substantially the same quality of service which existed immediately preceding the **Workplace Violence**; and

        (3)    reasonable expenses which would not have been incurred except for such **Workplace Violence** and which were incurred by the **Organization** for the sole purpose of reducing loss described in Paragraph (A)(1) and Paragraph (A)(2) of this definition, not to exceed the amount of actual reduction of such loss;

    (B)    less the sum of:

        (1)    all recoveries, insurance, suretyship and other indemnity which would cover loss described in Subsection (A) of this definition in the absence of this coverage; and

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 137 of 143



Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Workplace Violence Expense*
*Coverage Part*

(2)    the amount by which the **Organization** fails to reduce loss described in Subsection (A) of this definition through any reasonable measures.

**Employee** means any natural person in the regular service of an **Organization** in the ordinary course of such **Organization's** business, whom such **Organization** governs and directs in the performance of such service, including any **Executive**, a part-time, seasonal, leased and temporary employee, intern or volunteer. **Employee** shall not include any independent contractor.

**Executive** means any natural person specified below:

(A)    a duly elected or appointed director, officer, trustee, in-house general counsel or duly constituted committee member of any **Organization** incorporated in the United States of America;

(B)    a duly elected or appointed: (1) manager or member of the Board of Managers or equivalent position; (2) duly constituted committee member; (3) in-house general counsel; or (4) trustee, of any **Organization** formed as a limited liability company in the United States of America; or

(C)    a holder of an equivalent position to those described in Subsections (A) or (B) above in any **Organization** incorporated, formed or organized anywhere in the world.

**Guest** means any natural person visiting the **Premises** for a lawful purpose.

**Insured** means any **Organization** and any **Insured Person**.

**Insured Person** means:

(A)    any **Employee**; or

(B)    any customer or **Guest** of an **Organization** on the **Premises**.

**Loss of Life** means death, including clinical death, determined by a medical examiner or similar local governing medical authority.

**Operations** means business activities of an **Organization** at the **Premises** prior to the **Workplace Violence**.

**Period of Restoration** means the period of time which begins twenty-four (24) hours following the actual suspension of **Operations** as described in Insuring Clause (B), Business Income Coverage, and ends on the earlier of:

(A)    the date **Operations** are restored by an **Organization**, with due diligence and dispatch, to the level that existed prior to the **Workplace Violence**;

(B)    ninety (90) days after such suspension of **Operations**; or

(C)    thirty (30) days after a civil authority denies an **Insured** access to the **Premises**,

provided that termination of this Coverage Part shall not reduce the **Period of Restoration**.

**Premises** means buildings, facilities or properties occupied by an **Organization** in conducting its business.

**Relatives** means spouse, domestic partner, siblings, spouse's siblings, ancestors, spouse's ancestors, lineal descendants or lineal descendants' spouses. Lineal descendants include adopted children, foster children and stepchildren. Ancestors include adoptive parents and stepparents.

**Salary** means compensation an **Organization** pays an **Employee**, including but not limited to bonus, commission, incentive payments and the cost of health, welfare and pension benefits.

**Stalking Threat** means conduct, other than **Workplace Violence**, which demonstrates intent to harm an **Employee** or an **Organization**.

**Stalking Threat Expenses** means reasonable fees and expenses for, or cost of:

(A)    an independent threat management consultant to assess and help diffuse the **Stalking Threat**;

(B)    independent security guard services for up to ninety (90) days; and

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 138 of 143

**CHUBB**
Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0<sup>SM</sup>*
*Workplace Violence Expense*
*Coverage Part*

(C)    other reasonable expenses incurred by an **Organization**, subject to the Company's prior written approval.

**Workplace Violence** means any intentional and unlawful:

(A)    act of potentially deadly force involving the use of a lethal weapon; or

(B)    threat of deadly force involving the display of a lethal weapon,

which occurs on or in the **Premises** and which did or could result in bodily injury or death to an **Insured Person**.

**Workplace Violence Expenses** means reasonable fees and expenses for, or cost of:

(A)    an independent crisis management consultant for ninety (90) days following the date the **Workplace Violence** occurs;

(B)    an independent public relations consultant for ninety (90) days following the date the **Workplace Violence** occurs;

(C)    independent crisis mental health specialists for ten (10) days following the date the **Workplace Violence** occurs;

(D)    independent security guard services for up to ninety (90) days;

(E)    an independent forensic analyst;

(F)    the **Salary** which an **Organization** continues to pay an **Employee** who has been a victim of **Workplace Violence**; coverage shall apply to the **Salary** in effect at the time of such **Workplace Violence** and will end ninety (90) days following the date such **Workplace Violence** occurs;

(G)    the **Salary** or wages which an **Organization** pays a newly hired **Employee** to conduct the duties of an **Employee** who has been a victim of **Workplace Violence**; coverage shall apply to such **Salary** in effect at the time of such **Workplace Violence** and will end ninety (90) days following the date such **Workplace Violence** occurs;

(H)    a reward paid by an **Organization** to a natural person who provides information leading to the arrest and conviction of the person(s) responsible for the **Workplace Violence**;

(I)    reasonable medical, mental health, dental and cosmetic expenses, including the cost of plastic surgery, for an **Insured Person** who is a victim of **Workplace Violence**;

(J)    reasonable expenses of rest and rehabilitation of an **Insured Person** and the **Insured Person's Relatives**, including meals and recreation, for up to thirty (30) days, when such expenses are incurred within twelve (12) months following the date the **Workplace Violence** occurs; and

(K)    other reasonable expenses incurred by an **Organization**, subject to the Company's prior written approval.

---

**III.**    **EXCLUSIONS**

No coverage will be available for:

(A)    <u>Off Premises</u>
**Workplace Violence** which occurs at any location other than the **Premises**;

(B)    <u>War</u>
loss arising from declared or undeclared war, civil war, insurrection, riot, civil commotion, rebellion or revolution, military, naval or usurped power, governmental intervention, expropriation or nationalization;

(C)    <u>Legal Costs</u>
legal costs, judgments and settlements incurred as the result of any claim, suit or judicial action brought against an **Organization** in connection with **Workplace Violence** or **Stalking Threat**;

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 139 of 143



Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0<sup>SM</sup>*
*Workplace Violence Expense*
*Coverage Part*

(D)   Robbery
      loss resulting from the use or threat of force or violence occurring on the **Premises** for the purpose of demanding money, securities or property; or

(E)   Notice
      loss unless the **Workplace Violence** or **Stalking Threat** occurs or is directly or indirectly communicated to any **Insured** prior to the:

      (1)   termination of this Coverage Part as to such **Insured** and is discovered and communicated in writing to the Company within sixty (60) days following the effective date of such termination;

      (2)   termination of any Insuring Clause or termination of any particular coverage offered under any Insuring Clause and is discovered and communicated in writing to the Company within sixty (60) days following the effective date of such termination;

      (3)   termination of this Coverage Part in its entirety and is discovered and communicated in writing to the Company within sixty (60) days following the effective date of such termination, if this Coverage Part is not renewed with the Company; or

      (4)   termination of this Coverage Part in its entirety and is discovered and communicated in writing to the Company prior to such termination, if this Coverage Part is renewed with the Company.

---

**IV.   PROOF OF LOSS AND LEGAL PROCEEDINGS**

(A)   As a condition precedent to coverage hereunder:

      (1)   a loss must be sustained or communicated to an **Insured**; and

      (2)   the **Parent Organization** must furnish a proof of loss with full particulars to the Company within six (6) months after such loss is sustained or communicated to an **Insured**.

(B)   No **Insured** shall institute legal proceedings against the Company after the expiration of a period of two (2) years immediately following the time such loss was sustained.

---

**V.   LIMITS OF LIABILITY**

(A)   The Company's maximum liability for each loss shall not exceed the Limit of Liability set forth in Item 2 of the WPV Declarations, regardless of the number of **Insureds** sustaining the loss.

(B)   The payment of loss under this Coverage Part will not reduce the liability of the Company for other losses, provided that the Company's maximum liability for each loss shall not exceed the Limit of Liability set forth in Item 2 of the WPV Declarations.

(C)   All loss resulting from a single act or series of related acts committed by a person or group in which the same **Insured** is concerned or implicated, whether loss covered under Insuring Clauses (A), Expense Coverage, (B), Business Income Coverage, or (C), Loss of Life Coverage, will be treated as a single loss.

(D)   The maximum liability of the Company for each **Employee's Loss of Life** will be the **Benefit Amount**, which amount is part of, and not in addition to, the Limit of Liability set forth in Item 2 of the WPV Declarations.  If more than one **Employee** suffers a covered **Loss of Life** from a single act or a series of related acts of **Workplace Violence**, the Company's maximum liability for all **Benefit Amount(s)** shall be the Limit of Liability set forth in Item 2 of the WPV Declarations, provided that if such total **Benefit Amount(s)** exceed the available Limit of Liability of this Coverage Part, such available Limit of Liability shall be divided proportionately among such **Employees'** beneficiaries.

(E)   The Company's maximum liability for **Business Income** covered from a single act of **Workplace Violence** or series of related acts of **Workplace Violence** shall be twenty five percent (25%) of the Limit of Liability set forth in Item 2 of the WPV Declarations up to a maximum of $1,000,000, which amount is part of, and not in addition to, the Limit of Liability set forth in Item 2 of the WPV Declarations.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 140 of 143



Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Workplace Violence Expense*
*Coverage Part*

(F) The Company's maximum aggregate liability for all rest and rehabilitation **Workplace Violence Expenses** covered from a single act of **Workplace Violence** or series of related acts of **Workplace Violence** ($50,000), which amount is part of, and not in addition to, the Limit of Liability set forth in Item 2 of the WPV Declarations.

---

## VI. LIABILITY FOR PRIOR LOSSES

(A) Coverage shall be available for loss as a result of **Workplace Violence** or **Stalking Threat** which occurred or was communicated, prior to the inception date of this Policy, prior to the effective date of coverage for any additional **Insureds** or prior to the effective date of any coverage added by endorsement, if:

  (1) an **Organization** or some predecessor in interest of such **Organization** carried a prior policy, which at the time such **Workplace Violence** or **Stalking Threat** occurred or was communicated, afforded some or all of the coverage of an Insuring Clause under this Coverage Part applicable to such prior loss;

  (2) such coverage continued without interruption from the time such loss was sustained until the inception date or effective date(s) as described above; and

  (3) such loss was first discovered by an **Insured** after the time allowed for discovery under the last such policy.

(B) If such prior policy carried by an **Organization** or predecessor in interest of such **Organization** was issued by the Company or any subsidiary or affiliate of The Chubb Corporation, such prior policy shall terminate as of the inception of this Policy and such prior policy shall not cover any loss not discovered and noticed to the Company prior to the inception of this Policy.

(C) The **Insured** will neither be entitled to a separate recovery under each policy in force at the time such **Workplace Violence** or **Stalking Threat** occurred or was communicated, sustained or discovered, nor will the **Insured** be entitled to recover the sum of the limits of liability of any such policies. The Company's maximum liability will not exceed the lesser of the limit of liability of the policy in force at the time such **Workplace Violence** or **Stalking Threat** occurred or was communicated or the Limit of Liability set forth in Item 2 of the WPV Declarations.

---

## VII. BENEFICIARY

The **Benefit Amount** for **Loss of Life** shall be paid to an **Employee's** designated beneficiary. If such **Employee** has not designated a beneficiary, or if the designated beneficiary is not alive, the Company will pay the **Benefit Amount** in the following order:

(A) to the spouse or domestic partner;

(B) in equal shares to the surviving children;

(C) in equal shares to the surviving parents;

(D) in equal shares to the surviving brothers and sisters; or

(E) to the estate,

of the **Employee**.

---

Case 1:22-cv-00553-CCE-JEP Document 1-2 Filed 07/15/22 Page 141 of 143

**CHUBB®** Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*<sup>SM</sup>
*Workplace Violence Expense*
*Coverage Part*

**VIII. NON-ACCUMULATION OF LIABILITY**

(A) When there is more than one **Insured**, the maximum limit of liability of the Company for loss sustained by one or all **Insureds** shall not exceed the amount for which the Company would be liable if all losses were sustained by any one **Insured**.

(B) Regardless of the number of years this coverage remains in effect and the total premium amounts due or paid, the limit of liability of the Company with respect to any loss shall not be cumulative from **Policy Year** to **Policy Year** or from **Policy Period** to **Policy Period**.

**IX. LOSS SUSTAINED**

All loss shall be deemed to have been sustained under:

(A) Insuring Clause (A), Expense Coverage, at the time of the payment of incurred **Workplace Violence Expenses** or **Stalking Threat Expenses** by the **Organization**;

(B) Insuring Clause (B), Business Income Coverage, upon the expiration of the **Period of Restoration**; or

(C) Insuring Clause (C), Loss of Life Coverage, at the time the **Loss of Life** occurs.

**X. OTHER INSURANCE**

If any loss under this Coverage Part is insured under any other valid and collectible insurance policy (other than a policy that is issued specifically as excess of the insurance afforded by this Coverage Part), this Coverage Part shall be excess of and shall not contribute with such other insurance, regardless of whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

**XI. FOREIGN CURRENCY**

The Company shall pay the United States of America dollar value of foreign currency based on the rate of exchange published in *The Wall Street Journal* on the day loss involving foreign currency is discovered.

Case 1:22-cv-00553-CCE-JEP   Document 1-2   Filed 07/15/22   Page 142 of 143

Coverage Section:  ForeFront Portfolio 3.0 Workplace Violence Expense Coverage Part Federal

Effective date of
this endorsement/rider: March 10, 2019          Federal Insurance Company

                                       Endorsement/Rider No. 1

                                       To be attached to and
form a part of Policy No. 8234-7252

Issued to:  THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY

RECOVERIES SECTION ADDED ENDORSEMENT

In consideration of the premium charged, it is agreed that this Coverage Part is amended to include the following section:

**RECOVERIES**

(A)    Recoveries for any loss covered under this Coverage Part, whether effected by the Company or by an **Insured**, less the cost of recovery, shall be distributed as follows:

      (1)    first, to an **Insured** for the amount of such loss, otherwise covered, in excess of the applicable Limits of Liability;

      (2)    second, to the Company for the amount of such loss paid to an **Insured** as covered loss;

      (3)    third, to an **Insured** for the Retention applicable to such loss;

      (4)    fourth, to an **Insured** for the amount of such loss not covered under this coverage section.

(B)    Recovery from reinsurance or indemnity of the Company shall not be deemed a recovery hereunder.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

14-02-18107 (05/2011)                  Page 1